Form G-3

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION** ▼ **DIVISION**

In re:  Midwest Leasing of Illinois          )     Chapter  7
                                             )
                                             )     No. 23-B-04510
                                             )
          Debtor(s)                          )     Judge  Janet S. Baer

<u>**NOTICE OF MOTION**</u>

TO:  See attached list

      PLEASE TAKE NOTICE that on June 14, 2023_____, at __10:00__ a.m.__ , I will appear before the Honorable _Janet S. Baer_____ , or any judge sitting in that judge's place, **either** in courtroom __615__ of the Everett McKinley Dirksen United States Courthouse___ , _219 S. Dearborn Street, Chicago, IL 60604___ **or** electronically as described below, and present the motion of _Creditor Presence Central and Suburban Hospitals Network_____ [to/for] _ Dismiss Case for Cause Pursuant to 11 U.S.C.  § 707(a)___ , a copy of which is attached.

      **All parties in interest, including the movant, may appear for the presentment of the motion either in person or electronically using Zoom for Government (audio only).**

      **To appear by Zoom using the internet**, go to this link:  https://www.zoomgov.com/. Then enter the meeting ID and passcode.

      **To appear by Zoom using a telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666.  Then enter the meeting ID and passcode.

      **Meeting ID and passcode.**  The meeting ID for this hearing is  __160 731 2971__ , and the passcode is  ___587656___ .  The meeting ID and passcode can also be found on the judge's page on the court's web site.

      **If you object to this motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date.  If no Notice of Objection is timely filed, the court may grant the motion in advance without calling it.

                By: _Christopher J. Letkewicz_____

                Benesch, Friedlander, Coplan & Aronoff LLP
                71 South Wacker Drive, Suite 1600
                Chicago, Illinois 60606-4637
                312.212.4949
                Attorney for Creditor Presence Central and
                Suburban Hospitals Network

## <u>CERTIFICATE OF SERVICE</u>

I, <u>Christopher J. Letkewicz</u>, certify [if an attorney]/declare under penalty of perjury under the laws of the United States of America [if a non-attorney] that I served a copy of this notice and the attached motion on each entity shown on the attached list at the address shown and by the method indicated on the list on <u>May 23, 2023</u>, at _____.

<u>Christopher J. Letkewicz</u>
[Signature]

-2-

**Notice sent by overnight Federal Express:**

Joliet Oncology-Hematology Associates, Ltd.
c/o Barnes & Thornburg, LLC
Attn: Denise Lazar & Erin Pauley
1 N. Wacker Drive, Suite 1400
Chicago, IL 60606

**Notice sent by ECF associated with the case:**

Lester A. Ottenheimer, counsel for Debtor

Deborah Kanner Ebner, Chapter 7 Trustee

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | No. 23-B-04510 |
| Midwest Leasing of Illinois, LLC, | ) | Chapter 7 |
| | ) | Judge Janet S. Baer |
| Debtor. | ) | |
| | ) | |

## MOTION TO DISMISS CASE FOR CAUSE
## PURSUANT TO 11 U.S.C. § 707(a)

Creditor Presence Central and Suburban Hospitals Network f/k/a Presence Hospitals PRV

f/k/a Provena Hospitals ("Presence") files this Motion to Dismiss Case for Cause Pursuant to 11

U.S.C. § 707(a). In support of the Motion, Presence states as follows:

### INTRODUCTION

1.     Midwest's bankruptcy petition is its latest gambit to frustrate Presence's ability to

recover millions of dollars in errant payments that Midwest refuses to return and that were

subsequently funneled to alter egos including its controlling member, Dr. Sarode Pundaleeka.

Midwest's petition serves no legitimate bankruptcy purpose and must be dismissed.

2.     Originally, Midwest owned medical equipment that it leased to a medical practice

owned in part by Dr. Pundaleeka—Joliet Oncology Hematology Associates, Ltd. ("JOHA").

JOHA subsequently transferred the lease to Presence. As part of that transfer, Presence had the

right to exercise a purchase option that would allow it to purchase the equipment at the end of

2014 for $1. Presence exercised that purchase option in December 2014, and at that point in

time, Midwest owned no medical equipment and did no other business. Despite that, Presence

erroneously continued to make payments to Midwest. Presence discovered the error in 2019 and

demanded the return of the errant payments, which totaled approximately $2.3 million. Midwest

refused to return the money, and in December 2019, Presence filed suit in Illinois state court

against Midwest. Presence, however, subsequently discovered in early 2021, that Midwest had less than $65 in its bank account due to Midwest's practice to transfer 96% of the Presence payments to JOHA, and then after Dr. Pundaleeka left JOHA, a practice where Dr. Pundaleeka withdrew large sums of money, sometimes in the amount of hundreds of thousands of dollars, for his own personal use. Consequently, Presence added JOHA and Dr. Pundaleeka as defendants.

3.       In early 2022, two years into the litigation, Midwest moved to its next plan to frustrate Presence's prosecution of its claim—moving to compel the case into arbitration pursuant to an arbitration agreement between JOHA and Presence (but not Midwest). The court granted the motion and the case proceeded in arbitration. At the first arbitration hearing, Midwest (and Dr. Pundaleeka) stated that it was going to "ride the coattails" of the other defendant— JOHA. That plan, however, was thwarted when JOHA settled with Presence. Midwest then turned to its next plan to hinder Presence's efforts to pursue its claim—refusing to participate in the arbitration by disobeying multiple orders to pay the required arbitrator fees. This effort failed when the arbitrator entered a default judgment against Midwest (and Dr. Pundaleeka) as a sanction for its repeated non-compliance and set the matter for a damages prove-up hearing on April 5, 2023. Midwest then turned to its current scheme to frustrate Presence's efforts to prosecute its claims—filing bankruptcy one day before the April 5 damages prove-up hearing.

4.       This years-long pattern of conduct is the antithesis of the honest yet unfortunate debtor that the bankruptcy laws are designed to help. Midwest has been out of business and a shell for years. It never filed for bankruptcy during that time frame. Instead, Midwest waited until it was on the brink of an arbitrator entering a multi-million dollar damages award against it to file bankruptcy.[1] Such clear litigation gamesmanship is consistently seen as evidence of a bad

---

[1] As explained in greater detail below, the arbitrator subsequently entered an arbitration award of approximately $1.7 million against Midwest and Dr. Pundaleeka. (*See infra* ¶ 21.)

faith bankruptcy filing requiring the case to be dismissed for cause. *See, e.g.*, *In re Am. Telecom Corp.*, 304 B.R. 867, 872–75 (Bankr. N.D. Ill. 2004). Cause further exists to dismiss Midwest's bankruptcy case because Midwest has no assets, and the case otherwise serves no legitimate bankruptcy purpose. All of the assets that Midwest identifies are worthless, and even if they had value, it would simply be a pot of money that could be used to pay Presence. This is not a case where multiple creditors are racing to capture Midwest's assets. This is, in essence, a one creditor case. The only other creditor it identifies is JOHA concerning a counterclaim it lost to Midwest at trial. JOHA has not participated in this bankruptcy whatsoever. Finally, given the advanced stage of Presence's case against Midwest, bankruptcy will only delay, not expedite, its resolution. Put simply, no basis exists for Midwest's bankruptcy and it must be dismissed.

## FACTUAL BACKGROUND

5.     To further explain why Midwest's bankruptcy case must be dismissed, this section provides an overview of Presence's and Midwest's relationship and the nearly five years of litigation that has involved multiple parties and jurisdictions.

### I.     The Parties and the Lease Between Presence and Midwest.

6.     Midwest was created in 2006 for the purpose of owning and leasing Tomo Therapy equipment, which is used to treat cancer patients. (Ex. S at 17:5–6, 17:19–20.) Midwest is made up of four members: Dr. Pundaleeka (40% owner and controlling member), Dr. Kulumani Sivarajan (20% owner), Dr. Sanjiv Modi (20% owner) and Dr. Sauod Loutfi (20% owner). At the time of Midwest's creation, these Midwest members were also shareholders in JOHA, an oncology medical practice, with Dr. Pundaleeka serving as JOHA's President. In November 2006, Midwest entered into a lease (the "Lease"), with JOHA for the Tomo Therapy equipment. (Ex. A.) Dr. Pundaleeka signed the Lease on behalf of both Midwest and JOHA. (*Id.*)

7.     In December 2011, JOHA and Provena Mercy Medical Center, an operating unit

3

of Provena Hospitals, the predecessor to Presence, entered into an Asset Lease and Transfer

Agreement in which Presence agreed, among other things, to assume the Lease. (*See* Ex. B at §§

1.1(c), 1.3.) Contemporaneously with the execution of that agreement, Midwest and JOHA

entered into the Consent to Assignment and Assumption and First Amendment to the Lease, in

which Midwest allowed JOHA to assign the Lease to Presence and amended the Lease's terms,

including, allowing Presence to terminate the Lease and purchase the Tomo Therapy equipment

at the end of the current term, December 31, 2014, for $1. (Ex. C at ¶ 2(h).)

**II.      Presence Terminates the Lease, But Mistakenly Continues to Make Payments to
         Midwest.**

8.      In November 2014, Presence sent a letter to Dr. Pundaleeka notifying Midwest

and him of Presence's intention to terminate the Lease. (Ex. D.) Presence also sent this letter via

email to Dr. Sivarajan, who then forwarded the letter to Dr. Pundaleeka. (Ex. E.) In December

2014, Presence paid the $1 purchase option under the Lease, which was transmitted

electronically to JOHA's bank account. (Ex. F at PSCHN001562.) Despite Presence exercising

the purchase option, no further contractual relationship existing between Presence and Midwest,

and Midwest not otherwise providing Presence any goods or services, Presence made multiple

erroneous payments to Midwest.

**III.     Dr. Pundaleeka Leaves JOHA and Files Multiple Lawsuits Against JOHA.**

9.      During the time that Presence was making these erroneous payments, and

specifically, in 2017, Dr. Pundaleeka got into a dispute with the other JOHA shareholders that

resulted in Dr. Pundaleeka filing suit against JOHA. (Ex. G at ¶ 78.) Later in 2017, Dr.

Pundaleeka and JOHA reached a settlement agreement in which JOHA paid money to Dr.

Pundaleeka, and Dr. Pundaleeka no longer had any ownership interest in JOHA. (*Id.* at ¶ 79.)

10.     In May 2018, Dr. Pundaleeka filed a lawsuit on behalf of Midwest and another

LLC controlled by him against JOHA and JOHA administrator, Paramjit Sidhu, in the Circuit

Court of the Twelfth Judicial Circuit, Will County, Illinois. In the lawsuit, Midwest alleged that Mr. Sidhu "unilaterally made payments from … Midwest to JOHA" in excess of $2,500,000.00 "without the knowledge or consent" of Midwest. (Ex. H at ¶¶ 19, 45, 50.) JOHA later filed a counterclaim against Midwest, alleging that Midwest authorized the payments, and as a result, to the extent JOHA was liable to Midwest "or to anyone as a result of the allegations and claims set forth by Midwest," Midwest must indemnify JOHA. (Ex. I at Counterclaim ¶¶ 14–25.)

## IV.    Presence Discovers the Errant Payments, Midwest Refuses to Return the Payments, and Presence Files a Lawsuit Against Midwest.

11.    As that litigation between Midwest, JOHA and Mr. Sidhu was ongoing, and specifically in September 2019, Presence discovered it had made multiple erroneous payments to Midwest totaling $2,343,042.00. (Ex. J at ¶¶ 9–11.) Upon discovering the erroneous payments, Presence contacted Midwest regarding the error and asked for the return of the erroneous payments. (*Id.* at ¶ 12.) Midwest refused to return the payments, and as a result, in December 2019, Presence filed a lawsuit against Midwest in Circuit Court of the Twelfth Judicial Circuit, Will County, Illinois, seeking the return of the errant payments. (*See generally* Ex. K.)

12.    In March 2020, Midwest filed a motion to dismiss, which the court denied in November 2020. After the denial of the motion, Presence and Midwest commenced discovery. Through discovery, Presence learned that Midwest was but an empty shell with less than $65 in its bank account as a result of, among other things, (a) a monthly practice from 2012 until May 2018 of writing checks from Midwest to JOHA in the amount of 96% of Presence's payments to Midwest (Midwest's only source of revenue), and (b) Dr. Pundaleeka withdrawing large sums of money from Midwest's bank account sometimes in excess of $300,000 after Midwest filed suit against JOHA. (*See, e.g.*, Ex. L at ¶ 2.) Because of that discovery, Presence filed an amended complaint, adding JOHA (as the alter ego of Midwest) and Dr. Pundaleeka (as the alter ego of

5

Midwest and for fraudulent transfers he received from Midwest) as defendants. (*See generally id.*) The alleged fraudulent transfers in the amended complaint (*see id.* ¶¶ 65–69, 78, 81–83, 99–109) are identical to the promissory notes identified as assets in Midwest's bankruptcy petition, which ostensibly were loans from Midwest to Dr. Pundaleeka. (*See* Dkt. 1 at 9–10.)

13.    Specifically, (a) Paragraph 65(a)–(b) of the amended complaint identified two transfers to Dr. Pundaleeka—one for $160,000 and one for $20,000–which equals the amount of the first promissory note set forth in Midwest's bankruptcy petition (Dkt. 1 at 9); (b) Paragraph 65(c) identified a transfer of $49,327 to Dr. Pundaleeka, which is equal to the second promissory note set forth in Midwest's bankruptcy petition (*id.* at 10); (c) Paragraph 65(d) identified a transfer of $16,432 to Dr. Pundaleeka, which is equal to the third promissory note set forth in Midwest's bankruptcy petition (*id.*); (d) Paragraph 66 identified a transfer of $16,432 to Dr. Pundaleeka, which is equal to the fourth promissory note set forth in Midwest's bankruptcy petition (*id.*); (e) Paragraph 78 identified an unrepaid transfer of $65,000 to Dr. Pundaleeka, which is equal to the fifth promissory note set forth in Midwest's bankruptcy petition (*id.*); (f) Paragraph 82 identified a transfer of $70,000 to Dr. Loutfi, which is equal to the sixth promissory note set forth in Midwest's bankruptcy petition (*id.*);[2] and (g) Paragraph 81 identified a transfer of $150,000 to Dr. Pundaleeka, which is equal to the "doubtful uncollectable amount" for the seventh promissory note set forth in Midwest's bankruptcy petition (*id.*).[3]

14.    JOHA, Midwest and Dr. Pundaleeka then filed multiple motions to dismiss while also participating in discovery. In a January 2022 Motion to Dismiss, Midwest argued for the first time that the court should compel arbitration pursuant to a Professional Services Agreement

---

[2] At the May 11, 2023 meeting of creditors, Dr. Pundaleeka admitted that Midwest's bankruptcy petition incorrectly identified himself as the borrower rather than Dr. Loutfi.

[3] Dr. Pundaleeka admitted at the meeting of creditors that $165,000 face amount of the promissory note was incorrect and the correct amount was $150,000.00.

between JOHA and Presence. (Ex. M at 6–13.) Neither Midwest nor Dr. Pundaleeka were a party

to that agreement. Despite that and Presence's opposition, on March 21, 2022, the court granted

Midwest's request and compelled arbitration. (Ex. N.)

## V.      An Illinois State Court Rejects Midwest's Claims and JOHA's Counterclaims.

15.      The next day, on March 22, the same court entered a 29-page order and final

judgment after a bench trial in the Midwest-JOHA/Sidhu litigation. The court rejected Midwest's

claims against JOHA (Mr. Sidhu was previously voluntarily dismissed). The court reasoned that

Dr. Pundaleeka "was aware of the payments being made from [Midwest] to JOHA and in fact, he

signed checks of the same to JOHA…. [T]he credible testimony from the emails and testimony

of Mr. Sidhu was that Dr. Pundaleeka in fact kept a very close eye on what was going on in all

his businesses and in the bank accounts…. No complaints were made by [Midwest] until Dr.

Pundaleeka filed these lawsuits and stopped payments in 2018. The payments were approved,

made by, and accepted by Dr. Pundaleeka or his delegated authority prior to that date." (Ex. O at

27–28; *see also id.* at 29.) The court also rejected JOHA's counterclaim against Midwest,

reasoning that the "issue is more appropriately addressed in the 19L1046 case [i.e., the Presence-

Midwest/JOHA/Dr. Pundaleeka case] and will not be addressed here." (*Id.* at 29.)

## VI.     The Arbitration Commences and Concludes With Arbitrator Entering a Default Judgment and Midwest Files Bankruptcy Day Before Damages Prove-Up Hearing.

16.      In June 2022, Presence commenced the arbitration and agreed to proceed through

the arbitration. (Ex. P.) The parties held their first status hearing on August 25, 2022. At this

hearing, counsel for Midwest informed the arbitrator that it planned on "riding the coattails of

JOHA." Unfortunately for Midwest, on December 31, 2022, Presence and JOHA entered into a

settlement agreement, and JOHA was dismissed with prejudice. (Exs. Q–R.)[4]

---

[4] The settlement amount has been redacted because it is confidential under the settlement agreement.

17.     On February 16, 2023, Dr. Pundaleeka was deposed in the arbitration. When asked about the alleged fraudulent transfers, (*see supra* ¶ 12), he testified that some of the transfers were made to "keep a minimum amount of money in the Midwest bank account," (Ex. S at 120:10–22, 122:19–123:6, 124:18–125:3), and other transfers were not loans, but rather distributions he paid to himself. (*Id.* at 132:7–133:1, 133:7–135:8.) Dr. Pundaleeka admitted, however, that no distributions were paid to other Midwest members, and he was unaware of any basis that allowed him to receive distributions before other members. (*Id.*)[5] He added: "[A]s a matter of routine, I don't leave any money in the bank accounts. It will be drawn either as a loan or a distribution, so there won't be any money left in the bank, period." (*Id.* at 141:19–142:6.)

18.     Before, contemporaneously, and after Dr. Pundaleeka's deposition, various issues arose regarding Midwest's (and Dr. Pundaleeka's) compliance with the arbitrator's orders. (*See* Ex. T at 5–8.) This culminated in Midwest's refusal to comply with the arbitrator's orders on November 14 and December 22, 2022, and February 15, 2023, to pay a $3,500 arbitrator fee deposit. (Ex. U at ¶¶ 3–7.) Midwest refused to do so despite the arbitrator telling it at "multiple telephonic hearings … of the additional deposit requirement and advised [Midwest and Dr. Pundaleeka] of the possibility of sanctions, including an order of default, being imposed against any party or parties that did not comply with the additional deposit requirement." (*Id.* at ¶ 6.)

19.     The arbitrator then entered an order requiring Midwest (and Dr. Pundaleeka) to submit a brief to explain why they should not be sanctioned for their non-compliance and allowing Presence the opportunity to file a response. (Ex. DD at ¶¶ 4–5.) After the parties filed their respective briefs, the arbitrator heard argument on March 13, 2023, and on the same date, entered "a default order against each of Midwest and Pundaleeka for each of their separate

---

[5] With respect to the $70,000 transfer to Dr. Loutfi, Dr. Pundaleeka admitted that it was not for any Midwest-specific purpose. (Ex. S at 147:6–21.)

failures, without good cause shown, to comply with the additional deposit requirements of Orders 3 [November 14, 2022 Order], 5 [December 22, 2022 Order] and 10 [February 15, 2023 Order]." (Ex. V at ¶ 11.) The arbitrator then set the case for a damages prove-up hearing on April 5, 2023, and ordered Presence to submit "any documents in support of its damages claims by … March 24," and allowed Midwest and Dr. Pundaleeka to "submit any documents in response" by March 31. (*Id.* at ¶ 12.) Presence submitted its documents in support of its damages claim on March 24. (*See generally* Ex. V.) Midwest (and Dr. Pundaleeka) did not submit any response.

20.    Unbeknownst to Presence, Midwest filed its bankruptcy petition on April 4, 2023. On April 5, the arbitrator held the damages prove-up hearing. Counsel for Midwest and Dr. Pundaleeka did not appear. (Ex. W at ¶ 5.) Prior to starting the hearing, the arbitrator emailed Midwest and Dr. Pundaleeka's counsel and asked if they would be appearing. (*Id.*) The arbitrator received no response and the hearing took place. (*Id.*) On April 7, the arbitrator provided the parties the Final Arbitration Award, awarding Presence $1,761,846.17 and holding Midwest and Dr. Pundaleeka jointly and severally liable. (Ex. X at ¶ 10.) On April 10, the arbitrator told the parties that "minor adjustments to the final order" needed to be made "based on the fact that Midwest/Pundaleeka did not submit the required additional deposit." (Ex. Y at 2.)

21.    On April 13, Presence received Midwest's bankruptcy petition in the mail, and informed the arbitrator of the petition the next day. (*Id.* at 1.) The arbitrator asked whether Dr. Pundaleeka had filed for bankruptcy as well, and Presence told him that Dr. Pundaleeka had not based on the available information. (*Id.*) On May 2, the arbitrator entered a revised Final Arbitration Award in the amount of $1,765,346.17 (an increase of $3,500) and again holding Midwest and Dr. Pundaleeka jointly and severally liable. (Ex. W at ¶ 10.)[6]

---

[6] Presence recognizes that the Court may conclude that the April 5, 2023 damages prove-up hearing and subsequent Final Award is a violation of the automatic stay and therefore, void.

## LEGAL STANDARDS

22.     Under 11 U.S.C. § 707(a), Chapter 7 of the Bankruptcy Code consistent with Chapters 11 and 13, allows for the dismissal of a bankruptcy for cause. *In re Am. Telecom*, 304 B.R. at 869. "Cause" includes "a lack of good faith in filing the bankruptcy petition" or "a failure to present a bankruptcy case implicating any of the policies underlying the chapter in which the debtor seeks protection." *Id.* Corporate Chapter 7 cases such as here "have very limited purposes. They do not implicate the fresh-start considerations underlying … other type[s] of bankruptcy case[s], including individual Chapter 7 cases…. The only policy implicated is the fair and orderly liquidation" of assets to creditors. *Id.* at 869–70. This is because typically, "[r]esort to the protection of bankruptcy laws is not proper when there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation." *Kelley v. Cypress Fin. Trading Co.*, 518 B.R. 373, 378 (N.D. Tex. 2014) (citation and internal quotations omitted). In evaluating whether cause exists, a "[c]ourt must look at the totality of the circumstances surrounding both objective and subjective considerations in each case to determine whether the Bankruptcy Code is being used properly and fairly." *In re Am. Telecom*, 304 B.R. at 869.

## ARGUMENT

23.     "Cause" exists to dismiss Midwest's bankruptcy petition for three reasons, any one of which standing alone would be sufficient for dismissal. First, Midwest filed this petition as an unfair litigation tactic to delay resolution of Presence's claim against Midwest (and its controlling member Dr. Pundaleeka). Second, Midwest has no assets to administer. Third, Midwest's bankruptcy petition does not otherwise serve any legitimate bankruptcy purpose.

**I.      Midwest Filed This Petition as a Mere Litigation Tactic to Delay Resolution of Presence's Claim Against It.**

24.     Midwest's bankruptcy petition should be dismissed, as an initial matter, because it is nothing more than another effort to thwart Presence from collecting on its claim against it and

Dr. Pundaleeka. One of the primary policy aims of bankruptcy is to "give the honest yet unfortunate debtor a fresh start-not the dishonest person a head start." *Piazza v. Nueterra Healthcare Physical Therapy, LLC*, 469 B.R. 388, 391 (S.D. Fla. 2012). As a result, bankruptcy courts consistently dismiss bankruptcy petitions where it concludes that the petition is merely a tool to delay collection of a judgment or an ongoing litigation. *See In re Am. Telecom*, 304 B.R. at 872 (collecting cases); *Piazza*, 469 B.R. at 393; *In re Original IFPC Shareholders, Inc.*, 317 B.R. 738, 751, 755 (Bankr. N.D. Ill. 2004) (dismissing petition where it was "essentially a litigation maneuver to improve [debtor's] chances of proceeding uninterrupted against contingent creditors … in the post-trial phases of the adjudicated trade-secret suit"); *In re Atlas Red-D Mix, Inc.*, 544 B.R. 648, 653–54 (Bankr. S.D. Ind. 2015) (same, where debtor had been out of business for two years and the "primary reason for filing the bankruptcy case was to thwart the [creditor's] collection of the Judgment and control the venue of the debtor's liquidation").

25.     *In re Am. Telecom* is particularly instructive. In *In re Am. Telecom*, creditor obtained a $173,000 judgment against debtor and then initiated an alter ego claim against two of the debtor's principals to collect the judgment. 304 B.R. at 868. The alter ego suit was set for trial and four days before the trial, debtor filed a Chapter 7 bankruptcy petition. *Id.* The court dismissed the case reasoning that the petition under the circumstances was simply "an unfair litigation tactic for delaying [creditor's] alter-ego claim … which was about to proceed to trial on the eve of this bankruptcy filing," and that "Chapter 7 of the Bankruptcy Code was never intended to serve merely as a litigation tool for two sole shareholders holding onto a corporate shell that has not conducted any business activity for two years." *Id.* at 872–75. The court further concluded that debtor's petition was an unfair litigation tactic because debtor failed to file its petition in the previous two years when it stopped all business activities. *Id.* at 874.

26.     Similar to the debtor in *In re Am. Telecom Corp.*, Midwest filed its bankruptcy

petition shortly before a major litigation event—there a trial, and here, a damages prove-up

hearing after the arbitrator entered a default judgment. Further, similar to the debtor in *In re Am.*

*Telecom*, Midwest has been defunct for years, and in fact, more than twice as long as the debtor

in *In re Am. Telecom*. Dr. Pundaleeka testified at the meeting of the creditors that Midwest has

not been in business since 2018, ***more than five years ago***. Midwest has not and cannot provide

any credible explanation for such a delay in filing bankruptcy. "There was no sudden financial

disaster … [and] the petition was timed perfectly to stay the Creditor's [Presence] collection

efforts," one day before the damages prove-up hearing. *Cf. Piazza*, 469 B.R. at 393 (dismissing

Chapter 7 petition where it was filed "one day before a state court deadline to produce

documents relating to whether the Debtor could exempt income as a head of household from his

liability on the final judgment"). The Bankruptcy Code is not intended for such clear litigation

gamesmanship, and Midwest's petition was clearly brought in bad faith and must be dismissed.

## II.     Midwest Has No Assets for Ratable Distribution.

27.     Midwest's petition should further be dismissed because Midwest has no assets to

administer. Midwest admits in its petition that it has $0 in bank accounts and lists no other

tangible assets such as equipment. *See* Dkt. 1 at 8–9, 12. Midwest instead lists a series of unpaid

promissory notes (all of which were fraudulent transfers (*see supra* ¶¶ 12, 19)), but it is highly

questionable whether any of those promissory notes will be repaid. Indeed, with respect to the

promissory notes with Dr. Pundaleeka, Dr. Pundaleeka previously testified in the Presence

litigation that repayment is contingent on Midwest winning its appeal in its lawsuit against

JOHA, and even if it is successful, the promissory note will simply reduce the amount of money

that would come to him personally rather than he repaying the promissory notes:

> Q.· And when it says [the promissory note]:· Pending outcome of the current
> lawsuit, under what scenario would you need to repay this $180,000?

A. If we were to collect the money that was due to Midwest from JOHA, this would be only part of the payment of my 40 percent from $2.6 million that was supposed to be due from JOHA to Midwest Leasing. Midwest Leasing only had about 400-500,000. So 300,000 if we collect the total amount, 40 percent of that will be $1.20 million for me. So I don't have to pay this, except for the interest that I have drawn from the date that I got the money to the point of settlement of the lawsuit when it happens.

(Ex. S at 142:7–19.) With respect to the promissory note between Midwest and Dr. Loutfi, Dr. Loutfi has not repaid any of it, has not indicated when he will start repaying it, and in fact, Dr. Pundaleeka has not even asked Dr. Loutfi when he will start repaying it. (*Id.* at 147:19–148:5.)

28.     Next, Midwest lists its lawsuit against JOHA, Mr. Sidhu and Dr. Sivarajan. With respect to the lawsuit against JOHA, that claim is worthless because Midwest lost that lawsuit in the trial court and it is highly questionable that Midwest will be able to obtain a reversal of that decision. (*See supra* ¶ 15.) Turning to the lawsuits against Mr. Sidhu and Dr. Sivarajan, these were third-party claims that Midwest asserted in the Presence-Midwest litigation. (Ex. Z, Third-Party Compl.) The trial court stayed these third-party claims in light of the Midwest-JOHA litigation. (Ex. AA.) Midwest has subsequently abandoned pursuing those third-party claims. Specifically, after initially filing a motion seeking to lift the stay, Midwest abandoned the motion, and the Will County circuit court struck the motion. (Exs. BB–CC.)[7]

29.     Even if these promissory notes and lawsuits were not worthless, they would simply be a pot of money that would go to Presence. The only other creditor listed in Midwest's petition is a counterclaim that JOHA asserted against Midwest in the Midwest-JOHA litigation. Dkt. 1 at 14. JOHA lost this counterclaim at trial. (*See supra* ¶ 15.) While JOHA has appealed, Midwest has opposed the appeal. Even if JOHA prevails, it would only reduce any liability it has to Midwest; rather than requiring Midwest to pay JOHA a set amount of money. (Ex. I,

---

[7] Midwest also lists a "breach of lease" claim against Presence, but Dr. Pundaleeka admitted at the meeting of the creditors that Midwest has not filed any lawsuit against Presence regarding such a claim.

Counterclaim at ¶¶ 24–25.)[8] Where a debtor's only "assets" are claims that would be a source of funds for one creditor, courts treat the debtor as one without assets and dismiss the case. *See In re Semco Mfg. Co.*, 649 B.R. 155, 170 (Bankr. S.D. Tex. 2023) (dismissing Chapter 7 case and concluding debtor had no assets to administer where claimed assets were two lawsuits that would simply be payable to one creditor).

### III.   Midwest's Bankruptcy Petition Serves No Legitimate Bankruptcy Purpose.

30.     A third independent reason why Midwest's bankruptcy case should be dismissed is because no legitimate bankruptcy purpose will be served here. This is not a situation where multiple creditors are racing to seize Midwest assets. *See In re Lots by Murphy, Inc.*, 430 B.R. 431, 436 (Bankr. S.D. Tex. 2010) (stating that one purpose of bankruptcy is to "maximize the repayment of an insolvent debtor's debts by overcoming the collective action (or musical-chairs) problem that arises when each of the debtor's unsecured creditors races to seize the debtor's assets, when a more orderly liquidation … would yield a larger total recovery"). This is, in essence, a one creditor case. The other creditor, JOHA, has a claim currently worth zero, at best has a claim that will simply reduce any liability it might owe to Midwest (*see supra* ¶ 29), and has not participated in this bankruptcy. JOHA has not filed any appearance and did not attend the meeting of the creditors. Only one creditor appeared at the meeting—Presence. Bankruptcy courts consistently dismiss Chapter 7 cases that are one creditor cases. *See, e.g.*, *In re Atlas Red-D Mix*, 544 B.R. at 654; *In re Lots by Murphy, Inc.*, 430 B.R. at 436–37; *Kelley*, 518 B.R. at 378.

31.     In addition, the bankruptcy will only delay rather than expedite the litigations at the heart of Midwest's bankruptcy petition. With respect to Presence's claim, the arbitrator has already entered a judgment and award adverse to Midwest (and Dr. Pundaleeka). All that is left

---

[8] Specifically, JOHA alleged that if it is found liable to Midwest, the amount of liability should be reduced through Midwest indemnifying JOHA.

to do is for Presence to file a motion to confirm the arbitration award and then the parties to proceed with any appeal filed. With respect to Midwest's claim against JOHA and JOHA's claim against Midwest, those could be resolved literally any day now. The respective appeals have been fully briefed and the appellate court has indicated that it will not hear oral argument. Midwest has otherwise abandoned or never pursued the other claims set forth in its bankruptcy petition. (*See supra* ¶ 28 & n.4.) Given how far along the above described active litigations are, requiring the parties to adjudicate them through the bankruptcy court rather than the state courts will only delay their final resolution. Accordingly, allowing Midwest's Chapter 7 bankruptcy to proceed will serve no substantial purpose and will only harm Presence. *See In re Original IFPC Shareholders*, 317 B.R. at 754–55 (rejecting conversion to Chapter 7 and dismissing Chapter 11 case where debtor's primary asset was a years-long pending trade secret claim because "[t]his far into the state court litigation there appears to be no advantage to adding a Chapter 7 trustee to the process"); *In re Ripley & Hill*, 176 B.R. 596, 599 (Bankr. M.D. Fla. 1994) (dismissing Chapter 7 case where creditor had pending lawsuit with only damages to be decided because creditor would be "harm[ed] in the form of delay in liquidating [creditor's] claim and wasted judicial resources from another court entering this dispute"); *In re Lots by Murphy*, 430 B.R. at 436–37 (dismissing Chapter 7 case, reasoning that it will benefit creditor "because it will allow him to return to prosecuting the State Court Suit and avoid the delays of a bankruptcy case").

## CONCLUSION

32.     Midwest's bankruptcy case is its latest litigation delay tactic, serves no legitimate bankruptcy purpose, was brought in bad faith, and, for the foregoing reasons, must be dismissed for cause under 11 U.S.C. § 707(a). If Midwest does not voluntarily dismiss its bankruptcy case and the Court grants Presence's Motion, Presence will seek the recovery of its attorney's fees from Midwest and its counsel in bringing this Motion pursuant to Bankruptcy Rule 9011.

Respectfully submitted,

By:/s/*Christopher J. Letkewicz*

Dated:  May 23, 2023

Christopher J. Letkewicz
Sven T. Nylen
Benesch, Friedlander, Coplan & Aronoff LLP
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
312.212.4949

*Attorneys for Creditor Presence Central and*
*Suburban Hospitals Network*