# Exhibit C

Andrea Lynn Chasteen
Will County Circuit Clerk
Twelfth Judicial Circuit Court
Electronically Filed
2019L 001046
Filed Date: 8/31/2023 4:04 PM
Envelope: 24207129
Clerk: GMA

**IN THE CIRCUIT COURT OF WILL COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| PRESENCE CENTRAL AND SUBURBAN HOSPITALS NETWORK F/K/A PRESENCE HOSPITALS PRV F/K/A PROVENA HOSPITALS, | ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 19 L 1046 |
| v. | ) ) ) | Hon. Bobbi N. Petrungaro |
| MIDWEST LEASING OF ILLINOIS, LLC, JOLIET ONCOLOGY-HEMATOLOGY, ASSOCIATES, LTD., and SARODE K. PUNDALEEKA, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF PRESENCE'S OPPOSITION TO MIDWEST LEASING OF ILLINOIS, LLC AND SARODE PUNDALEEKA'S PETITION TO VACATE ARBITRATION AWARD**

Christopher J. Letkewicz
Olivia Sullivan
Benesch, Friedlander, Coplan & Aronoff LLP
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606
312.212.4949
cletkewicz@beneschlaw.com
osullivan@beneschlaw.com

## INTRODUCTION

"[A] court will grant a petition to vacate an arbitration award **only in extraordinary circumstances**." *First Health Grp. Corp. v. Ruddick*, 393 Ill. App. 3d 40, 47 (1st Dist. 2009).[1] No such extraordinary circumstances exist here. Midwest's Petition (1) raises a claim that this Court lacks jurisdiction to adjudicate and otherwise ignores well-settled law, (2) seeks to relitigate arguments that the arbitrator previously rejected, (3) asserts a bias claim based simply on disagreeing with the arbitrator's decision, and (4) argues a claim that it waived over 18 months ago.[2] Midwest's Petition should be denied, and the Award should be confirmed.[3]

***Automatic Stay Claim.*** Midwest first argues that the arbitrator exceeded his powers because his Award violated the automatic stay in Midwest's-then bankruptcy case. (Pet. 4–5.) Midwest's claim fails out of the box because this Court lacks jurisdiction to provide any relief for any purported violations of the automatic stay. That jurisdiction belongs *exclusively* to bankruptcy courts. *See, e.g.*, *E. Equip. & Servs. Corp. v. Factory Point Nat'l Bank*, 236 F.3d 117, 121 (2d Cir. 2001); *Halas v. Platek*, 239 B.R. 784, 792–93 (N.D. Ill. 1999).

Even if this Court had jurisdiction over Midwest's automatic stay claim (it does not), Midwest's claim fails because the Award did not violate the automatic stay. Bankruptcy courts have rejected automatic stay challenges where the debtor has engaged in inequitable conduct. Here, Midwest engaged in inequitable conduct by filing a bankruptcy petition that the bankruptcy court quickly concluded was in bad faith and dismissed it for cause.

---

[1] Throughout this Opposition, all internal citations and quotation marks have been omitted and emphasis has been added unless otherwise noted.

[2] "Midwest" refers to Plaintiff Midwest Leasing of Illinois, LLC, individually, or collectively, with Plaintiff Dr. Sarode K. Pundaleeka. "Petition" or "Pet." refers to Midwest Leasing of Illinois, LLC and Sarode Pundaleeka's Petition to Vacate Arbitration Award.

[3] "Award" refers to the May 2, 2023 Final Arbitration Award in this matter.

But even if the Award was a violation of Midwest's automatic stay (it was not), the Award should still be confirmed. It is well settled that the automatic stay applies only to (subject to limited exceptions not relevant here) a debtor. *See, e.g.*, *In re Caesars Entm't Operating Co.*, 540 B.R. 637, 643 (Bankr. N.D. Ill. 2015). Here, the only debtor was Midwest, *not* Dr. Pundaleeka. Accordingly, the automatic stay did *not* apply to Dr. Pundaleeka. Where a court has concluded that an arbitration award violated the automatic stay as to one party, but not another, the court still *affirms* the arbitration award in its entirety. *See Marquis Yachts v. Allied Marine Grp., Inc.*, 2010 WL 1380137, at *8 (D. Minn. March 31, 2010) (attached hereto as Ex. 6).

**Arbitrator Exceeded His Powers Claim.** Next, Midwest copies and pastes the same argument it made in the arbitration to assert that the arbitrator did not have the authority under the American Health Law Association Rules of Procedure for Commercial Arbitration (the "AHLA Rules") to enter a default order for non-payment of arbitrator fees. (*Compare* Pet. 6–9 *with* Presence's Mot. Ex. J at 7–9.)[4] Simply trying to relitigate an issue previously decided by the arbitrator falls well short of establishing that the arbitrator made a "gross error[] of judgment in law … apparent upon the face of the award." *Tim Huey Corp. v. Global Boiler & Mech., Inc.*, 272 Ill. App. 3d 100, 106 (4th Dist. 1995). Indeed, this argument falls short under a rigorous *de novo* review. Under the AHLA Rules, the arbitrator had broad sanction authority, including entering a default order. Courts have affirmed arbitration awards based on default judgments for failing to pay the required arbitration fees. *See Willick v. Napoli Bern Ripka & Assocs., LLP*, 2018 WL 6443080, at *4 (C.D. Cal. Sept. 13, 2018) (attached hereto as Ex. 8).

**Arbitrator Bias Claim**. Midwest provides zero evidence in its Petition that demonstrates

---

[4] "Presence" refers to Plaintiff Presence Central and Suburban Hospitals Network f/k/a Presence Hospitals PRV f/k/a Provena Hospitals. "Presence's Mot." refers to Presence's Motion to Lift Stay and Confirm Arbitration Award.

that the arbitrator had a "direct, definite and demonstratable interest … in the outcome of the arbitration." *Edward Elec. Co. v. Automation, Inc.*, 229 Ill. App. 3d 89, 101 (1st Dist. 1992). Instead, Midwest simply argues that the arbitrator was biased because he entered an adverse ruling against them. But mere disappointment in the outcome is not evidence of bias.

**The Arbitrability of Presence's Claim.** Finally, Midwest asserts that there was no agreement to arbitrate. This claim is frivolous. Eighteen months ago, Midwest filed a motion to compel Presence's claims into arbitration. In that motion, which this Court granted, Midwest argued: "There can be **no question** that Plaintiff[] [Presence] entered into a binding and enforceable arbitration agreement, which is subject to the FAA and **precludes litigation of [its] claims in this Court**." (Ex. 1 at 11.) Midwest cannot claim that the dispute was arbitrable 18 months ago and now claim that the dispute is not arbitrable. Even if Midwest had not moved to compel arbitration, it waived any challenge to arbitrability when it failed to challenge the arbitrability at the time of the answer. *First Health*, 393 Ill. App. 3d at 48, 52.

***

For these reasons and those set forth below, Midwest's Petition should be denied.

## FACTUAL BACKGROUND

Midwest's Petition fails to include numerous facts relevant to the arbitrator's default order and subsequent Award against Midwest and Dr. Pundaleeka. Accordingly, this section sets forth additional facts that provide the necessary context for the arbitrator's decision.

**Midwest Moves to Compel Arbitration Two Years into the Litigation.** Presence initiated this lawsuit in December 2019 against Midwest alleging claims of unjust enrichment and declaratory judgment. Presence subsequently amended its complaint three times to add new parties (Dr. Pundaleeka and Joliet Oncology Hematology Associates ("JOHA")), new claims (unjust enrichment against Dr. Pundaleeka and JOHA as alter egos of Midwest, and fraudulent

transfer), and new facts. Presence filed its Third Amended Complaint in December 2021.

In response and relevant here, Midwest moved in January 2022 to compel the dispute to arbitration before the AHLA. In the motion, Midwest argued that pursuant to a Professional Services Agreement ("PSA") between JOHA and Presence, "[t]here should be no question that the claims presented are all subject to the arbitration," (Ex. 1 at 7), because "[a] plain reading of the Complaint together with the terms of the arbitration provisions [in the PSA] makes it clear that the parties' dispute is subject to arbitration." (*Id.* at 12.) Midwest added that Presence should be "equitably estopped from bringing a claim against Midwest and Pundaleeka outside of arbitration despite the fact that Pundaleeka and Midwest were not parties to the PSA." (*Id.* at 13.) Over Presence's objection, the Court granted Midwest's motion. (Presence's Mot. Ex. B.)

***Midwest's Conduct in the Arbitration.*** After the Court's order, the dispute proceeded to arbitration before the AHLA. At the initial status hearing, Midwest did not challenge the arbitrability of the dispute. (*See id.* Ex. D ¶ 2.) In fact, Midwest did not even submit a responsive pleading, and its non-answer was treated as a denial of all material allegations. (*Id.*) As discussed in Presence's Motion to Confirm, numerous issues arose regarding Midwest's compliance with the arbitrator's orders. (Presence's Mot. ¶ 6.) In particular, Midwest failed to comply with the arbitrator's orders on November 14, and December 12, 2022, to pay the required $3,500 in arbitrator fees. (*Id.* ¶ 7.) This non-compliance continued for months.

At a February 15, 2023 status hearing, the arbitrator was made aware that Midwest was continuing to not comply with his prior orders regarding paying the arbitrator fees and warned Midwest that he had broad sanction powers under the AHLA Rules, including entering a default judgment. (*Id.*) The arbitrator entered another order requiring Midwest to pay the required arbitrator fees. (*Id.* Ex. H ¶ 2.) Midwest ignored the arbitrator's order for a third time.

The arbitrator then entered an order requiring Midwest to file a brief explaining why it

should not be sanctioned for repeatedly ignoring his orders. (*Id.* Ex. I ¶ 2.) On March 3, Midwest submitted its brief, and on March 8, Presence filed its response, arguing that the arbitrator should enter a default judgment against Midwest as a sanction. (*Id.* Exs. E, J.)

The arbitrator then held oral argument on the issue. After the argument, the arbitrator issued a four-page ruling, entering a "default order against each of Midwest and Pundaleeka for each of their separate failures, without good cause shown, to comply with the additional deposit requirements of Orders 3, 5 and 10." (*Id.* Ex. K ¶ 11.) In the decision, the arbitrator stated that a default order was appropriate based on AHLA Rules 4.l(a)(3), 4.l(a)(5), 5.3, and 7.6(c), and the decision in *Willick*. (*Id.* ¶¶ 9–10.) The arbitrator further noted that Midwest and Dr. Pundaleeka failed to provide "any documentary proof" that paying the arbitrator fees would cause a "financial hardship" despite "being given several opportunities to so." (*Id.* ¶¶ 8, 10.)

The arbitrator set the matter for a damages prove-up hearing on April 5 and ordered Presence to submit any documents in support by March 24 and gave Midwest until March 31 to submit any response. (*Id.* ¶ 12.) On March 24, Presence submitted a brief and documents in support of its damages claim. (*Id.* Ex. L.) Midwest did not submit any response.

On April 5, the arbitrator held the damages prove-up hearing. Despite the arbitrator contacting Midwest's and Dr. Pundaleeka's counsel, they did not appear. (*Id.* Ex. N ¶ 5.) As a result, the hearing took place without Midwest participating. (*Id.*). On April 7, the arbitrator provided the parties the Final Arbitration Award, awarding Presence $1.7 million and holding Midwest and Dr. Pundaleeka jointly and severally liable. (*Id.* Ex. O.) On April 10, the arbitrator told the parties that "minor adjustments to the final order" needed to be made "based on the fact that Midwest/Pundaleeka did not submit the required additional deposit." (*Id.* Ex. P at 2.)

Unbeknownst to Presence, Midwest filed for Chapter 7 bankruptcy on April 4, 2023. (*Id.* Ex. Q.) Presence did not receive the bankruptcy petition until April 13. The next day, Presence

told the arbitrator about Midwest's bankruptcy petition. (*Id.* Ex. P at 1.) The arbitrator asked whether Dr. Pundaleeka had filed for bankruptcy as well, and Presence told him no. (*Id.*) On May 2, the arbitrator issued a revised Final Arbitration Award in the amount of $1,765,346.17 and again held Midwest and Dr. Pundaleeka jointly and severally liable. (*Id.* Ex. N.)

**Midwest's Short-Lived Bankruptcy Proceedings.** On May 23, Presence moved to dismiss Midwest's bankruptcy for cause because, in particular, it was "clearly brought in bad faith," was nothing more than "a mere litigation tactic" to "thwart Presence from collecting on its claim against Midwest," and served "no legitimate bankruptcy purpose" because Presence was Midwest's only creditor. (*Id.* Ex. R ¶¶ 24, 26, 30.) Presence also flagged in the motion that the arbitrator had entered the initial Award on April 7 and the revised final Award on May 2 after Midwest's bankruptcy petition. (*Id.* ¶¶ 20–21.) Midwest initially objected to Presence's motion. On June 14, the bankruptcy court held a hearing on the motion. There, the bankruptcy trustee stated: "I don't see a basis for this bankruptcy filing." (Ex. 2 at 2:19–20.) In response, the court stated: "I thought that might be what you sa[y] because that was my conclusion, too. Mr. Ottenheimer [Midwest's counsel], I don't see what your response could be." (*Id.* 3:6–10.)

On June 28, Midwest withdrew its objection, (Presence's Mot. Ex. S), and on June 30, the bankruptcy court granted Presence's motion and dismissed Midwest's bankruptcy case. (*Id.* Ex. T.) At no point did the bankruptcy court conclude that the Award violated the automatic stay as to Midwest. Indeed, Midwest never made such a claim during the bankruptcy proceedings.

## STANDARD OF REVIEW

"It has long been the view of [the Illinois Supreme Court] that arbitration awards should be construed wherever possible, so as to uphold their validity." *Rauh v. Rockford Prods. Corp.*, 143 Ill. 2d 377, 386 (1991). This is because "[a] contrary course would be a substitution of the judgment of the Chancellor in place of the judges chosen by the parties, and would make an

award the commencement, not the end, of litigation." *Garver v. Ferguson*, 76 Ill. 2d 1, 9 (1979). Indeed, as some courts have remarked: "[a]rbitration does not provide a system of junior varsity trial courts offering the losing party complete and rigorous *de novo* review." *Jimmy John's Franchise, LLC v. Kelsey*, 549 F. Supp. 2d 1034, 1040 (C.D. Ill. 2008). As a result, the party challenging the award must "prove by clear and convincing evidence that an award was improper." *Herricane Graphics, Inc. v. Blinderman Const. Co.*, 354 Ill. App. 3d 151, 156 (2d Dist. 2004). Mere errors in judgment or mistakes of law are not enough. *Garver*, 76 Ill. 2d at 7. Instead, the challenger must show that the arbitrator engaged in fraud or misconduct or made a "gross error of judgment in law … [that] [is] apparent upon the face of the award." *Sweet v. Steve's Cartage Co.*, 51 Ill. App. 3d 913, 915 (3d Dist. 1977). Accordingly, if the arbitrator "acted in good faith, the award is conclusive upon the parties." *Garver*, 76 Ill. 2d at 7–8.

## **ARGUMENT**

Midwest's Petition should be denied for at least four reasons. ***First***, Midwest's automatic stay claim fails because the Court lacks jurisdiction to adjudicate any automatic stay claims and even if it decided the claim (it should not), there was no violation of the stay, and even if there was (there was not), it is not a basis to vacate the Award. ***Second***, the arbitrator did not commit a gross error of law in entering a default order because the AHLA Rules empowered the arbitrator to enter such an order as a sanction. ***Third***, Midwest presents no evidence that the arbitrator was biased. ***Fourth***, Midwest waived any challenge to arbitrability.

## I. MIDWEST'S PREVIOUSLY FILED AND NOW DISMISSED BANKRUPTCY PETITION IS NOT A BASIS TO VACATE THE AWARD.

### A. This Court Lack Jurisdiction to Determine Whether the Award Violated the Automatic Stay in Midwest's Bankruptcy.

Midwest's claim that the Award should be vacated because it violated Midwest's bankruptcy's automatic stay is dead on arrival because this Court lacks jurisdiction to decide

such a claim. Courts have repeatedly held that ***only a bankruptcy court*** can decide whether a violation of the automatic stay has taken place. *See E. Equip.*, 236 F.3d at 120–21 (affirming district court decision that it lacked jurisdiction to decide whether defendants violated automatic stay because only a bankruptcy court could decide); *Halas*, 239 B.R. at 793 (holding that state courts "do not have jurisdiction to impose sanctions under § 362(h) [automatic stay provision]"); *In re Raboin*, 135 B.R. 682, 684 (Bankr. D. Kan. 1991) ("[T]his court [the bankruptcy court] has exclusive jurisdiction to determine the extent and effect of the stay."). Indeed, one Court succinctly held: "Any relief for a violation of the stay must be sought in the Bankruptcy Court." *E. Equip*, 236 F.3d at 121; *see also Cisse v. 17161 Alva Rd. Owners Assoc.*, 2019 WL 6118442, at *1 (S.D. Cal. Nov. 18, 2019 (collecting cases)) (attached hereto as Ex. 3).

Courts have taken this view because "the automatic stay [is] 'a creature peculiar to federal bankruptcy law [that] plays a fundamental role in the administration of the Bankruptcy Code." *Halas*, 239 B.R. at 791 (quoting *In re Elegant Concepts, Ltd.*, 67 B.R. 914, 917 (Bankr. E.D.N.Y. 1986)). Accordingly, to allow state courts to decide automatic stay issues "would undermine Congress' intent to have one uniform bankruptcy system. Indeed, [i]t is for Congress and the federal courts, not the state courts, to decide what incentives and penalties are appropriate for use in connection with the bankruptcy process and when those incentives or penalties shall be utilized." *Id.* at 792 (collecting cases). In short, if Midwest wishes to vacate the Award because it violated the automatic stay, Midwest must raise that with the bankruptcy court and not this Court.[5] Midwest does not cite any case in which a state court vacated an arbitration

---

[5] Neither *In re MarketXT Holdings Corp.*, 2009 WL 2957809 (Bankr. S.D.N.Y. July 20, 2009) and *In re Knightsbridge Dev. Co.*, 884 F.2d 145 (4th Cir. 1989) require a different result. (*See* Pet. 4–5.) As an initial matter, in *In re MarketXT*, the bankruptcy court annulled the automatic stay; thus, allowing arbitration award to be confirmed. 2009 WL 2957809, at *4–5. More importantly, these cases involve a bankruptcy court and a federal appellate court reviewing a

award because it violated the automatic stay.

**B.    Even Assuming the Court Had Jurisdiction, the Stay Was Not Violated.**

Even if the Court decided to resolve the automatic stay issue (it needs and should not), the Court should conclude that there was no violation of the stay for two reasons. ***First***, Midwest is not entitled to the protection of the automatic stay when it engaged in inequitable conduct by filing its bankruptcy petition in bad faith. Bankruptcy courts are courts of equity. *E.g.*, *Matthews v. Rosene*, 739 F.2d 249, 251 (7th Cir. 1984). As a result, "[e]quitable defenses, including unclean hands … may be raised by persons accused of violating the automatic stay." *In re Den Beste*, 2012 WL 2061402, at *1 (Bankr. N.D. Cal. June 6, 2012) (collecting cases) (attached hereto as Ex. 4). Put another way, "[s]uspension of Section 362 automatic stay provisions may be consonant with the purposes of the Bankruptcy Act when equitable considerations weigh heavily in favor of the creditor." *Matthews*, 739 F.2d at 251.

Here, Midwest filed its bankruptcy petition in bad faith in a transparent effort to frustrate Presence's ability to collect on its claim against Midwest. (*See* Ex. 2 at 2:19–20, 3:6–10; Presence's Mot. Ex. R ¶¶ 24–26; *id.* Ex. T.) That alone is sufficient to deny Midwest the benefit of the automatic stay. *See In re Mack*, 2007 WL 1222575, at *4–5 (M.D. Fla. Apr. 24, 2007) (affirming bankruptcy court's decision that debtor not entitled to protection of automatic stay where debtor filed bankruptcy in bad faith) (attached hereto as Ex. 5); *see also In re Basrah Custom Design*, 600 B.R. 385, 386–87 (Bankr. E.D. Mich. 2019) (denying motion to enforce automatic stay where debtor had unclean hands "in filing and prosecuting this bankruptcy case"). Further, Midwest was well aware that the Award was entered after its bankruptcy filing, but never claimed in the three months its bankruptcy case was pending that the Award violated the

---

bankruptcy decision, respectively, evaluating whether an arbitration award violated the automatic stay, and not the situation here, where Midwest is asking a *state court* to determine such an issue.

automatic stay. Midwest does not and cannot justify its delay for seeking relief in connection with the stay. *See Sole Survivor Corp. v. Buxbaum*, 2009 WL 210471, at *8 (C.D. Cal. Jan. 22, 2009) (affirming denial of motion alleging violation of automatic stay where debtor did not raise issue until after bankruptcy case was dismissed) (attached hereto as Ex. 7).

 ***Second***, both the bankruptcy trustee and bankruptcy court were aware that the Award was entered after Midwest's bankruptcy filing, but took no action to void the Award because it violated the automatic stay. This too shows that there was no violation of the stay. *See id.* (citing the bankruptcy trustee's and bankruptcy court's awareness of the post-petition foreclosure and lack of effort to void the foreclosure as another basis to conclude there was no violation of stay).

### C. Even Assuming a Stay Violation Occurred, the Court Can Affirm the Award Because the Stay Applied to Only Midwest, Not Dr. Pundaleeka.

 Even assuming that the Award violated the automatic stay (it did not), it is not a basis to vacate the Award. Here, the Award is against Midwest *and* Dr. Pundaleeka. Only Midwest filed for bankruptcy. It is black letter law that—absent certain limited exceptions not relevant here—the automatic stay applies to only the debtor, and no one else. *See, e.g.*, *In re Caesars*, 540 B.R. at 643. This is the case even where, like here, it is alleged that the non-debtor is the alter ego of the debtor. *E.g.*, *Performance Food Grp. Co., LLC v. ARBA Care Ctr. of Bloomington, LLC*, 2017 IL App (3d) 160348, ¶ 26 ("Just because two entities are *alter egos* does not make them both debtors under the Bankruptcy Code. It simply means they are liable for each other's debts." (quoting *Pavers & Rd. Builders Dist. Council Welfare Fund v. Core Contracting of N.Y., LLC*, 536 B.R. 48, 51 (Bankr. E.D.N.Y. 2015)). If a debtor wishes to extend the protections of the stay to a non-debtor, an affirmative motion must be filed and granted providing such relief. *C.H. Robinson Co. v. Paris & Sons, Inc.*, 180 F. Supp. 2d 1002, 1018 (N.D. Iowa 2001); *see also 555 M Mfg., Inc. v. Calvin Klein, Inc.*, 13 F. Supp. 2d 719, 722 (N.D. Ill. 1998) (declining to extend

automatic stay to non-debtor where debtor did not file and the bankruptcy court did not grant motion extending stay to non-debtor). Here, Midwest never sought to extend the automatic stay to non-debtor Dr. Pundaleeka, and therefore, the automatic stay never applied to Dr. Pundaleeka.

Accordingly, at best, Midwest could argue that the Award violated the automatic stay as to Midwest, but not Dr. Pundaleeka. This is significant. In *Marquis Yachts,* the court was faced with a situation where an arbitration award violated the automatic stay as to one party, but not the other party.[6] 2010 WL 1380137, at *8. The court stated that it did not have the authority under Section 11 of the Federal Arbitration Act (which is nearly identical to Section 13 of the Illinois Uniform Arbitration Act) to vacate the award in part and that it either had to confirm it or vacate it in its entirety. *Id.* The court then concluded that it would confirm the award in its entirety because "the panel was acting, in part, within its powers by continuing the arbitration proceedings and issuing the final award on [the claim not affected by the automatic stay]." *Id.* Thus, even if the court were to decide the automatic stay issue and conclude the Award violated the stay as to Midwest (it should not), the Award should still be confirmed because the arbitrator was, at a minimum, acting within his powers as to Dr. Pundaleeka. *See id.*

## II. The Arbitrator Did Not Commit a Gross Error of Law in Entering a Default Order Against Midwest and Dr. Pundaleeka.

Midwest's claim that the arbitrator "exceeded his power" by issuing a default order against it should be rejected because Midwest comes nowhere close to establishing a gross error of law apparent upon the face of the award. As discussed above, a mere mistake of law is not enough to vacate an arbitration award. *See supra* at 7. Instead, the challenger must show "a gross error of judgment in law … [that] [is] apparent upon on the face of the award." *Sweet*, 51 Ill.

---

[6] The court incorrectly decided whether there was a violation of the automatic stay. *See supra* at 7–9. This is likely due to neither party raising the jurisdiction issue.

App. 3d at 915. This means Midwest must show that "the arbitrator deliberately disregarded what he knew to be the law." *Tim Huey*, 272 Ill. App. 3d at 106. Illinois courts have described this as "an almost nonexistent standard of review." *Id.*

Here, Midwest does not show an error in law, let alone a gross error of law apparent on the face of the award. Midwest largely repeats verbatim the same arguments it made to the arbitrator about why he could not enter a default order. (*Compare* Pet. 6–9 *with* Presence's Mot. Ex. J at 7–9.) By doing so, it implicitly concedes that the arbitrator did not commit a gross error of law because this Court cannot substitute its judgment for that of the arbitrator; nor can it provide "a rigorous *de novo* review." *See Garver*, 76 Ill. 2d at 9; *Kelsey*, 549 F. Supp. 2d at 1040.

The arbitrator's decision was well-supported under the AHLA Rules and the law and could be upheld under a "rigorous *de novo* review," let alone the gross error of law apparent from the face of the award standard the Court must apply here. Under AHLA Rule 4.1, "[a]n arbitrator has the power to: … (3) sanction parties for failing to comply with any orders of the arbitrator or any obligations under the Rules … and (5) take **any actions** or **make any decisions that are necessary and proper** to conducting a fair and efficient arbitration under the Rules." AHLA R. 4.1(a)(3), (5). Nowhere in any of those Rules or in any other AHLA Rule does it bar an arbitrator from imposing a particular sanction, such as a default order. This includes AHLA Rule 5.3 cited by Midwest. (*See* Pet. 8.) AHLA Rule 5.3 simply provides that non-payment of an arbitrator's fee is grounds for sanctions, not that it bars an arbitrator from entering a default order against a non-paying party. AHLA R. 5.3 ("The arbitrator may also sanction a party for non-payment unless the party can prove to the arbitrator's satisfaction that paying the deposit would cause a financial hardship."). In short, by broadly allowing an arbitrator to "sanction," take "any actions," or "make any decisions," the AHLA Rules give an arbitrator broad sanction power, including, but not limited to, entering a default order.

*Willick* is instructive. In *Willick*, the arbitrator entered a default judgment against the defendant after defendant violated an arbitrator's order to pay an accounting firm's fees. 2018 WL 644380, at *1. The arbitrator then held a "prove-up" hearing in which plaintiff "prove[d] up" its claims, and the arbitrator then awarded over $4 million in damages. *Id.* at *2. The defendant then opposed plaintiff's motion to confirm the award, asserting that the default judgment exceeded the arbitrator's powers because the applicable rules, AAA, barred an arbitrator from "entering[ing] a default award as a sanction." *Id.* at *3. The court disagreed and confirmed the award. *Id.* at *4–5. The court reasoned that the arbitrator did not exceed his powers because he did not impose a default award; rather, he "entered default as a sanction," then "conducted a prove-up hearing," and "[o]nly after that prove-up hearing did the Arbitrator enter the Award." *Id.* at *4.[7] The AHLA, unlike AAA, does not bar a default award as a sanction. Accordingly, if an arbitrator is empowered under AAA to enter a default judgment, he is certainly empowered to do so under AHLA Rules. *See id.*; *see also Seagate Tech., LLC v. W. Digital Corp.*, 854 N.W.2d 750, 764 (Minn. 2014) (affirming award where arbitrator barred evidence or defense on certain trade secret issues and entered judgment of liability as sanction for fabricating evidence).

Midwest asserts three arguments as to why the arbitrator exceeded his power. Each is meritless. *First*, Midwest cites a law review article to claim that an arbitrator cannot enter a default judgment. (*See* Pet. 6–7.) Putting aside that the law review article does not discuss the AHLA Rules and thus is not relevant, the article actually argues *for* Presence's position that an arbitrator should be able to enter a default order for non-payment of arbitrator fees. Specifically, the article states: "When two commercial entities freely agree to arbitrate disputes and one of them thereafter is responsible for the termination of the arbitration, there is nothing unfair about

---

[7] *Willick* shows that Midwest's claim that "defaults are *never* utilized as a sanction" is false. (Pet. 8).

a court holding that party in default. The non-paying party should be deemed to have waived its right to arbitration and its opportunity to litigate liability on the merits."[8]

*Second*, Midwest argues that AAA does not allow for default judgments. (*See* Pet. 7.) The AAA Rules, however, have no applicability to this arbitration, and in any event, courts have upheld default judgments entered under AAA Rules. *See Willick*, 2018 WL 644380, at *4–5.

*Third*, Midwest argues that entering a default order is akin to a refusal to hear evidence, citing *Henley* and *Johnson.* Not so, *see, e.g., Willick*, 2018 WL 644380, at *4–5, and in any event, *Henley* and *Johnson* are readily distinguishable. Neither *Henley* nor *Johnson* involves an arbitrator imposing a default order for noncompliance with an arbitrator's order. Rather, *Henley* involved an arbitration award that was not signed by all the arbitrators as required under the rules and misrepresented that the decision was unanimous, and *Johnson* involved arbitrators excluding certain evidence from defendants on the erroneous ground that the evidence related to non-arbitrable issues. *Henley v. Econ. Fire & Cas. Co*., 153 Ill. App. 3d 66, 73 (1st Dist. 1987); *Johnson v. Baumgardt*, 216 Ill. App. 3d 550, 559–60 (2d Dist. 1991). The factual scenarios in *Henley* and *Johnson* are far adrift from the situation here.

In sum, the arbitrator was well within his power to enter a default order, let alone committing a gross error of law apparent on the face of the award.

## III.    No Evidence Exists that the Arbitrator Was Biased.

Midwest argues that the arbitrator was biased against it because he was "obsess[ed] with payment and his hyperfocus on Midwest and Pundaleeka's failure [to pay]." (Pet. 9.) This argument, however, is nothing more than an effort by Midwest to overturn an unfavorable award.

---

[8] Neal Eisenman & Brian Farkas, *Stiffing the Arbitrators: The Problem of Nonpayment in Commercial Arbitration*, HARVARD NEGOTIATION LAW REVIEW at 19 (2015), *available at* https://www.hnlr.org/wp3content/uploads/sites/22/HNLR-Eiseman-and-Farkas-.pdf.

In order to vacate an award based on arbitrator bias, the challenger must provide evidence that the arbitrator had "a direct, definite and demonstratable interest" in the outcome. *Edwards*, 229 Ill. App. 3d at 101. "[P]roof of partiality may not be remote, uncertain or speculative." *Id.* Here, Midwest sets forth zero evidence that the arbitrator had any interest in the outcome or any relationship with Presence and/or its counsel. Instead, Midwest offers speculation that he must have been biased because he was purportedly "obsess[ed] with payment." (Pet. 9.) Such speculation, however, falls well short of proving by clear and convincing evidence that the arbitrator was biased. *See Edwards*, 229 Ill. App. 3d at 102 (rejecting bias claim).

## IV. Midwest Waived Any Challenge as to the Arbitrability of the Dispute.

Midwest's arbitrability argument is frivolous. Eighteen months ago, Midwest specifically asserted in a motion to compel arbitration that there is "no question that the claims presented are all subject to the arbitration." (Ex. C at 7; *see also supra* at 3–4.) They cannot now turnaround and claim the opposite. *Cf. Elsasser v. DV Trading, LLC*, 444 F. Supp. 3d 916, 929 (N.D. Ill. 2020) (estopping plaintiffs from avoiding arbitration clause in agreement where it sought the benefit from that agreement). Putting that aside, it is well settled that arbitrability must be challenged no later than the answer to the arbitration demand, or it is considered waived. *See, e.g.*, *First Health*, 393 Ill. App. 3d at 48. Here, Midwest waited until after the parties completed discovery in the arbitration and after the arbitrator entered the Award to challenge arbitrability. That is far too late and must be deemed waived. *See, e.g.*, *Craveable Hospitality Grp., LLC v. Tadros*, 2020 IL App (1st) 191460-U, ¶ 33 (concluding party waived arbitrability where he did not object until "about 15 months after he had actively participated in the arbitration process").

## <u>CONCLUSION</u>

For the above reasons, Midwest's Petition should be denied and the Award confirmed.

Dated: August 31, 2023

Respectfully submitted,

PRESENCE CENTRAL AND SUBURBAN
HOSPITALS NETWORK f/k/a PRESENCE
HOSPITALS PRV f/k/a PROVENA
HOSPITALS

By:/s/*Christopher J. Letkewicz*
    One of Its Attorneys

Christopher J. Letkewicz
cletkewicz@beneschlaw.com
Olivia Sullivan
osullivan@beneschlaw.com
Benesch, Friedlander, Coplan & Aronoff LLP
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606
312.212.4949

<u>**CERTIFICATE OF SERVICE**</u>

The foregoing **Plaintiff Presence's Opposition to Midwest Leasing of Illinois, LLC and Sarode Pundaleeka's Petition to Vacate Arbitration Award** was served by electronic mail on this 31st day of August of 2023 to the counsel of record for the parties as set forth below.

Alexander Loftus
David Eisenberg
LOFTUS & EISENBERG, LTD.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
T: 312.332.4200
C: 312.772.5396
alex@loftusandeisenberg.com
david@ loftusandeisenberg.com
*Counsel for Defendants Midwest Leasing*
*of Illinois, LLC, and Sarode Pundaleeka*

Jenna E. Milaeger
GOLDBERG LAW GROUP
120 South Riverside Plaza, Suite 1675
Chicago, Illinois 60606
T: 224-263-1839
jmilaeger@goldberglawoffice.com
*Counsel for Defendant Joliet Oncology and*
*Hematology Associates, Ltd.*



*/s/ Christopher J. Letkewicz*
Christopher J. Letkewicz
*Attorney for Plaintiff Presence*

# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## WILL COUNTY, ILLINOIS, LAW DIVISION

PRESENCE CENTRAL AND SUBURBAN  )
HOSPITALS NETWORK F/K/A PRESENCE  )
HOSPITALS PRV F/K/A PROVENA  )
HOSPITALS,  )
                                        )
       Plaintiff,  )
                                          )    Case No. 19 L 1046
       v.  )
                                          )    Hon. Bobbi N. Petrungaro
MIDWEST LEASING OF ILLINOIS, LLC,  )
JOLIET ONCOLOGY-HEMATOLOGY,  )
ASSOCIATES, LTD., and SARODE K.  )
PUNDALEEKA,  )
                                          )
       Defendants.  )

## EXHIBIT INDEX

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 1 | Midwest's Motion to Dismiss Presence's Third Amended Complaint or in the Alternative Compel Arbitration Pursuant to 710 ILCS 5/2 |
| 2 | June 14, 2023 Hearing Transcript in *In re Midwest Leasing of Illinois, LLC*, Case No. 23 B 04510 |
| 3 | *Cisse v. 17161 Alva Rd. Owners Assoc.*, 2019 WL 6118442 (S.D. Cal. Nov. 18, 2019) |
| 4 | *In re Den Beste*, 2012 WL 2061402 (Bankr. N.D. Cal. June 6, 2012) |
| 5 | *In re Mack*, 2007 WL 1222575 (M.D. Fla. Apr. 24, 2007) |
| 6 | *Marquis Yachts v. Allied Marine Grp., Inc.*, 2010 WL 1380137 (D. Minn. March 31, 2010) |
| 7 | *Sole Survivor Corp, v. Buxbaum*, 2009 WL 210471 (C.D. Cal. Jan. 22, 2009) |
| 8 | *Willick v. Napoli Bern Ripka & Assocs., LLP*, 2018 WL 6443080 (C.D. Cal. Sept. 13, 2018) |

# EXHIBIT 1

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## WILL COUNTY, ILLINOIS, LAW DIVISION

PRESENCE CENTRAL AND SUBURBAN )
HOSPITALS NETWORK F/K/A         )
PRESENCE HOSPITALS PRV F/K/A    )
PROVENA HOSPITALS,              )
                                )
    Plaintiff,                )
                                )
    v.                        )    19 L 1046
                                )
MIDWEST LEASING OF ILLINOIS, LLC, )
JOLIET ONCOLOGY-HEMATOLOGY,     )
ASSOCIATES, LTD., and SARODE K. )
PUNDALEEKA,                     )
                                )
    Defendants.               )

## <u>DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED VERIFIED COMPLAINT PURSUANT TO 735 ILCS 5/2-619.1 OR IN THE ALTERNATIVE COMPEL ARBITRATION PURSUANT TO 710 ILCS 5/2</u>

Defendants, Midwest Leasing of Illinois, LLC ("Midwest") and Sarode Pundaleeka ("Pundaleeka"), pursuant to Section 2-619.1 and 710 ILCS 5/2, respectfully request that this Court dismiss Plaintiff's Third Amended Complaint with prejudice. In support of their motion, Defendants state as follows:

### INTRODUCTION

This is an inventive claim that needs to be finally disposed of. Plaintiff is desperately and very creatively trying to run away from contracts governing the parties' relationships whose application would either result in the claim being dismissed or compelled to arbitration (and then dismissed). While PCSHN's lawyering has been tremendous it's the facts in support of the claims are absurd and should finally end now.

### LEGAL STANDARD

Motions to dismiss under both sections 2-615 and 2-619 test the legal sufficiency of the

complaint, but in two different ways. *Downey v. Wood Dale Park Dist.*, 286 Ill. App. 3d 194, 200 (2d Dist. 1997). A section 2-615 motion asserts that, even if all well-pled factual averments in the complaint are true, the plaintiff has failed to plead facts satisfying all elements of the claim. *Hough v. Kalousek*, 279 Ill. App. 3d 855, 863 (1st Dist. 1996).

A section 2-619 motion admits the legal sufficiency of the complaint but asserts another affirmative matter that defeats the claim. *Am. Family Mut. Ins. Co. v. Krop,* 120 N.E.3d 982, 986 (2018). In particular, section 2-619(a)(9) authorizes the dismissal of a claim where "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." A section 2-619 motion admits as true all well-pleaded facts and all reasonable inferences that can be drawn from them. (*Id.*)

The Illinois Uniform Arbitration Act, 710 ILCS 5/2(a) reads:

> On application of a party showing an agreement described in Section 1, and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration, but if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party, otherwise, the application shall be denied.

## ARGUMENT

I.  **PCSHN'S CLAIMS FOR UNJUST ENRICHMENT (COUNTS I AND II) MUST BE DISMISSED BECAUSE THERE IS NO SEPARATE CAUSE OF ACTION FOR UNJUST ENRICHMENT AND THE ALLEGATIONS OF A CONTRACT ARE INCORPORATED.**

### A. The complaint should be dismissed on a 2-619 basis because the Third Amended Complaint erroneously incorporates all allegations of a contract.

The gravamen of the claim is that Midwest strictly enforced the terms of the contract and parties fully performed the agreement to the letter. Presence desperately tries to avoid the application of the contract since the very claim is that Midwest dared live by its terms strictly which resulted in a good deal for Midwest and a bad deal with Presence. Every error is not

compensable the parties must live with their contracts and the performance required by them. It's time for this case to end.

In its TAC, Plaintiff failed to plead unjust enrichment in the alternative and continues to incorporate by reference factual allegations related to the existence of a contract between Plaintiff, Midwest, and JOHA. (TAC 12-25). The story cannot be told without the contract and this needs to be dismissed now. Because Plaintiff's unjust enrichment claim is still insufficient as a matter of law, Count II of Plaintiff's TAC should also be dismissed with prejudice because alter ego liability is not an independent cause of action. *See Peetoom v. Swanson*, 778 N.E.2d 291, 295 (2002) (citing *In re Rehabilitation of Centaur Ins. Co*., 606 N.E.2d 291 (1992), aff'd, 632 N.E.2d 1015 (1994)).

Plaintiff will argue these Counts should be spared on the basis that they are allowed to plead in the alternative. That is, Plaintiff says they may seek relief under a theory of unjust enrichment as an alternative to a contract claim. They are not wrong. The problem is that Plaintiffs have not actually pleaded in the alternative. Plaintiff knows that any contract claim fails as a matter of law and desperately tries to plead around the contract while still alleging its existence and it governing the parties relationship. The law doesn't work that way and contracts between sophisticated parties control.

As a court has explained, pleading in the alternative in this context means that Plaintiff may claim in Count I that "there was a contract and that it was breached by [the defendant]," and then to claim in Count V that "there was no valid contract and that [the defendant] was unjustly enriched." *Samuels v. Old Kent Bank*, Case No. 96 C 6667, 1997 U.S. Dist. LEXIS 11485, at *38 (N.D. Ill. July 31, 1997). Here, however, Plaintiff incorporated in their unjust enrichment claim the allegations that there is a valid contract. As such, PCSHN has not pleaded an alternative theory.

Instead, it (however inadvertently) acknowledges that there is a valid contract but then assert that Midwest was unjustly enriched by its strict compliance with the contracts terms!

The existence of express contracts between the parties concerning the lease payments at issue defeats any claim by Plaintiff for unjust enrichment against Midwest as a matter of law. *See People ex rel. Hartigan*, 153 Ill. 2d. at 497 (plaintiff's unjust enrichment claim was properly dismissed where an express contract existed governing the transaction); *Swedish American Hosp. Ass'n of Rockford v. Illinois State Medical Inter-Ins. Exchange*, 395 Ill. App. 3d 80, 108 (2nd Dist. 2009) (summary judgment on the plaintiff's unjust enrichment count was proper as a matter of law due to the existence of a specific contract that governed the relationships of the parties)

**B. The Complaint should be dismissed on a 2-615 basis because no separate cause of action for unjust enrichment exists without allegations of fraud, duress, or undue influence.**

To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience. *HPI Health Care Services, Inc. v. Mt. Vernon Hospital*, 131 Ill. 2d 145, 160 (1989). However, unjust enrichment is not a separate cause of action that, standing alone, will justify an action for recovery. *Mulligan v. QVC, Inc.*, 382 Ill. App. 3d 620, 631 (1st Dist. 2008). Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct. *Alliance Acceptance Co. v. Yale Insurance Agency*, 271 Ill. App. 3d 483, 492 (1st Dist. 1995). For a cause of action based on a theory of unjust enrichment to exist, there must be an independent basis that establishes a duty on the part of the defendant to act and the defendant must have failed to abide by that duty. *Lewis v. Lead Industries Ass'n, Inc.*, 342 Ill. App. 3d 95, 105 (1st

Dist. 2003). A plaintiff fails to state a cause of action for unjust enrichment absent an allegation of duty. *Martis v. Grinnell Mut. Reinsurance Co*., 388 Ill. App. 3d 1017, 1024-1025 (3rd Dist. 2009).

Here, there is no assertion by PCSHN of improper conduct on the part of Midwest, such as fraud, duress, or undue influence. All Midwest did was go by the letter of the contract. Nevertheless, PCSHN attempts to assert a cause of action that courts have declared, standing alone, does not justify an action for recovery. PCSHN should not be allowed to recover on a theory of unjust enrichment where there is no allegation of improper conduct by the defendant.

## II. THE REMAINING COUNTS SHOULD BE DISMISSED BECAUSE PLAINTIFF CANNOT PLEAD AN INDEPENDENT CAUSE OF ACTION FOR AN ALTER EGO THEORY OF LIABILITY OR FRAUDULENT TRANSFER.

Counts II is actually a claim for an alter ego theory of liability against Dr. Pundaleeka whereby Plaintiff alleges that JOHA was the alter ego of Midwest and should be jointly and severally liable with Midwest for unjust enrichment. (TAC, 129-134). However, Illinois courts have held that there is no "stand-alone" cause of action for alter ego liability. *A.L. Dougherty Real Estate Management Co., LLC., v. Su Chin Tsai*, 2017 IL App (1st) 161949,  26. Thus, unless there is a cognizable underlying cause of action pled against Midwest, Plaintiff cannot seek to impose liability on Dr. Pundaleeka as the alter ego of Midwest. Because Plaintiff's claim against Midwest for unjust enrichment fails as a matter of law due to Plaintiff incorporating by reference contract allegations into Count I, Plaintiff's claim against JOHA in Count II for alter ego liability similarly fails as a matter of law.

### III. THIS DISPUTE IS SUBJECT OF A BINDING ARBITRATION AGREEMENT AND ARBITRATION MUST BE COMPELLED AT LEAST TO DETERMINE ARBITRABILITY.

In the course of discovery in this case Midwest first received a copy of the Professional Services Agreement between PCSHN and JOHA. Included in this agreement was a dispute resolution provision. Unfortunately, this did not come to light until much water was under the bridge but now that it has been disclosed the Court should compel resolution by its terms. Obviously, Midwest cannot waive a right it did not know it had. Now it knows it has this right and is asserting in the first instance since it came to counsel's attention.

The agreement at issue here provides:

28. . Dispute Resolution. Any dispute **between the parties related to this Agreement** ( except with respect to any disputes pertaining to fair market value determination, which disputes will be resolved in accordance with Section 5 hereof) shall first be considered by the Council, which will be established under the Management Services/Performance Improvement Agreement. If the dispute is not resolved within thirty (30) days thereafter, the senior management of each of the parties will meet to attempt to resolve the dispute. If the dispute is not resolved within thirty (30) days after being referred to the senior management teams, the dispute will be subject to voluntary mediation at the request of either party. If the dispute is not resolved within sixty (60) days of a written request for mediation, the dispute will be subject to binding arbitration in Aurora, Illinois, in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Arbitration, and, **to the extent of the subject matter of the arbitration, shall be binding not only on all parties to this Agreement, but on its Affiliates, to the extent that such Affiliate joins in the arbitration.** Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof by the Alternative Dispute Resolution Service of the American Health Lawyers Association. The parties shall continue to perform their obligations under this Agreements during the pendency of any dispute resolution proceeding. Reasonable costs associated with the resolution of the dispute, including attorneys' fees may be awarded to the prevailing party in any arbitration.

(Confidential PSA Agreement incorporated herein as Exhibit "A" PCSHN001227[1])

---

[1] This agreement is not being filed at the time this motion is filed subject to resolving the confidentiality of the document.

The strong policy favoring enforcement of agreements to arbitrate disputes reflected in the Illinois Uniform Arbitration Act and United States Supreme Court and the Illinois Supreme Court have repeatedly confirmed the Federal Arbitration Act. Defendant, PCSHN, entered into a written Agreement with JOHA. By signing the Agreement, Plaintiff agreed to a broad mandatory arbitration provision whereby all "Any dispute between the parties related to this Agreement... will be subject to binding arbitration in Aurora, Illinois, in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Arbitration". The intent is clear and the parties specifically bargained for this time and cost savings of what would otherwise be a long, fact intensive, and expensive case to litigate. There should be no question that the claims presented are all subject to the arbitration provision.

## A. The rules invoked in the PSA specify that it is up to the arbitrator to determine arbitrability.

The parties' arbitration clause specifies disputes are American Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Arbitration ("AHLA Rules") under its rules. Since the parties have expressly agreed to apply the AHLA Rules then the rules also govern the question of arbitrability which require that question be answered by an arbitrator rather than this Court. *Wal-Mart Stores, Inc. v. Helferich Patent Licensing, LLC,* 51 F. Supp. 3d 713, 719, 2014 U.S. Dist. LEXIS 83208, *12, 2014 WL 2795827 (N.D. Ill. 2014); *see also*, *Imperial Crane Sales, Inc. v. Sany Am., Inc*., 2015 U.S. Dist. LEXIS 91549, *12-14, 2015 WL 4325483 (N.D. Ill. 2015) ("Absent any argument or citations to the contrary, this Court concurs with that 'overwhelming majority.' 'Accordingly, the Court finds that by incorporating the AAA Rules, including Rule 7(a), into the arbitration provision,' the parties 'clearly and unmistakably agreed to have an arbitrator decide whether they agreed to arbitrate Plaintiff's disputes.'" (citations omitted).

The AHLA Rules incorporated in the agreement drafted by Plaintiff states, with respect to jurisdiction, that "If the filing party (Claimant) produces a document that arguably requires arbitration of the claim under the Rules, the Administrator will appoint an arbitrator pursuant to the process described in this Section. **After receiving appropriate evidence and argument, the arbitrator, once appointed, shall have the power to determine his or her jurisdiction and any issues of arbitrability**." (Rule 3.1, AHLA Rules attached hereto as Exhibit "B")

The AHLA Rules go on to state:

> (a) ARBITRABILITY. Once appointed, the arbitrator may issue a preliminary award that addresses whether the arbitration clause is valid, and whether it applies to the claims or counterclaims raised by the parties.

(Rule 5.2, Rules attached hereto as Exhibit "B")

Multiple courts have held that when the rules provide its for the arbitrator to decide arbitrability the case must first go to arbitration to resolve the issue. [W]here the parties agree to arbitration pursuant to the rules of the American Arbitration Association ("AAA"), the parties incorporate the AAA's rules into the arbitration agreement." *Dunston v. R.H. Love Galleries, Inc*., No. 07 CV 5113, 2008 U.S. Dist. LEXIS 44118, 2008 WL 2339564, at *2 (N.D. Ill. Jun. 4, 2008) (*citing Commonwealth Edison Co. v. Gulf Oil Corp*., 541 F.2d 1263, 1272 (7th Cir. 1976)). While neither the Supreme Court nor the Seventh Circuit have resolved whether incorporation of the AAA Rules constitutes "clear and unmistakable" evidence that the parties intended the question of arbitrability to be decided by an arbitrator, other circuits have drawn this conclusion. *See Fallo v. High-Tech Inst*., 559 F.3d 874, 878 (8th Cir. 2009) ("Consequently, we conclude that the arbitration provision's incorporation of the AAA Rules . . . constitutes a clear and unmistakable expression of the parties' intent to leave the question of arbitrability to an arbitrator."); *Qualcomm Inc. v. Nokia Corp*., 466 F.3d 1366, 1373 (Fed. Cir. 2006); *Contec Corp. v. Remote Solution, Co*., 398 F.3d 205,

208 (2d Cir. 2005); *Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005); *see also Haire v. Smith, Currie & Hancock LLP*, 925 F. Supp. 2d 126, 132 (D. D.C. 2013) (collecting federal appellate and district court cases). Additionally, other courts in this Illinois have agreed with the various appellate courts in other circuits and come to the same conclusion. *See Corrigan v. Domestic Linen Supply Co.*, No. 12 C 0575, 2012 U.S. Dist. LEXIS 100961, 2012 WL 2977262, at *2 (N.D. Ill. July 20, 2012) ("[W]hen parties agree in a valid arbitration agreement that the AAA's rules apply, an arbitrator should decide the scope of arbitrability." (*citing Bayer CropScience, Inc. v. Limagrain Genetics Corp., Inc.*, No. 04 C 5829, 2004 U.S. Dist. LEXIS 25070, 2004 WL 2931284, at *4 (N.D. Ill. Dec. 9, 2004))); *Yellow Cab Affiliation, Inc. v. N.H. Ins. Co.*, No. 10-cv-6896, 2011 U.S. Dist. LEXIS 8304, 2011 WL 307617, at *4 (N.D. Ill. Jan. 28, 2011)("[T]he Court finds that by specifically incorporating the Commercial Arbitration Rules of the American Arbitration Association into their agreement, the parties clearly and unmistakably evidenced their intention to grant the arbitrator the authority to determine whether their dispute is arbitrable."); *see also Price v. NCR Corp.*, 908 F. Supp. 2d 935, 945 (N.D. Ill. 2012) (holding that by adopting the AAA Rules in their arbitration agreement, the parties agreed that an arbitrator would determine whether the agreement authorized class arbitration).

Accordingly, by incorporating the AHLA Rules, including Rule 5.2, into the arbitration provision, Plaintiff clearly and unmistakably agreed to have an arbitrator decide whether the claims presented here are arbitrable thus this action must be dismissed in favor of arbitration**.**

### B. The FAA and UAA favor enforcement of arbitration agreements.

"[T]he decision whether to compel arbitration is not discretionary. Where there is a valid arbitration agreement and the parties' dispute falls within the scope of that agreement, arbitration is mandatory and the trial court must compel it." *LRN Holding, Inc. v. Windlake Capital Advisors,*

*LLC*, 409 Ill. App. 3d 1025, 1028 (2011). When presented with a motion to stay litigation pending arbitration pursuant to the FAA, "the court's inquiry is limited to whether an agreement to arbitrate exists and whether it encompasses the issue in dispute." *Jensen v. Quik International*, 213 Ill. 2d 119, 123 (2004). If "the court finds that an agreement to arbitrate exists and the issue presented is within the scope of that agreement, a stay is mandatory." *Id*.

The FAA establishes that a written agreement to arbitrate contained in any contract evidencing a transaction involving interstate commerce is valid, irrevocable, and enforceable absent grounds for revocation of the contract. 9 U.S.C. § 2; *see Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 625 (1985). In determining whether a matter must be submitted to arbitration under the FAA, courts must determine (1) whether a valid agreement to arbitrate exists; and (2) whether the dispute falls within the substantive scope of the agreement. *Id.* at 626- 28. **Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration**. *Id.* at 626. The party resisting arbitration bears the burden of showing that the arbitration agreement is invalid or does not encompass the claims at issue. *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000).

The Illinois General Assembly shares the same favorable view of arbitration agreements and their enforcement, as evidenced by its enactment of the Uniform Arbitration Act in 1961. *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135 (Ill. 2006). The UAA provides, in relevant part, that "[a] written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable, and irrevocable save such grounds as exist for the revocation of any contract[.]" 710 ILCS 5/1 § 1. The Supreme Court of Illinois has declared that the "public policy in Illinois favors arbitration." *Phoenix v. Rosen*, 242 Ill. 2d 48, 949 N.E.2d 639, 647 (Ill. 2011). The Illinois Supreme

Court recognized that the basic intent of the UAA is "to discourage litigation and foster the voluntary resolution of disputes in a forum created, controlled and administered by the agreement to arbitrate." *Melena*, 847 N.E.2d at 111. "The [Illinois Uniform Arbitration] Act embodies a legislative policy favoring enforcement of agreements to arbitrate future disputes. Accordingly, it empowers courts, upon application of a party, to compel or stay arbitration, or to stay court action pending arbitration." *Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 124 Ill. 2d 435, 443 (Ill. 1988).

### C.  A valid and enforceable arbitration agreement exists.

In determining whether parties have agreed to arbitrate, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v Kaplan*, 514 U.S. 938, 944 (1995). The basic elements of any contract formation are offer, acceptance, and consideration. *See Duldulao v. St. Mary of Nazareth Hospital Center,* 115 Ill. 2d 482, 490 (1987). Under Illinois law, a contract provision is part of the parties' bargain when it is "bargained for, brought to the purchaser's attention," or conspicuous. *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.*, 86 Ill. App. 3d 980, 990 (1980).  There is no doubt that the arbitration provision was conspicuously printed in the Agreement and drafted by Plaintiff and broadly covers all of its dealings with JOHA and its affiliates.

By drafting the Agreement including an arbitration provision, Plaintiff acknowledged that it was giving up the right to litigate claims in a court of law and instead agreed that all disputes were subject to binding arbitration. There can be no question that Plaintiffs entered into a binding and enforceable arbitration agreement, which is subject to the FAA and precludes litigation of their claims in this Court.

**D. The Claims asserted in Plaintiff's Third Amended Complaint are subject to arbitration.**

A plain reading of the Complaint together with the terms of the arbitration provision makes it clear that the parties' dispute is subject to arbitration. Once it is determined that an agreement to arbitrate is valid, "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986); *Miller v. Flume*, 139 F.3d 1130, 1136 (7th Cir. 1998) (any doubts concerning the scope of an arbitration clause and the issues arbitrable thereunder should be resolved in favor of arbitration). The arbitration provision in the Agreement encompasses all disputes stemming from the relationship between the JOHA and PCSHN. There is no question that Plaintiff's claims at least relate to the PSA Agreement and this question of whether it relates sufficiently is for the arbitrator and not the Court.

Further, when construing arbitration language similar to that involved in this matter, courts have held that provisions encompassing any dispute "arising out of" or "related to this agreement" must be broadly construed. *See Guar. Trust Life Ins. Co. v. Platinum Supplemental Ins., Inc.*, 2016 IL App (1st) 161612, *7 (holding that language in the arbitration provision of "arising out of" or "related to this agreement" make the provision a generic arbitration clause that must be broadly construed); *Keeley & Sons, Inc. v. Zurich American Insurance Co.*, 409 Ill. App. 3d 515, 520 (2011). Like the arbitration provision at issue here, where the clause in question is broad, there is a heightened presumption of arbitrability such that "[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT&T Techs.*, 475 U.S. at 650.

The arbitration provision at issue contains the language "arising out of" or "related to this agreement," making the provision a generic arbitration clause that must be broadly construed. As such, Plaintiff's claim against Defendants is subject to arbitration and Defendants are entitled to an Order compelling arbitration.

Plaintiff is equitably estopped from bringing a claim against Midwest and Pundaleeka outside of arbitration despite the fact that Pundaleeka and Midwest were not parties to the PSA. The law is clear as stated in *Peach v. CIM Ins. Corp.*, 352 Ill. App. 3d 691, 696-697, 816 N.E.2d 668, 673 (5th Dist. 2004).

> Existing case law demonstrates that equitable estoppel allows a nonsignatory to compel arbitration in two different circumstances. First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory. When each of a signatory's claims against a nonsignatory 'makes reference to' or 'presumes the existence of' the written agreement, the signatory's claims 'arise[] out of and relate[] directly to the [written] agreement,' and arbitration is appropriate. Second, 'application of equitable estoppel is warranted … when the signatory [to the contract containing the arbitration clause] raises allegations of … substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.' Otherwise, 'the arbitration proceedings [between the two signatories] would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.'

Both rational for equitable are implicated here because the claims all arise from the contract and are in reality between the signatory parties.

Furthermore, the claims seem to allege an agency relationship between the defendants thus arbitration should be compelled. *See Caligiuri v. First Colony Life Insurance Co.,* 318 Ill. App. 3d 793, 800, 742 N.E.2d 750, 756 (2000).

**CONCLUSION**

PCSHN's claims cannot be salvaged with amendment. A plaintiff should be given leave to replead unless doing so would be futile. *Thompson v. N.J.*, 2016 IL App (1st) 142918, ¶ 65. Where no set of facts can be alleged by plaintiff to correct a defect, dismissal with prejudice is proper. *Id.; see also Dunn v. Baltimore & O. R. Co.*, 127 Ill. 2d 350, 362 (1989). Here, there is no set of facts that can overcome the fact that PCSHN made voluntary rental payments as required by the Lease for nearly five years. They cannot rewrite the contract with this claim. Accordingly, PCSHN's complaint should be dismissed with prejudice or in the alternative it should be referred to arbitration as PCSHN agreed to.

WHEREFORE, Defendants, MIDWEST LEASING OF ILLINOIS, LLC and SARODE PUNDALEEKA, respectfully requests that its Motion to Dismiss Plaintiff's Complaint be granted with prejudice and for any and all other or further relief that this Court deems just and proper under the circumstances.

Respectfully submitted,

**MIDWEST LEASING OF ILLINOIS, LLC and SARODE PUNDALEEKA**
Defendants,

By: __*/s/ Alexander Loftus*_____
       One of Its Attorneys

Alexander Loftus, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
T: 312.899.6625
C: 312.772.5396
alex@loftusandeisenberg.com

Dated: January 13, 2022

# EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Midwest Leasing of Illinois,     )  No. 23 B 04510
                                 )  Chicago, Illinois
                                 )  10:00 a.m.
                     Debtor.     )  June 14, 2023



      TRANSCRIPT OF PROCEEDINGS BEFORE THE
           HONORABLE JANET S. BAER



APPEARANCES:

Chapter 7 Trustee:          Ms. Deborah Ebner;

For the Debtor:             Mr. Lester Ottenheimer;

For Presence Central &
Suburban Hospitals
Network:                    Mr. Sven Nylen;







Court Reporter:             Amy Doolin, CSR, RPR
                            U.S. Courthouse
                            219 South Dearborn
                            Room 661
                            Chicago, IL  60604.

1           THE CLERK:  Midwest Leasing of
2   Illinois, LLC.
3           MR. OTTENHEIMER:  Good morning, Your
4   Honor.  Les Ottenheimer on behalf of the debtor.
5           MR. NYLEN:  Good morning, Your Honor.
6   Sven Nylen on behalf of Presence Central & Suburban
7   Hospitals Network.
8           MS. EBNER:  Good morning, Judge.
9   Debbie Ebner, trustee.
10           THE COURT:  Good morning.  I have
11   before me a motion to dismiss the debtor filed by
12   Presence Central & Suburban Hospitals, which appears
13   to be the only creditor of merit in this case.  And I
14   did see a notice of objection was filed by the
15   debtor.  I'm going to just turn to Ms. Ebner first.
16           Ms. Ebner, what's your position on
17   this matter?
18           MS. EBNER:  Strangely, I support the
19   motion to dismiss.  I don't see a basis for this
20   bankruptcy filing.  It's really a -- after doing some
21   digging, it really is a one-creditor case.  I had
22   extensive discussions with the creditor, Presence,
23   about using the bankruptcy forum to administer the
24   estate.  But, in essence, by continuing the
25   bankruptcy, the only thing that would be accomplished

1  is to create an administrative creditor, i.e., me,

2  and my attorney, in front of the -- with priority

3  over the creditor who is seeking to dismiss the case.

4  So it really is kind of pointless.

5         THE COURT:  I appreciate that, Ms.

6  Ebner.  I actually asked you that because I thought

7  that might be what you said because that was my

8  conclusion, too.

9         Mr. Ottenheimer, I don't see what your

10  response could be.

11         MR. OTTENHEIMER:  Well, when I read

12  the motion, the motion seemed to indicate that the

13  case should be dismissed because there's no assets

14  for creditors and because they want to pursue a

15  co-debtor.  And I'm -- Your Honor knows there's been

16  many, many cases that are filed that are no assets.

17  And there's nothing that precludes a creditor from

18  going after the co-debtor.

19         THE COURT:  You know, I don't really

20  care at this point about the co-debtor.  I mean, the

21  fact of the matter is that I've got a case that the

22  one creditor who is really concerned here doesn't

23  believe that it needs a bankruptcy estate to

24  administer the assets to make sure they don't go

25  south of whatever it happens to be, so I just don't

1   see why we need a bankruptcy case.

2             MR. OTTENHEIMER:  Judge, I'd like to

3   talk to my client and maybe not oppose the motion if

4   I could get a little bit of time to do that.

5             THE COURT:  All right.  I'll set a

6   response date for you.  How much time do you want?

7             MR. OTTENHEIMER:  I need 28 days, Your

8   Honor.  I've got two trials coming up in the next

9   three weeks.

10            THE COURT:  Okay.  So that will take

11  you to July 12.

12            Ms. Ebner, I'll give you the

13  opportunity or -- I'm sorry, Mr. Nylen really is the

14  one I would expect -- I'll give you an opportunity to

15  file a reply if you need to.  You kind of know my

16  position on this issue.  And I will be interested to

17  see if Mr. Ottenheimer comes up with something we

18  don't know about that would convince me otherwise.

19            So I'll give you the time to file the

20  reply, but I'm not requiring you to do so.  But I

21  will set 14 days to file a reply, which will take us

22  to the 26th of July.  And I'll put this on for status

23  and ruling -- assuming Mr. Ottenheimer is still going

24  to pursue this matter and oppose the motion, I'll put

25  it on for August 2nd at 10:00 o'clock.

1          MR. OTTENHEIMER:  Thank you, Your

2     Honor.

3          MS. EBNER:  Your Honor, if I may?  If

4     Mr. Ottenheimer ultimately agrees that this case

5     should be dismissed, if he could notify everyone and

6     Your Honor also so we could avoid another use of

7     judicial time.

8          MR. OTTENHEIMER:  Absolutely.  That

9     makes perfect sense.

10         THE COURT:  Yeah, I would greatly

11    appreciate that, especially if I don't have to read

12    briefs I don't otherwise have to read.

13         MR. OTTENHEIMER:  Correctest.

14         THE COURT:  Okay.  Thank you.

15         (Which were all the proceedings had in

16         the above-entitled cause, June 14,

17         2023, 10:00 a.m.)

18    I, AMY B. DOOLIN, CSR, RPR, DO HEREBY CERTIFY
      THAT THE FOREGOING IS A TRUE AND ACCURATE
19    TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
      ENTITLED CAUSE. /S/

20

21

22

23

24

25

# EXHIBIT 3

2019 WL 6118442
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

Mamady B. CISSE, Plaintiff,

v.

17161 ALVA ROAD OWNERS ASSOCIATION,
a nonprofit mutual benefit corporation,
Community Legal Advisors, Inc., a California
corporation, Audrey C. Smith, an individual;
and Does 1 through 100, inclusive, Defendants.

Case No.: 19cv2163-GPC(MSB)
|
Signed 11/18/2019

**Attorneys and Law Firms**

Mamady B. Cisse, San Diego, CA, pro se.

Mark Allen Wilson, Law Offices of Michael Spilger, San Diego, CA, for Defendant.

Audrey C. Smith, San Diego, CA, pro se.

**ORDER SUA SPONTE REMANDING CASE TO STATE COURT**

Hon. Gonzalo P. Curiel, United States District Judge

**\*1** The case was filed in the San Diego Superior Court on November 28, 2018 with an amended complaint filed on October 8, 2019. (Dkt. Nos. 1, 1-2 Compl.) On November 12, 2019, Defendant Community Legal Advisors, Inc., filed a notice of removal alleging that the Court has subject matter jurisdiction pursuant to federal question jurisdiction, 28 U.S.C. § 1331. (Dkt. No. 1.)

The state court first amended complaint alleges causes of action to quiet title to real property, wrongful foreclosure and violation of U.S. bankruptcy automatic stay, 🚩11 U.S.C. § 362(a). (Dkt. No. 1-2 at 10.) In its notice of removal, Defendant relies on Williams v. PFK Funding Servs., Inc., Case NO. C18-48 RSM, 2018 WL 3328398, at * 3 (W.D. Wash. 2018) to support the Court's subject matter jurisdiction. However, in Williams, the Court did not specifically hold that it had jurisdiction over violations of the bankruptcy automatic stay but its ruling was influenced by other non-bankruptcy

related claims that were subject to the court's subject matter jurisdiction. Id.

In fact, many district courts have held that a claim for violation of a bankruptcy automatic stay under 🚩11 U.S.C. § 362 does not provide a district court with subject matter jurisdiction. Federal courts have subject matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. However, "[a] Federal District Court does not have original jurisdiction over bankruptcy matters." Park v. Nat'l City Bank of Indiana, Case No. CV 14-1354 SJO(PJWx), 2014 WL 12564360, at *1 (C.D. Cal. Mar. 19, 2014) (quoting Radke v. Holbrook, No. CV 09-01355 GAF, 2010 WL 9010982, at *7 (C.D. Cal. May 11, 2010) (citations omitted)). Instead, the district court has jurisdiction over an appeal of a final judgment or order of the bankruptcy court. See 🚩28 U.S.C. § 158(a)(1) and (3). A claim for violation of the automatic stay "*must* be brought in the bankruptcy court, rather than in the district court, which only has appellate jurisdiction over bankruptcy case." 🚩Eastern Equipment and Servs. Corp. v. Factory Point Nat'l Bank, Bennington, 236 F.3d 117, 121 (2d Cir. 2001); see e.g., MSR Exploration, Ltd. v. Meridian Oil, Inc., 74 F.3d 910, 916 (9th Cir. 1996) (claim arising from bankruptcy proceeding must be "brought in the bankruptcy court itself, and not as a separate action in the district court"); see also Radke, 2010 WL 9010982, at *7 ("Plaintiff's allegations concerning the violation of the automatic stay in a bankruptcy proceeding must be raised in the Bankruptcy Court ... A Federal District Court does not have original jurisdiction over bankruptcy matters."); Guancione v. Wachovia Mortg. Corp., No. 5:10–CV–3166 JF (HRL), 2010 WL 2991728, at *3 (N.D. Cal. July 28, 2010) ("to the extent that Plaintiff could establish a violation of the automatic stay, their remedy lies within the jurisdiction of the bankruptcy court"); 🚩Zimmerman v. Bellows, 988 F. Supp. 2d 1026, 1034 (D. Minn. 2013) ("Count V alleges that Defendants violated the automatic stay, for which Zimmerman seeks relief under 🚩11 U.S.C. § 362(k). Though no party has raised the issue, the Court determines that it lacks jurisdiction to consider this claim."); Heghmann v. Town of Rye, 326 F. Supp. 2d 227, 232–33 (D.N.H. 2004) ("Defendants argue that this court lacks subject matter jurisdiction over plaintiff's claims arising under 🚩11 U.S.C. § 362(h) for willful violation of the automatic stay because all such claims must be brought in the bankruptcy court. The weight of the authority supports the defendants' argument.").

**\*2** Accordingly, because the claim for violation of U.S. bankruptcy automatic stay, ⚑ 11 U.S.C. § 362(a) does not support this Court's jurisdiction, the Court *sua sponte* REMANDS the case to state court for lack of subject matter jurisdiction.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 6118442

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 4

2012 WL 2061402
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
N.D. California.

In re Paul and Melody Den BESTE, Debtor(s).

Paul Den Beste, Plaintiff(s),

v.

Alex Harrington, et al., Defendant(s).

Bankruptcy No. 10–13558.
|
Adversary No. 11–1298.
|
June 6, 2012.

**Attorneys and Law Firms**

James P. Chandler, Law Offices of James P. Chandler, Sonoma, CA, for Debtor.

Paul Den Beste, Cloverdale, CA, pro se.

Russell Stanaland, Lerner, Veit and Stanaland LLP, San Francisco, CA, for Defendants.

Mansuetto Anthony Lenci, Kansas City, MO, pro se.

Memorandum on Motion for Summary Judgment

ALAN JAROSLOVSKY, United States Bankruptcy Judge.

 **\*1** Plaintiff Paul Den Beste filed his Chapter 13 petition on September 15, 2010, and his case was converted to Chapter 7 on October 22, 2010. The automatic stay remained in effect for about a year and a half due to a pending objection to Den Beste's discharge, which was ultimately sustained. Until the court put a stop to it, Den Beste used the automatic stay as a club, filing five adversary proceedings for alleged violations of the automatic stay. This is one of those actions. Defendants, who are plaintiffs in a state court lawsuit against Den Beste, seek summary judgment.

On October 29, 2010, in a state court action in which he was a defendant, and without leave of this court, Den Beste filed and served a motion to strike the complaint. On December 10, 2010, the state court denied the motion and, finding it frivolous, awarded the plaintiff in that case, Edith Mazzaferri, $11,150.00 in fees and costs. On January 7, 2011,

the state court awarded an additional $4,150.00. On January 14, 2011, Mazzaferri recorded abstracts of judgment. Den Beste then appealed the award, again without leave of this court. The state appellate court subsequently affirmed denial of the motion and declared Den Beste a vexatious litigant, but vacated and remanded the award of fees and costs on procedural grounds. Mazzaferri then released her judgment liens.

What is certain is that Den Beste violated the automatic stay first. Section 362(a)(1) operates as a stay, applicable to all entities, of the continuation of an action against the debtor that was commenced before the bankruptcy. A debtor who is in bankruptcy violates the automatic stay when he is the defendant in a state court action and takes affirmative action in that action, including prosecuting an appeal, without leave of the bankruptcy court. *Ingersoll–Rand Fin. Corp. v. Miller Min. Co.,* 817 F.2d 1424, 1426 (9th Cir.1987).

Having initiated improper action, Den Beste cannot complain that Mazzaferri defended herself. *In re Way,* 229 B.R. 11, 13 (9th Cir. BAP1998).[1] Equitable defenses, including unclean hands and judicial estoppel, may be raised by persons accused of violating the automatic stay. *Employment Development Dept. v. Bertuccio,* 2011 WL 1158022, \* 10 (N.D.Cal.2011); *Sole Survivor Corp. v. Buxbaum,* 2009 WL 210471, \*8 (C.D.Cal 2009); *In re Andrada Financing, LLC,* 2011 WL 3300983,\*5 (9th Cir.BAP2011). The court finds that Den Beste is barred from seeking damages in this case by the doctrine of unclean hands because he violated the automatic stay himself, and by judicial estoppel because his actions in the state court were inconsistent with the existence of a stay.

1    The court reminds all parties that it has the power to annul the automatic stay, thereby making valid actions taken in technical violation of the stay. Nobody has made such a motion, but annulment may be appropriate under these circumstances. See *In re Myers,* 491 F.3d 120, 127 (3rd Cir.2007).

Moreover, an award of attorneys' fees imposed as a sanction for frivolous conduct in litigation is not subject to the automatic stay even if private parties are the beneficiaries of the award. *In re Berg,* 230 F.3d 1165, 1168 (9th Cir.2000).

For the foregoing reasons, the court will grant summary judgment in favor of defendants and this adversary

proceeding will be dismissed with prejudice. Counsel for defendants shall submit a form of order granting their motion for summary judgment and denying Den Beste's countermotion, and a form of judgment dismissing this adversary proceeding.

**All Citations**

Not Reported in B.R., 2012 WL 2061402

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

2007 WL 1222575
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.

In re Gregory S. MACK, Debtor.
Gregory S. Mack, Appellant,
v.
Gene Chambers, Grange Mutual Casualty Co., Grange
Indemnity Co., Trustgard Insurance Co., Allstate
Insurance Co., Liberty Mutual Insurance Co., Appellees.

No. 6:06-cv-1782-Orl-19.
|
April 24, 2007.

**Attorneys and Law Firms**

[Jonathan B. Alper](), [Jonathan B. Alper](), PA, Heathrow, FL, for
Debtor.

### ORDER

[PATRICIA C. FAWSETT](), Chief United States District Judge.

**\*1** This case comes before the Court on the following:

1. Appellant-Debtor Gregory Mack's Notice of Appeal
(Doc. No. 1, filed Nov. 29, 2007);

2. Appellant-Debtor Gregory Mack's Initial Brief (Doc. No.
26, filed Jan. 5, 2005);

3. Brief of Appellees, Grange Mutual Casualty Company,
Grange Indemnity Insurance Company, and Trustgard
Insurance Company (Doc. No. 34, filed Feb. 4, 2007);

4. Appellees Brief of Allstate and Liberty (Doc. No. 35,
filed Feb. 5, 2007); and

5. Appellant-Debtor Gregory Mack's Reply Brief (Doc. No.
38, filed Feb. 21, 2007).

### Background

Appellant-Debtor Gregory Mack ("Mack") appeals an Order
of the United States Bankruptcy Court for the Middle District
of Florida ("Bankruptcy Court") granting Appellees Motion

for Relief from the Automatic Stay under [11 U.S.C.
Section 362]. (Doc. No. 1, Doc. No. 1-2).

Mack, a Florida resident, operates health clinics in Kentucky.
(Doc. No. 3-3, p. 3, l.12-21). Appellees include multiple
insurance companies that are suing Mack in the United
States District Court for the Eastern District of Kentucky
("Kentucky Case") for submitting fraudulent claims.[1] (Doc.
No. 3-8).

[1]   The Kentucky case is styled as *Grange Mutual
      Casualty Company, et al. v. Mack, et al.,*
      Case No. 3:02-cv-110-JMH. (Doc. No. 3-8).
      Appellees include Grange Mutual Casualty
      Company, Grange Indemnity Insurance Company,
      and Trustgard Insurance Company (collectively
      "Grange") and Allstate Insurance Company and
      Liberty Mutual Insurance Company (collectively
      "Allstate/Liberty"). The underlying Bankruptcy
      Court Order addressed the arguments of all
      Appellees for vacating the automatic stay together.
      (*See* Doc. No. 1-2). The Court finds that the
      positions of Grange and Allstate/Liberty are
      sufficiently similar to warrant analyzing their
      arguments on appeal together. (*Compare* Doc. No.
      34 *with* Doc. No. 35). Unless otherwise noted
      referenced to "Appellees" includes both Grange
      and Allstate/Liberty.

The Kentucky Case involves claims under the Racketeering
Influenced and Corrupt Organizations Act ("RICO"), [18
U.S.C. Section 1961] *et seq.,* and Florida and Kentucky state
law. (Doc. No. 3-13). On October 21, 2005, the Kentucky
District Court issued an Order granting Appellees' motion to
compel discovery and imposing sanctions against Mack and
his co-defendants. (Doc. No. 3-28). The Kentucky District
Court found that Mack and his co-defendants acted in bad
faith and willfully failed to comply with court orders.[2] (*Id.*
at p. 18). Therefore, the Kentucky District Court struck their
answers and entered a default against them. (*Id.*) On February
8, 2006, before a final default judgment was entered in the
Kentucky Case, Mack filed a voluntary petition for Chapter
7 bankruptcy. (Doc. No. 2-2). Appellees have unsecured,
nonpriority claims against Mack in the bankruptcy case. (*Id.*
at pp. 22, 26). Pursuant to [11 U.S.C. Section 362(a)],
Mack's petition for bankruptcy automatically stayed the
Kentucky Case. Appellees moved for relief from the stay in

order to pursue the claims in the Kentucky Case. (*See* Doc. No. 2-3, Doc. No. 2-10, Doc. No. 2-18).

2      The Order in the Kentucky Case specifically stated that striking the answer and entering a default was "the only sanction that is adequate in light of the wilful, prejudicial, and repeated obstruction ... and their repeated disregard of the Court's orders." (Doc. No. 3-28, p. 18).

On June 14, 2006 the Bankruptcy Court held an evidentiary hearing on Appellees' Motions. (Doc. No. 1-2, p. 1). The Bankruptcy Court found that Mack "stepped into this bankruptcy case with unclean hands ... [because his] primary purposes in filing this bankruptcy case, based upon the timing and the circumstances of the filing, was to frustrate the [Appellees] and delay the Kentucky Litigation." (Doc. No. 1-2, p. 3-4). The Bankruptcy Court also noted that the Kentucky District Court found that Mack had acted in bad faith in that case. (*Id.* at pp. 3, 7). Thus, the Bankruptcy Court concluded that "[e]quity compel[ed] granting relief from the stay ... [because Mack], due to his lack of good faith and unclean hands, is not entitled to the benefits of the automatic stay...." (*Id.* at p. 7). Additionally, the Bankruptcy Court found that it would be a more efficient use of judicial resources to allow the Kentucky Case to proceed because: (1) the Kentucky Case involves complex RICO and state law issues; (2) almost all witnesses, parties and documents are located in Kentucky; and (3) the judge presiding over the Kentucky Case is intimately familiar with the case and is in the best position to adjudicate it. (*See id.* at pp. 4, 7). Although litigating in Kentucky would be prejudicial to Mack, the Bankruptcy Court found that any prejudice to Mack was far outweighed by the hardship Appellees would face from litigating in Orlando. (*Id.* at pp. 4, 7). Moreover, the Bankruptcy Court found that litigating in Kentucky would not unduly prejudice the bankruptcy estate. (*Id.* at pp. 4, 7). The Bankruptcy Court also cited the discretionary abstention provision, 🚩 28 U.S.C. Section 1334(c)(1), and noted that despite the fact that it had jurisdiction over Appellees' claims against Mack, that it was in "the interests of justice" to abstain in favor of "[a]llowing the Kentucky Litigation to proceed." (*Id.* at p. 8). On the basis of all of the factors discussed, the Bankruptcy Court granted Appellees relief from the stay and abstained from hearing Appellees' claims against Mack so that Appellees could pursue their claims in the Kentucky Case. (*Id* .)

**\*2**   Mack appealed the Bankruptcy Court's Order, asserting four issues. (Doc. No. 1, Doc. No. 1-4). Mack asserts that the Bankruptcy Court erred in: (1) considering his failure to provide discovery and his "bad faith" in the Kentucky Case as a basis for granting relief from the stay in the instant case; (2) finding that the prejudice to Appellees in denying relief from the stay outweighed prejudice to him by granting relief; (3) finding that relief from stay would not prejudice the bankruptcy estate and other creditors; and (4) abstaining from hearing Appellees' claims against him. (Doc. No. 1-4).

### Standard of Review

The District Court has jurisdiction to hear appeals from final orders of the Bankruptcy Court under 🚩 28 U.S.C. Section 158(a). An order granting or denying relief from an automatic stay is considered final and is reviewable on appeal for abuse of discretion. 🚩 *In re Dixie Broad., Inc.,* 871 F.2d 1023, 1026 (11th Cir.1989). The bankruptcy court's decision to abstain under 🚩 28 U.S.C. Section 1334(c)(1) is also appealable and can be reviewed for an abuse of discretion. 🚩 *Matter of Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 6 F.3d 1184, 1188 (7th Cir.1993). A court abuses its discretion if it applies the wrong legal standard, uses improper procedures to reach its result or makes factual findings that are clearly erroneous. 🚩 *In re Bayshore Ford Truck Sales, Inc.,* 471 F .3d 1233, 1251 (11th Cir.2006) (citations omitted).

When reviewing Bankruptcy Court order, the District Court must give "due regard" the Bankruptcy Court's opportunity to evaluate witness credibility. FED. R. BANKR. P. 8013. Factual findings, whether based on oral or documentary evidence, cannot be set aside unless they are clearly erroneous. *Id.* "[F]indings of the trial court, when dependent upon oral testimony where the candor and credibility of the witnesses would best be judged, [have] great weight." 🚩 *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948). A finding of fact is clearly erroneous when "although there is evidence to support it, the reviewing court on entire evidence is left with the definite and firm conviction that mistake has been committed." *Id.* The Bankruptcy Court's conclusions of law are reviewed *de novo.* 🚩 *In re Club Associates,* 956 F.2d 1065, 1069 (11th Cir.1992).

## Analysis

### I. The Bankruptcy Court's Decision to Lift the Stay Was Not an Abuse of Discretion.

Title 11 U.S.C. Section 362(d)(1) allows the Bankruptcy Court upon request of a party and after notice and hearing to grant relief from the automatic stay "for cause." Courts conduct a case-by-case inquiry and apply a totality of the circumstances test to determine whether cause for relief from the stay exists. *In re Alosi*, 261 BR. 504, 508 (Bankr.M.D.Fla.2001). The Bankruptcy Court balances a series of factors, including but not limited to "efficient use of judicial resources, the location of witnesses, documents, and other necessary parties ... [and] whether a creditor has a probability of success on the merits of his case." *Id.* The decision to lift the stay is within the discretion of the Bankruptcy Court Judge. *In re Dixie Broad., Inc.*, 871 F.2d 1023, 1026 (11th Cir.1989).

### A. The Bankruptcy Court's Factual Finding that the Prejudice to Appellees from Litigating in Orlando Outweighs the Prejudice to Mack from Litigating in Kentucky is Not Clearly Erroneous.

**\*3** On appeal, Mack contends that the Bankruptcy Court erred in finding that the prejudice to Appellees from litigating in Orlando outweighed the prejudice he would suffer if he were forced to litigate in Kentucky where he has no legal representation. (Doc. No. 1). The only specific argument of prejudice Mack offers is he will "suffer substantial hardship and prejudice from a relief from the stay" because he is unrepresented in the Kentucky Case and does not have enough funds to defend himself. (Doc. No. 26, pp. 14-15). Mack supports his argument with citations entirely to his own testimony. (*See id.*) Although Mack testified that he will face significant prejudice, Mack's own testimony does not provide a strong enough basis for the Court to conclude the Bankruptcy Court's finding regarding the balance of prejudices was clearly erroneous.

Foremost, multiple courts have reasoned that the threat of additional legal expenses alone is not sufficient prejudice to justify lifting the automatic stay. *See, e.g., In re Walker*, 927 F.2d 1138, 1143 (10th Cir.1991); *Matter of Stoneking*, 222 B.R. 650, 656 (Bankr.M.D.Fla.1998); *In re Harris*, 85 B.R. 858, 860 (Bankr.D.Colo.1988). Moreover, a fact finder hearing oral testimony is required to make credibility

determinations. As the fact finder, the Bankruptcy Court made an implicit credibility determination that Mack's testimony was not convincing enough to establish that he would suffer more prejudice than Appellees. [3] Because the Bankruptcy Court heard the testimony in the first instance, the Court must give its credibility determinations and factual findings significant credence. FED. R. BANKR. P. 8013. *See also United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). Mack has failed indicate any basis proving the Bankruptcy Court's findings were clearly erroneous.

[3]     Although Mack testified regarding potential prejudice, there are inconsistencies and admissions in Mack's testimony which could be read to support a finding that he was not credible. For instance, Mack's primary allegation of prejudice is that he cannot afford a lawyer, and therefore, cannot mount an effective defense in the Kentucky Case. (Doc. No. 26, pp. 14-15). However, Mack admitted that he had significant assets on cross examination. (*See* Doc. No. 3-3, pp. 11-27).

Additionally, there is support for the fact that the Appellees will face significant prejudice from litigating in Orlando in the record. The Kentucky Case contains additional unrelated defendants who are not parties to the instant case. (*Compare* Doc. No. 1-7 *with* Doc. No. 3-8; Doc. No. 3-3, p. 31). The automatic stay provision does not apply to nondebtors, so Appellees will also have to pursue the Kentucky Case. *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 509 (3d Cir.1997); *In re Sunbeam Sec. Litig.*, 261 B.R. 534, 536 (S.D.Fla.2001). Therefore, forcing Appellees to proceed against Mack in Orlando would require them to litigate substantially similar claims in two different forums.

The Bankruptcy Court reached a conclusion that was supported by the evidence. The Bankruptcy Court's acceptance of one of two permissible conclusions is not clearly erroneous. As it is based on facts of record and was derived from determining the credibility of witnesses, it may not be reversed even if this Court is convinced, which it is not, that it would have decided the factual issue differently. *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985).

### B. There is a Proper Basis for the Bankruptcy Court's Finding that Litigating in Kentucky is Not Overly

**Prejudicial to the Bankruptcy Estate or Other Creditors.**

 **\*4**  Mack contends that the Bankruptcy Court erred in finding that lifting the stay did not prejudice the bankruptcy estate or other creditors (Doc. No. 1). However, Mack's initial brief cites no evidence that continuing the Kentucky Case will prejudice the bankruptcy estate or other creditors. (*See* Doc. No. 26, pp. 14-15). Mack's only argument is that he will "suffer substantial hardship and prejudice from a relief from the stay" because he is unrepresented in the Kentucky Case and does not have enough funds to defend himself. (*Id.*) In his reply brief, Mack claims that filing for bankruptcy benefits the majority of his creditors, because Appellees, who are the most aggressive unsecured creditors, will receive a disproportionate amount of his assets. (Doc. No. 38, p. 6). However, Mack has waived this argument by failing to raise it in his initial brief. *See, e.g., Spann v. Cobb County Pretrial Court Servs. Agency,* 206 Fed. Appx. 910, 910 n. 1 (11th Cir.2006) (arguments not raised in initial appellate brief are waived); *United States v. Dicter,* 198 F.3d 1284, 1289 (11th Cir.1999) (arguments raised for the first time in a reply brief are waived).

Even if there was no waiver, Mack's argument is legally insufficient. Mack's reply brief makes vague references to his bankruptcy schedules and argues that bankruptcy is necessary to ensure that his assets are fairly distributed among all his unsecured creditors. (Doc. No. 38, p. 6). However, attorney argument is not evidence. *See United States v. Murray,* 154 Fed. Appx. 740, 745 n. 7 (11th Cir.2005) (noting that it is proper to instruct the jury that what attorneys say in argument is not evidence).

The Bankruptcy Court explicitly found that "[n]o great prejudice to the bankruptcy estate will result in permitting the Kentucky Litigation to proceed." [4] (Doc. No. 1-2, p. 4). The Bankruptcy Court's finding is supported by the fact that the Chapter 7 Trustee did not oppose Appellees' Motion to lift the stay. (Doc. No. 1-7; Doc. No. 3-3, p. 27). Therefore, the Court finds that is no basis for concluding that the Bankruptcy Court's finding was clearly erroneous.

[4]  The Court notes that the Bankruptcy Court's conclusions of law include the statement that "[a]llowing the Kentucky Litigation to proceed in Kentucky will not prejudice the bankruptcy estate." (Doc. No. 1-2, p. 7). However, the factual finding on which the conclusion was based was that

there was "[n]o great prejudice to the bankruptcy estate." (*Id.* at p. 4). In light of the factual finding of minimal prejudice, it is highly unlikely that the Bankruptcy Court intended to use such strong language in its conclusions of law. Therefore, the Court will construe the statement in the Bankruptcy Court's conclusions of law to mean that there is no substantial prejudice to the bankruptcy estate.

**C. Consideration of Mack's Bad Faith Was Not Improper.**

Mack's argument on appeal is that the Bankruptcy Court erred in considering its alleged bad faith prior to filing his petition for bankruptcy. (Doc. No. 26, pp. 9-14). Mack contends that "[n]o court employing a balancing test to consider relief from a Chapter 7 stay has considered the debtor's alleged bad faith prior to his filing his bankruptcy petition." (*Id.* at p. 10) Mack argues that consideration of his prepetition bad faith as justification for lifting the stay constitutes reversible error, but he fails to cite any legal precedent directly supporting his position. (*Id.* at pp. 10-12).

Mack's argument is not well taken. Foremost, Mack's argument that the Bankruptcy Court justified its decision based on his alleged bad faith in the Kentucky Case is not supported by the language of the Bankruptcy Court's Order. (*See* Doc. No. 1-2). Mack is correct in his contentions that the Bankruptcy Court: (1) noted that the Kentucky District Court found he acted in bad faith; and (2) found that he stepped into the bankruptcy case with unclean hands. (*Id.* at pp. 2-3). However, the Bankruptcy Court's Order does not indicate that the Kentucky District Court's finding of bad faith is the basis of the Bankruptcy Court's finding of "unclean hands." Immediately after the Bankruptcy Court found that Mack stepped into the instant litigation with unclean hands, the Bankruptcy Court explicitly found that circumstances and timing of the filing of the Chapter 7 petition indicate that Mack's purpose in filing the instant case was "to frustrate the Movants and delay the Kentucky Litigation." (*Id.* at pp. 3-4). The Bankruptcy Court's discussion of the Kentucky Litigation was not intended to form the basis of a finding of bad faith in the instant case; rather it was intended to indicate that Mack had improper motivation in filing his bankruptcy petition and therefore was not entitled to the automatic stay. [5] (Doc. No. 1-2, p. 7 ("He had unclean hands in the Kentucky Litigation and filed this bankruptcy case with unclean hands with the purpose to further thwart the Kentucky Litigation. The Debtor, due to his lack of good faith and unclean hands, is not entitled to the benefits of the automatic stay as to the

Kentucky Litigation.")). The Court's position is supported by Mack's own testimony that the primary reason he filed for bankruptcy is because he he was unable to continue defending himself in the Kentucky Case. (Doc. No. 3-3, p. 1).

5    Mack was facing the prospect of a default judgment in the Kentucky Case. (Doc. No. 3-28). The Kentucky District Court Ordered Grange to refile a motion for final default judgment on January 26, 2006 if Mack did not produce required discovery materials. (Doc. No. 3-8, p. 44, entry 226). The docket sheet of the Kentucky Case indicates the Mack did not produce the required discovery materials. (*See id.* at p. 45, entry 230 (Motion to compel production filed by Grange filed Jan. 24, 2006), p. 46, entry 240 (Renewed Motion to compel filed by Grange filed Feb. 2, 2006)). Mack filed his voluntary petition for Bankruptcy on February 9, 2006. (Doc. No. 2-2). The Bankruptcy Court Order's findings of fact state that Mack filed his petition to take advantage of the automatic stay provision in order to avoid the entry of final default judgment against him in the Kentucky Case. (*See* Doc. No. 1-2 p. 3).

**\*5** The Bankruptcy Court's finding of Mack's bad faith is based on his bad faith in filing for bankruptcy. Cause for relief is usually found to exist when a debtor files his bankruptcy petition in bad faith. *In re Dixie Broad., Inc.,* 871 F.2d 1023, 1026 (11th Cir.1989)(Chapter 11); *In re Natural Land Corp.,* 825 F.2d 296, 297 (11th Cir.1987)(Chapter 11). The Court's own research has also disclosed Chapter 7 bankruptcy cases that have explicitly considered the motives of the debtor in filing when deciding whether to lift the automatic stay. *See, e.g., Matter of Reitnauer,* 152 F.3d 341, 344, 344 n. 15(5th Cir.1998) (Chapter 7 case holding that lifting stay was not an abuse of discretion and reasoning that "[a] debtor's lack of good faith in filing a bankruptcy petition may be an appropriate ground for lifting the automatic stay."); *In re Coleman,* 1999 WL 787401, \*2 (N.D.Tex. Sept. 30, 1999)* (Chapter 7 case stating "bad faith filing can constitute statutory 'cause' sufficient to justify the court granting relief to a creditor by lifting the stay."). Furthermore, Mack admits that a debtor's bad faith in filing for bankruptcy is cause for lifting the automatic stay. [6] (Doc. No. 38, p. 5). Therefore, the Court finds that there is nothing improper in the Bankruptcy Court's discussion of Mack's alleged bad faith.

6    In his Reply Brief Mack contends that he filed his bankruptcy petition in good faith. (*See* Doc. No. 38, pp. 5-7). However, Mack never presented this argument in his Notice of Appeal or argued that he had proper motive for filing his petition in his Initial Brief. (*See* Doc. No. 1; Doc. No. 26). Consequently, Mack has waived his ability to argue facts and circumstances which indicate his good faith motivation for filing for bankruptcy. *See, e.g., Spann v. Cobb County Pretrial Court Servs. Agency,* 206 Fed. Appx. 910, 910 n. 1 (11th Cir.2006) (arguments not raised in initial appellate brief are waived); *United States v. Dicter,* 198 F.3d 1284, 1289 (11th Cir.1999) (arguments raised for the first time in a reply brief are waived). Even if Mack had not waived such challenge, there is evidence to indicate that his decision to file for bankruptcy was not done in good faith. (*See* Doc. No. 3-3, p. 1 (Mack's testimony that he filed for bankruptcy because he was facing default and was unrepresented in the Kentucky Case)).

**D. Even if the Bankruptcy Court Considered Mack's Alleged Bad Faith in Kentucky it is Harmless Error.**

Alternatively, even if the Bankruptcy Court considered Mack's alleged bad faith in Kentucky, it is harmless error. Contrary to Mack's contentions, bad faith was not the sole basis for Bankruptcy Court's decision. The Bankruptcy Court considered "the totality of the facts and circumstances of this case" and explicitly referenced four factors, only the last of which can be potentially construed as involving Mack's conduct in the Kentucky Case. (Doc. No. 1-2, p. 7). In addition to the Bankruptcy Court's conclusion that "equity compels granting relief," the Bankruptcy Court explicitly found that: (1) it was a more efficient use to judicial resources to allow the Kentucky Case to proceed because the case had progressed much farther, the majority of the parties and witnesses are located there, and the presiding judge was already familiar with all of the issues and parties; (2) the prejudice to Appellees in litigating in Orlando outweighs the prejudice to Mack from litigating in Kentucky; and (3) allowing the Kentucky Case to proceed will not prejudice the Bankruptcy estate. (*Id.*)

As previously noted, the decision of lift the automatic stay is discretionary. *In re Dixie Broad., Inc.,* 871 F.2d 1023, 1026 (11th Cir.1989). When the Bankruptcy Court hears testimony and makes factual findings based on the evidence received,

this Court cannot substitute its own interpretation of the facts for that of the Bankruptcy Court merely because the facts can be construed in a different way. *See* 🚩 *Anderson v. City of Bessemer,* 470 U.S. 564, 574 (1985). The Bankruptcy Court may not be reversed if its factual findings are not clearly erroneous and adequately justify its discretionary conclusion. *Cf.* 🚩 *id.* at 577 ("[W]e cannot say that either interpretation of the facts is illogical or implausible. Each has support in inferences that may be drawn from the facts in the record; and if either interpretation had been drawn by a district court on the record before us, we would not be inclined to find it clearly erroneous."). Even if there was no finding of bad faith, it is not an abuse of discretion to lift the stay on the basis of the other grounds cited. *See, e.g.,* 🚩 *In re Bogdanovich,* 292 F.3d 104, 110 n. 1 (2d Cir.2002) (listing judicial economy, burden to debtor, bankruptcy estate and creditors as proper considerations in deciding to lift automatic stay that arose after debtor filed for Chapter 7 bankruptcy); *In re Garzoni,* 35 Fed.Appx. 179, 181 (6th Cir.2002) (same); *In re Cummings,* 221 B.R. 814, 818 (Bankr.N.D.Ala.1998) (bankruptcy court has discretion to lift stay that arose from filing of Chapter 7 petition if prejudice to creditors of being forced to litigate only in bankruptcy court outweighs prejudice to debtor and the bankruptcy estate from litigation outside the bankruptcy court); 🚩 *In re Tricare Rehab. Sys., Inc.,* 181 B.R. 569, 574 (Bankr.N.D.Ala.1994) (noting that judicial economy and whether a different court is better suited to determine the issues because of experience may be considered in deciding whether to lift an automatic stay). Because the Bankruptcy Court's conclusions rationally flow from its factual findings, there is no basis for finding that the Bankruptcy Court's conclusion was an abuse of its discretion. [7]

[7]      Although Mack disputes the Bankruptcy Court's findings that the prejudice to the Appellees outweighs the prejudice to the debtor and that allowing the Kentucky Case to proceed would not prejudice the bankruptcy estate, he does not contend that these are improper considerations. (*See* Doc. No. 1; Doc. No. 26). In fact, Mack admits that it was proper for the Bankruptcy Court to balance the prejudices to the debtor and creditor and consider which forum would be a more efficient use of judicial resources. (Doc. No. 26, p. 10).

## II. The Bankruptcy Court did Not Abuse its Decision in Deciding to Abstain from Hearing Appellees' Claims Against Mack.

**\*6** 🚩 Title 28 U.S.C. Section 1334(c)(1) allows the Bankruptcy Court to voluntarily abstain from hearing certain Bankruptcy cases by providing that:

> nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under 🚩 title 11 or arising in or related to a case under 🚩 title 11.

*Id.* The prospect of abstention may be raised by the parties or by the Court *sua sponte.* 🚩 *Carver v. Carver,* 954 F.2d 1573, 1579 (11th Cir.1992).

Mack incorrectly contends that abstention is only proper when there are difficult questions of state law or a unique state interest. (Doc. No. 26, p. 16). Abstention in the interests of justice is not limited to state law claims but may be invoked to avoid deciding federal claims. *In re Apex Oil Co.,* 980 F.2d 1150, 1152-53 (8th Cir.1992). Bankruptcy courts generally consider the following factors in order to determine whether abstention is proper:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 🚩 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form

of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of [the bankruptcy court's] docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

*E.g.,* 🚩 *[Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.,](#)* 6 F.3d 1184, 1189 (7th Cir.1993). However, this list is not exhaustive and no one factor is determinative. *Id.* Other courts have considered factors such as the need for finality or the other forum's familiarity with the facts and circumstances of the case. *See* 🚩 *[In re Reak,](#)* 92 B.R. 804, 807 (Bankr.E.D.Wis.1988) (abstention was appropriate although bankruptcy court had concurrent jurisdiction with the state court the state court was in a better position to adjudicate the claim because it was more familiar with the facts and circumstances of the case); 🚩 *[In re Cache, Inc.,](#)* 71 B.R. 851, 852 (Bankr.S.D.Fla.1987) (if mandatory abstention was not proper, then permissive abstention would be proper because "resolution of this major claim will, almost certainly, require District Court review by appeal of this court's summary determination. The District Court already has this matter pending before it and can decide this matter with greater finality and more rapidly if this court abstains than it could if it must await and exercise its appellate jurisdiction.")

**\*7** Mack's only allegation is that the Bankruptcy Court's decision to abstain was an abuse of discretion because the Bankruptcy Court's order "did not state any reason, basis or explanation for the abstention." (Doc. No. 26, p. 17). Accordingly Mack claims that the Bankruptcy Court made its decision to abstain without considering any factors. (*Id.*) Mack's argument is not well taken. A court abuses its discretion by failing to articulate specific factors when there is no basis for the conclusion in the record. *See In re W.* [*Pac. Airlines, Inc.,*](#) 263 B.R. 345, 347 (D.Colo.2001); *cf.,* 🚩 *[United States v. Brandenburg,](#)* 157 Fed. Appx. 875,

879 (6th Cir.2005) ("[A] district court's failure to articulate reasons for conditions [for supervised release] is harmless error where the reasons are obvious from the record."); 🚩 *[In re PEC Solutions, Inc. Sec. Litig.,](#)* 418 F.3d 379, 391 (4th Cir.2005) ("As long as a district court's reasons for denying leave to amend are apparent, its failure to articulate those reasons does not amount to an abuse of discretion.").

Although the paragraph of the Bankruptcy Court's Order which discusses the permissive abstention provision does not include specific discussion of the abstention factors, many of the factors are discussed in relation to the decision to lift the automatic stay. (*See* Doc. No. 1-2). Thus, the Bankruptcy Court's Order provides ample support for the decision to abstain. First, the Bankruptcy Court found that allowing the Kentucky Case to proceed would not unduly prejudice the bankruptcy estate and that proceeding in the Bankruptcy Court would severely prejudice Appellees. (Doc. No. 1-2, p. 4). As previously discussed, these findings are not clearly erroneous. *Infra* Analysis, Part I.A.

Second, the Kentucky Case was filed in 2002 and involves both RICO and state law claims. (*See* Doc. No. 3-13). Because there have been extensive proceedings in the Kentucky Case, that court is much more familiar with the law, the facts, and the parties. (*See* Doc. No. 3-8). Thus, judicial economy also favors abstention. Finally, there is potential evidence of forum shopping because the Bankruptcy Court found that Mack filed for bankruptcy to avoid final default judgment in the Kentucky Case. (Doc. No. 1-2, pp. 3-4). The Bankruptcy Court made factual findings which were not clearly erroneous and applied the correct legal standard. Therefore its decision to abstain was not an abuse of discretion.

**Conclusion**

The Court **AFFIRMS** the Bankruptcy Court's Order (Doc. No. 1-2) and **DISMISSES** the Appeal (Doc. No. 1).

**DONE** and **ORDERED** in Chambers in Orlando, Florida on April 23, 2007.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1222575

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 6

2010 WL 1380137
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

MARQUIS YACHTS, a division of
[Genmar Yacht Group, LLC](#), Plaintiff,

v.

ALLIED MARINE GROUP, INC. (NORTH),
Allied Marine Group, Inc. (South), Richard
Bertram Yachts, Inc. (North), and Richard
Bertram Yachts, Inc. (South), Defendants.

Civil No. 09–1770 (JRT/FLN).
|
March 31, 2010.

**Attorneys and Law Firms**

[Geoffrey P. Jarpe](#), Winthrop & Weinstine, Minneapolis, MN,
for plaintiff.

[Richard Gurbst](#), Squire, Sanders & Dempsey LLP, Cleveland,
OH, and [Stephen C. Rathke](#), Lommen Abdo, Cole, King &
Stageberg, P.A., Minneapolis, MN, for defendants.

### ORDER ADOPTING REPORT
### AND RECOMMENDATION

[JOHN R. TUNHEIM](#), District Judge.

**\*1** This matter is before the Court on defendants' objections
to a Report and Recommendation issued by United States
Magistrate Judge Franklin L. Noel on December 7, 2009.
After a *de novo* review of those objections, *see* [28 U.S.C.
§ 636(b)(1)](#); D. Minn. Local Rule 72.2(b), the Court overrules
the objections and adopts the Report and Recommendation
for the reasons set forth below.

### BACKGROUND

Plaintiff Marquis Yachts, a division of Genmar Holdings,
Inc.'s subsidiary Genmar Yacht Group, LLC ("Marquis"),
manufactures luxury yachts. Pursuant to a dealer agreement,
defendants Allied Marine Group, Inc. (North), Allied Marine
Group, Inc. (South), Richard Bertram Yachts, Inc. (North),
and Richard Bertram Yachts, Inc. (South) (collectively,

"Allied"), was to sell yachts manufactured by Marquis. The
dealer agreement states that any dispute between the parties,
"whether sounding in contract, tort or otherwise .... shall be
resolved by binding arbitration in accordance with Title 9 of
the U.S.Code and the Commercial Arbitration Rules of the
American Arbitration Association." (Dealer Agreement at 9,
Defs.' Br. in Supp. of Objection, Ex. B, Docket No. 36.)

Before the parties formalized the dealer agreement, Marquis
began constructing the first four of seven yachts. (Final Award
at 3–4, Application for Confirmation of Arbitration Award,
Ex. A, Docket No. 1.) Over the next few months, Allied
selected several custom options for the four yachts, including
hull color and electronics, and Marquis incorporated those
options as it manufactured the yachts. (*Id.* at 4–5.) On
July 1, 2008, Marquis requested that Allied provide order
acknowledgements for five yachts (the aforementioned four
under construction and one additional yacht) and provide a
deposit for one yacht. (*Id.* at 7.) Allied failed to return the
order acknowledgements and refused to submit the deposit,
believing such failure relieved it of any obligation to purchase
the yachts. (*Id.* at 5, 7–8.) Allied nonetheless continued to
specify additional options for the yachts. (*Id.* at 7.) After it
became clear that Allied would not purchase any of the yachts
under construction, Marquis mitigated its damages and was
able to sell all but one of the yachts at issue. (*Id.* at 8–9.)

On September 3, 2008, Allied initiated an arbitration action
against Marquis with the American Arbitration Association
("AAA") seeking declaratory relief from any obligation to
pay Marquis for the yacht remaining in Marquis' inventory.
(*Id.*) Allied was aware that Marquis intended to file an
arbitration claim on the same issue. (Online Filing Demand
for Arbitration at 2, Defs.' Br. in Supp. of Objection, Ex.
A, Docket No. 33.) On the same day, Marquis initiated
its own arbitration action with the AAA seeking specific
performance. (Report & Recommendation at 2, Docket No.
28.) The arbitration panel held a consolidated arbitration
hearing on April 20, 21, and 22, 2009, and the panel issued
an interim award in Marquis' favor on April 29, 2009. (*Id.*)

**\*2** On June 1, 2009, Genmar Yacht Group LLC and
Genmar Holdings, Inc. filed for Chapter 11 bankruptcy
in the United States Bankruptcy Court for the District of
Minnesota. The arbitration panel ordered the parties to submit
briefing on the effect on the arbitration proceedings of
[11 U.S.C. § 362](#), which imposes an automatic stay on
all actions and proceedings against the party petitioning for
bankruptcy. (Final Award at 18, Application for Confirmation

of Arbitration Award, Ex. A, Docket No. 1.) The panel finalized the arbitration award on June 25, 2009, ordering Allied to pay Marquis the purchase price and to accept delivery of the yacht, to pay sales and administrative costs related to Marquis' efforts to mitigate its damages, to pay interest accrued while Marquis awaited payment for the yachts, and to pay attorney's fees and administrative costs related to the arbitration proceedings. (*Id.* at 13.) The arbitration panel considered and rejected the argument that the stay applied to the arbitration proceeding, concluding that "the Panel's Final Award in the present case will **enhance** the bankruptcy estate." (*Id.* at 18 (emphasis in original).) The panel noted, however, that its decision was "subject to potential consideration by the courts of the applicability of 11 U.S.C. [§ ] 362(a)(2)," and therefore concluded that the decision was not necessarily final. (*Id.* at 19.)

On July 10, 2009, Marquis filed a claim with this Court seeking confirmation of the final arbitration award. (Docket No. 1.) Allied's counterclaim requested vacatur of the arbitration award, arguing that the panel violated the automatic stay and that the award violates public policy. (Answer to Compl. & Countercl., Docket No. 2.) Marquis moved for summary judgment. (Docket No. 4.) The Magistrate Judge recommended that the Court grant Marquis' motion confirming the arbitration panel's final award, grant Marquis post-award prejudgment interest, and deny Marquis' request for post-award attorney's fees. (Report & Recommendation at 7, Docket No. 28.)

## I. STANDARD OF REVIEW

Summary judgment is appropriate where no genuine issues of material fact exist and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, a court must view the facts in the light most favorable to the non-moving party, giving it the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Federal courts may vacate an arbitral award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). When considering whether to enforce an arbitral award, courts afford extraordinary deference to arbitrators. *Hall Street Assocs., L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 588–89, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008); *Crawford Group, Inc. v. Holekamp,* 543 F.3d 971, 976 (8th Cir.2008). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," the court, even if convinced that the arbitrator made a serious error, must confirm the arbitrator's award. *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). This deference is not, however, a "grant of limitless power." *Stark v. Sandberg, Phoenix & von Gontard, P.C.,* 381 F.3d 793, 799 (8th Cir.2004) (internal quotation marks omitted). To determine whether an arbitration panel exceeded its authority, courts must broadly construe the agreement and resolve all doubts in favor of the panel's authority. *Prime Therapeutics LLC v. Omnicare, Inc.,* 555 F.Supp.2d 993, 999 (D.Minn.2008) (citing *United Food & Commercial Workers, Local No. 88 v. Shop 'N Save Warehouse Foods, Inc.,* 113 F.3d 893, 895 (8th Cir.1997)).

## II. ANALYSIS

**\*3** Allied objects to the Report and Recommendation, arguing: (1) the automatic stay applies to the arbitration proceedings, (2) the arbitration panel exceeded its authority in its interpretation of the dealer agreements, and (3) the Magistrate Judge erred in recommending monetary damages that the arbitration panel did not award. The Court addresses the arguments in turn.

### A. Automatic Stay

The act of filing a bankruptcy petition operates as an automatic stay of "the commencement or continuation ... of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy] case[.]" 11 U.S.C. § 362(a)(1). The automatic stay presumptively applies to arbitration proceedings. *See In re Nerland Oil, Inc.,* 303 F.3d 911, 914 (8th Cir.2002); *see also In re Gull Air, Inc.,* 890 F.2d 1255, 1262 (1st Cir.1989) ("[T]he scope of section 362(a)(1) is broad, staying all

proceedings, including arbitration [.]"). Despite this breadth, "[t]he automatic stay ... does not divest all other courts of jurisdiction to hear every claim that is in any way related to the bankruptcy proceeding." 🚩 *Picco v. Global Marine Drilling Co.,* 900 F.2d 846, 850 (5th Cir.1990) (citation omitted). For example, the stay applies only to proceedings "against the debtor." 🚩 *Martin–Trigona v. Champion Fed. Sav. & Loan Ass'n,* 892 F.2d 575, 577 (7th Cir.1989). Proceedings brought by the debtor against other parties do not fall within the proscription of the automatic stay. [1] *Id.*

[1] In addition, "[m]inisterial acts ... do not fall within the proscription of the automatic stay." 🚩 *In re Soares,* 107 F.3d 969, 973–74 (1st Cir.1997). Here, however, the parties provided the panel with further briefing when Genmar Holdings, Inc. and Genmar Yacht Group, LLC filed the bankruptcy petition, and therefore the Court cannot say that the panel's entry of the final award was simply a ministerial act. *Cf.* 🚩 *In re Knightsbridge Dev. Co.,* 884 F.2d 145, 148 (4th Cir.1989) (holding that "the arbitration award [was] void as the product of a continuing pre-petition proceeding" where the arbitration panel engaged in deliberations after the petition was filed).

Allied argues that the arbitration panel exceeded its authority under 9 U.S.C. § 10(a)(4) in concluding that the automatic stay did not halt the arbitration proceedings. The Court agrees with the arbitration panel's conclusion that 🚩 Section 362(a) (1) does not affect the award, but reaches that conclusion for reasons that differ from those articulated by the panel.

### 1. The Court Reviews the Arbitration Panel's Interpretation of 🚩 **Section 362(a)(1)** De Novo.

The arbitration panel "considered the parties' memoranda related to the application of an automatic stay pursuant to 🚩 11 U.S.C. [§ ] 362, based on Genmar's filing for protection under Chapter 11 of the Bankruptcy Code." (Final Award at 2, Application for Confirmation of Arbitration Award, Ex. A, Docket No. 1.) The panel, noting the "against the debtor" phrase in 🚩 Section 362(a)(1) and citing *ACandS v. Travelers Casualty & Surety Co.,* 435 F.3d 252, 259 (3d Cir.2006), stated that the "Final Award in the present case will *enhance* the bankruptcy estate," and therefore concluded that

the automatic stay did not apply to the panel's proceedings. (*Id.* at 18.) The panel also noted that even though Allied was the first party to file a demand for arbitration, "the only affirmative relief ever at issue herein has been Marquis' right to recover damages from Allied. Even if Allied had fully prevailed on the merits of its claim, it would not have received damages or other affirmative relief." (*Id.* at 18.)

**\*4** The Court "affords the [arbitration panel's] decisions an extraordinary level of deference and confirms so long as the [panel] is even arguably construing or applying the contract and acting within the scope of [its] authority." *Crawford Group,* 543 F.3d at 976 (internal quotation marks omitted). Vacatur of an arbitral award is appropriate, however, "where the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). Whether the "extraordinary level of deference" extends to the panel's determination that the automatic stay did not apply to the arbitration proceedings is a question of first impression for the Court.

The Court concludes that it should review the panel's determination of the applicability of 🚩 Section 362(a)(1) *de novo.* Courts afford extraordinary deference to arbitration decisions because the parties have contractually consented to arbitration. *See* 🚩 *Stolt–Nielsen SA v. AnimalFeeds Int'l Corp.,* 548 F.3d 85, 95 (2d Cir.2008). The scope of the automatic stay, however, has implications extending beyond the contracting parties. The stay's purpose is, in part, to protect the interests of creditors in the bankruptcy estate. *See* 🚩 *Martin–Trigona,* 892 F.2d at 577 ("[The automatic stay] protects the bankrupt's estate from being eaten away by creditors' lawsuits and seizures of property before the trustee has had a chance to marshal the estate's assets and distribute them equitably among the creditors."). Genmar's creditors did not agree to submit the dispute between Marquis and Allied to arbitration. *See* 🚩 *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (internal quotation marks omitted)). Indeed, the debtor cannot waive the automatic stay. *Mar.* 🚩 *Elec. Co. v. United Jersey Bank,* 959 F.2d 1194, 1204 (3d Cir.1991) ("Because the automatic stay serves the interests of both debtors and creditors, it may not be waived and its scope may not be limited by a debtor."). The question of whether the arbitrators "exceeded their powers" by violating the automatic stay therefore differs from the typical "exceeded

their powers" inquiry under 9 U.S.C. § 10(a)(4), which focuses on whether the parties agreed to submit a particular dispute to arbitration. *See, e.g.,* Stark, 381 F.3d at 799–801. The question of the applicability of the automatic stay presents one of the "narrow circumstances" in which courts give the arbitration panel's findings no deference. *See* First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *cf.* ACandS, 435 F.3d at 258 ("A long-standing exception to this general rule [of deference to an arbitrator's findings] provides that courts may refuse to enforce arbitration awards that violate well-defined public policy as embodied by federal law. We hold that the automatic stay provision of the Bankruptcy Code promotes a public policy sufficient to preclude enforcement of an award that violates its terms or interferes with its purposes." (citation omitted)). *But see* Hall Street, 552 U.S. at 584 (holding that 9 U.S.C. § 10 enumerates the exclusive statutory grounds for vacating an arbitral award).

### 2. The Automatic Stay Applies to Allied's Claim in the Arbitration Proceedings, but Not to Marquis' Counterclaim in Those Proceedings.

**\*5** "Congress chose to stay only actions against the debtor and not those by him even though each can have adverse effects on the estate and other third party interests." Haag v. United States, 485 F.3d 1, 4 (1st Cir.2007). Courts have recognized that "[a]ll proceedings in a single case are not lumped together for purposes of automatic stay analysis. Even if the first claim filed in a case was originally brought against the debtor, section 362 does not necessarily stay all other claims in the case." Mar. Elec., 959 F.2d at 1204. As the Eighth Circuit has observed:

> Within a single case, some actions may be stayed, others not. Multiple claim and multiple party litigation must be disaggregated so that particular claims, counterclaims, crossclaims and third-party claims are treated independently when determining which of their respective proceedings are subject to the bankruptcy stay. Thus, within one case, actions against a debtor will be suspended even though closely related

In re Duncan, 987 F.2d 490, 491 n. 2 (8th Cir.1993) (quoting Mar. Elec., 959 F.2d at 1204–05) (emphasis removed); *accord* In re Hall, 304 F.3d 743, 746 (7th Cir.2002); Parker v. Bain, 68 F.3d 1131, 1137 (9th Cir.1995). "[C]ounterclaims asserted by a debtor are not actions 'against the debtor' which are subject to the automatic stay." U.S. Abatement Corp. v. Mobil Exploration & Producing U.S., Inc., 39 F.3d 563, 568 (5th Cir.1994). Counterclaims asserted against a debtor are subject to the automatic stay, but "[d]efenses [asserted against the debtor], as opposed to counter-claims, do not violate the automatic stay because the stay does not seek to prevent defendants sued by a debtor from defending their legal rights and the defendant in the bankrupt's suit is not, by opposing that suit, seeking to take possession of it." ACandS, 435 F.3d at 259 (internal quotation marks omitted). "In determining whether a continuing proceeding ... is against the debtor, we normally examine the posture of the case at the initial proceeding." McMillan v. MBank Fort Worth, N.A., 4 F.3d 362, 366 (5th Cir.1993).

At the initial proceeding and throughout the arbitration, Allied maintained a claim for declaratory relief against Marquis, and Marquis maintained a claim against Allied for specific performance and mitigation damages. Allied's claim against Marquis is an action "against the debtor" and therefore was subject to the automatic stay. There is no exception in Section 362(a) for claims for declaratory relief that do not seek monetary damages. The automatic stay did not apply, however, to Marquis' claim against Allied. [2] To the extent that the arbitration panel ruled on Allied's claim for declaratory relief, the panel violated the automatic stay and exceeded its powers. *See* 9 U.S.C. § 10(a)(4). The panel should have stayed that action and decided only Marquis' claim for relief.

[2] "[T]he bankrupt's cause of action is an asset of the estate [.]" Martin–Trigona, 892 F.2d at 577. As Marquis' counsel confirmed in a hearing before the Magistrate Judge, "there is no dispute, nor could there ever be any, that this award is an asset of the bankrupt[cy] estate." (Hr'g Tr. at 31, Docket No. 40.)

### 3. The Scope of the Automatic Stay Is Not Contingent on Whether the Award Enhances the Bankruptcy Estate.

**\*6** The arbitration panel erred in failing to identify which claims were "against the debtor" and which were brought by the debtor and in failing to stay the claim that was against the debtor. The panel instead focused on the outcome of the arbitration.

Courts have rejected such a wait-and-see approach to determining whether the automatic stay applies to a particular proceeding. "[W]hether a proceeding is against the debtor within the meaning of Section 362(a)(1) is determined from an examination of the posture of the case at the initial proceeding." *Freeman v. Comm'r, 799 F.2d 1091, 1092–93 (5th Cir.1986)* (per curiam). "That determination should not change depending on the particular stage of the litigation at which the filing of the petition in bankruptcy occurs." *Cathey v. Johns–Manville Sales Corp., 711 F.2d 60, 62 (6th Cir.1983)* (internal quotation marks omitted). "It is inconceivable that Congress intended or envisioned construction of the phrase 'against the debtor' to oscillate in any given judicial proceeding depending upon which stage of trial the action had progressed on the date of the filing of the bankruptcy petition." *Id.*

Whether the ultimate outcome of a proceeding favors the debtor is not dispositive. In a case pre-dating *ACandS,* the Third Circuit held:

> The automatic stay's effect on judicial proceedings against the debtor does not depend upon whether the court finds for or against the debtor. Once triggered, the automatic stay of an action pending against the debtor in district court continues until the bankruptcy case is closed, dismissed, or discharge is granted or denied, or until the bankruptcy court grants some relief from the stay. Absent relief from the stay, judicial actions and proceedings against the debtor are void *ab initio.*

*Mar. Elec., 959 F.2d at 1206* (citations and internal quotation marks omitted); *see also Ellis v. Consol. Diesel Elec. Corp., 894 F.2d 371, 373 (10th Cir.1990)* ("[T]he fact that judgment here was entered in favor of the debtor does not change the outcome.... [W]hether a case is subject to the automatic stay must be determined at its inception. The operation of the stay should not depend upon whether the district court finds for or against the debtor." (internal quotation marks, citation, and emphasis omitted)).

The arbitration panel relied on *ACandS,* a Third Circuit opinion authored by then-Judge Alito, in which the debtor challenged an arbitration award as violating Section 362(a). 435 F.3d at 255. ACandS, the debtor, had been "one of the nation's largest installers of asbestos insulation," and in 1988 it reached an agreement with its insurer, Travelers Casualty, regarding the allocation of coverage between products claims and operations claims. *Id.* at 255–56. The agreement provided that the parties would submit any disputes over reallocation of coverage first to mediation and then, if the mediation did not succeed, to binding arbitration. *Id.* at 256. In 2000, ACandS filed a motion for declaratory judgment seeking to have certain claims recognized as separate occurrences. *Id.* The district court then granted a joint motion for a stay pending arbitration. *Id.* In 2001, ACandS filed a formal demand with Travelers Casualty seeking an increase in the allocation of claims to operations, and the parties ultimately proceeded to arbitration on that claim. *Id.* at 256–57. Before the arbitration panel issued its award, ACandS petitioned for Chapter 11 bankruptcy. *Id.* at 257. After the panel issued its award, ACandS filed a motion in federal court seeking vacatur. *Id* . The district court denied the motion and affirmed the award, and also dismissed the 2000 motion as moot. *Id.*

**\*7** *ACandS* adopted an outcome-oriented test, holding that in arbitration proceedings the automatic stay attaches as soon as the scope of the parties' submissions supports an award that could diminish the bankruptcy estate. *Id.* at 260. The Third Circuit rejected the district court's finding "that the automatic stay did not apply because the arbitration was an action initiated by the debtor." *Id.* at 259. The court explained that the nature of arbitration makes it difficult to identify whether the arbitration is a proceeding "against the debtor":

While in the context of a trial it is simple to distinguish between claims and counter-claims that may support judicial relief, in the context of arbitration, especially in the absence of a joint statement of issues submitted, it is impossible to definitively classify the arguments presented. Travelers contends that its arguments in favor of a zero allocation of claims to the products coverage should be classified as a permissible defense. Defenses, as opposed to counter-claims, do not violate the automatic stay because the stay does not seek to prevent defendants sued by a debtor from defending their legal rights and the defendant in the bankrupt's suit is not, by opposing that suit, seeking to take possession of it. In the trial context, a defendant's failure to formally plead a counter-claim prevents the court from granting affirmative relief on the basis of the defendant's arguments. By contrast, an arbitration award will be affirmed so long as its form can be rationally derived from either the agreement between the parties or the parties' submissions to the arbitrators and the terms of the arbitral award are not completely irrational. This procedural flexibility, which is essential to the utility of arbitration, allows Travelers to make a colorable argument that it respected the stay by merely defending its interests when there is no question that in the trial context it would have been required to file a counterclaim in order to obtain the result it seeks to uphold.

*Id.* at 259–60 (internal quotation marks, citations, and emphases omitted). The court stated that "the panel's authority must yield when a dispute threatens the rights of third parties in violation of the laws of the United States." *Id.* at 260. The court held that, "[t]o avoid interfering with the broad purposes served by the automatic stay, it was necessary for the arbitration proceeding to halt as soon as the scope of the parties' submissions supported an award that could diminish ACandS's estate." *Id.* Hence, the court argued, "[b]y continuing beyond this point, the proceeding violated § 362(a)(1), and the panel's deliberations and the resulting award are therefore void." *Id.*

The Court does not find *ACandS* persuasive. *ACandS* is not consistent with the guidance of other circuits that emphasizes that the automatic stay applies only to proceedings "against the debtor," even though actions brought by the debtor also "can have adverse effects on the estate and other third party interests." *Haag,* 485 F.3d at 4; *Ellis,* 894 F.2d at 373 ("The operation of the stay should not depend upon whether the district court finds for or against the debtor."). *ACandS* did not address the requirement that arbitrators and courts disaggregate the claims to stay only those against the debtor and to allow other claims to go forward. *See In re Duncan,* 987 F.2d at 491 n. 2; *Maritime Elec.,* 959 F.2d at 1204–05. *ACandS* is also inconsistent with the rule that courts are to determine "whether a proceeding is against the debtor within the meaning of Section 362(a)(1) ... from an examination of the posture of the case at the initial proceeding." *Freeman,* 799 F.2d at 1092–93. *ACandS* also raises the danger that parties involved in arbitration initiated by a business that has petitioned for bankruptcy would seek declaratory relief that they do not owe the business any money. According to the Third Circuit's reasoning, such claims (or counterclaims) might go forward, so long as they do not run the risk of diminishing the bankruptcy estate. Such actions are nonetheless "against the debtor" and fall within the scope of the automatic stay, despite the fact that they may not have the potential to diminish the bankruptcy estate.

**\*8** The Court also does not find *ACandS* applicable to the arbitration proceedings in this case. Two circumstances critical to the Third Circuit's reasoning in *ACandS* are not present here, and therefore, even if the Eighth Circuit were to adopt *ACandS's* outcome-oriented test, the Court would not apply that test to the facts of this case. First, the arbitration proceedings in *ACandS* involved claims brought by ACandS, the debtor, and no readily identifiable claim by Travelers Casualty against the debtor. Travelers Casualty did not expressly raise a counterclaim, but did ultimately make a submission that sought affirmative relief that would have diminished the bankruptcy estate.[3] Here, however,

both parties brought claims, and the plain language of Section 326(a)(1) applies to Allied's claim. The panel did not identify any difficulty in classifying the claims in the arbitration proceeding as claims brought by or against the debtor. Second, Travelers Casualty's position evolved during the arbitration proceedings, while Allied's position and requested relief remained consistent throughout its arbitration proceedings with Marquis. Hence, the special circumstances that prompted the Third Circuit to adopt its outcome-oriented test are not present here.

3    Under the reasoning articulated in Part II.A.2 above, the arbitration panel in *ACandS* should have construed that submission as raising the equivalent of a counterclaim. Indeed, even if Travelers Casualty's submission had simply sought declaratory relief that would not have diminished the bankruptcy estate, the arbitration panel should have construed the submission as raising a counterclaim, and should have stayed proceedings on that counterclaim.

**4. The Court Declines to Modify the Arbitral Award**

"A district court must take the award as it finds it and either vacate the entire award using section 10 or modify the award using section 11." 🚩*Stark,* 381 F.3d at 799 (internal quotation marks omitted). Section 11 authorizes a reviewing court to modify an arbitration award under only limited circumstances:

  (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

  (b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

  (c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

9 U.S.C. § 11.

The Court does not have authority under Section 11 to modify the arbitration award. In ruling on Allied's claim for declaratory relief, which fell within the scope of the automatic stay, the panel arguably "awarded upon a matter not submitted to them." 🚩9 U.S.C. § 1 🚩1(b). Nonetheless, that matter had no effect on "the merits of the decision upon" Marquis'

claim against Allied, which was also a "matter submitted" to the panel and over which the panel had jurisdiction. *See id.* Therefore, even though the arbitrators exceeded their powers in failing to disaggregate the claims and in deciding Allied's claim for declaratory relief, the Court does not have authority to modify the arbitration award. [4]

4    If the Court is mistaken and the automatic stay applied to the entire arbitration, Marquis may still be able to obtain relief. Some courts have recognized that "the bankruptcy court has the power to annul the automatic stay pursuant to 🚩section 362(d)." 🚩*Picco,* 900 F.2d at 850. Therefore, if Allied persists in challenging the validity of the arbitration award, Marquis may petition the bankruptcy court to lift the stay to the extent that it may apply to the arbitration and to Marquis' efforts to confirm the award in this Court. *See id.* ("[E]ven if the district court's decision did violate the automatic stay when it was entered, the bankruptcy court's order lifting the stay cured any defect."); 🚩*In re Myers,* 491 F.3d 120, 127 (3d Cir.2007) ("[A]ctions in violation of the stay, although void (as opposed to voidable), may be revitalized in appropriate circumstances by retroactive annulment of the stay."). *But see Mar.* 🚩*Elec.,* 959 F.2d at 1207 n. 11 (questioning "whether a bankruptcy court may exercise its equitable powers to retroactively rehabilitate judicial acts and proceedings which would otherwise be void *ab initio* as violations of the automatic stay").

For the foregoing reasons, the Court concludes that the automatic stay applied to Allied's claim against Marquis but did not apply to those portions of the arbitration proceedings that involved Marquis' claims against Allied. Because the arbitration panel exceeded its powers under 9 U.S.C. § 10 in deciding Allied's claim against Marquis, but acted within its powers in deciding Marquis' claim against Allied, the Court must consider two options: vacating the entire award or modifying the award. The Court is not authorized to modify the arbitration award because there is no evidence that the panel's decision on Allied's claim against Marquis affected the merits of the panel's decision on Marquis' claims against Allied. The Court declines to vacate the entire award because the panel was acting, in part, within its powers by continuing

the arbitration proceedings and issuing the final award on Marquis' claim after Genmar petitioned for bankruptcy.

### B. The Arbitration Panel's Interpretation of the Dealer Agreements

**\*9** Allied and Marquis entered into arbitration pursuant to the dealer agreement. This dispute falls within the scope of § 3.7 of the dealer agreement, which states that "any action, whether sounding in contract, tort, or otherwise ... arising out of or in connection with [this agreement]" shall be resolved by binding arbitration. (*See, e.g.,* Marquis Yachts Dealer Agreement 2009 Model Year § 3.7, Docket No. 14.) Allied argues that the arbitration panel exceeded its powers by ignoring plain language in the dealer agreement.

As noted above, 9 U.S.C. § 10(a)(4) allows the Court to vacate an arbitral award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." This Court does not have the power or prerogative to second-guess the arbitration panel's findings as to the contractual dispute, and must give those findings an "extraordinary level of deference." *Crawford Group*, 543 F.3d at 976.

The parties do not dispute that the arbitration panel had authority under § 3.7 of the dealer agreement to decide any contract claims. Indeed, both parties pursued arbitration on the same day. Instead, Allied argues that the arbitration panel "exceeded [its] powers" by incorrectly interpreting the dealer agreement. *See* 9 U.S.C. § 10(a)(4). "Judicial review of arbitration awards is narrow because arbitration is intended to be the final resolution of disputes. Arbitrators do not act as junior varsity trial courts where subsequent appellate review is readily available to the losing party." *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731,* 990 F.2d 957, 960 (7th Cir.1993). The interpretation of the dealer agreements is a factual finding within the authority of the arbitration panel. The panel identified the relevant portions of the dealer agreement and applied them to the facts presented in the arbitration proceedings. The Court defers to the panel's findings and concludes that the panel did not exceed its powers in construing the dealer agreement.

Allied argues that beyond the statutory provisions, this Court can invalidate arbitral awards on the broad grounds of "public policy." *Hall Street* clarified that "Sections 10 and 11 of the FAA provide the exclusive grounds for vacating and

modifying an arbitration award," and courts cannot use extra-statutory bases to vacate arbitral awards pursuant to FAA claims. 552 U.S. at 586; *Prime Therapeutics,* 555 F.Supp.2d at 999; *see also Citigroup Global Markets, Inc. v. Bacon,* 562 F.3d 349, 355 (5th Cir.2009) (holding that manifest disregard of the law no longer constitutes a non-statutory ground for vacating awards under the FAA).

In *Carey Rodriguez Greenberg & Paul, LLP v. Arminak,* the United States District Court for the Southern District of Florida, relying on *Hall Street,* considered and rejected the defendant's claim that public policy is a valid non-statutory basis for vacatur under the FAA. 583 F.Supp.2d 1288, 1290–91 (S.D.Fla.2008). The *Arminak* court acknowledged that *Hall Street* allows for the possibility that other grounds could provide a proper basis for vacatur where the parties do not seek review of the arbitration award under the FAA. *Id.* at 1291 (quoting *Hall Street,* 552 U.S. at 590); *see Hall Street,* 552 U.S. at 590 ("In holding that §§ 10 and 11 provide exclusive regimes for the review provided by the statute, we do not purport to say that they exclude more searching review based on authority outside the statute as well. The FAA is not the only way into court for parties wanting review of arbitration awards: they may contemplate enforcement under state statutory or common law, for example, where judicial review of different scope is arguable."). The court concluded that it could not consider non-statutory grounds for vacatur, such as public policy, because the plaintiff petitioned for confirmation of the award under the FAA and because the defendant had "not filed a motion to vacate pursuant to a non-FAA alternative that also governs the enforcement of arbitration awards (e.g., a system for enforcement under either state statutory law or state common law)." *Id.*

**\*10** The Court agrees with and adopts *Arminak's* reasoning. Public policy is not one of the exclusive statutory grounds that the FAA provides for vacating arbitration awards. Allied provides no explanation for why state law should govern vacatur in this instance or of how state law would support vacatur.

### C. Post–Award Interest

Allied argues that the Magistrate Judge erred in recommending that the Court order Allied to pay Marquis monetary damages not awarded by the arbitration panel.[5]

**5** Marquis does not object to the Magistrate Judge's recommendation that the Court deny Marquis' request for post-award attorney's fees, and therefore the Court denies Marquis' request for summary judgment to the extent that it requests such fees. (*See* Pl.'s Mem. in Opp'n to Defs.' Objection to Report & Recommendation, Docket No. 38.)

The final award directs Allied to complete the purchase and take delivery of the yacht, and to compensate Marquis for certain pre-award interest, mitigation damages, attorney's fees, and arbitration fees and expenses. The Magistrate Judge recommended that the Court order Allied to pay Marquis the contracted price for the yacht and that Allied accept delivery of the yacht. The Magistrate Judge specified that Allied should pay Marquis a total of $2,987,170.53, which is the sum Marquis requested, and which includes specific performance of payment of the $2,731,174 purchase price of the yacht. Other than the issue of prejudgment interest, discussed below, the Court finds no appreciable difference between the final arbitration award and the Magistrate Judge's recommendation.[6] To the extent that Allied objects to the Magistrate Judge's decision to combine the specific performance portion of the final award with the other monetary relief in the final award, the Court's order reflects which portion of Allied's monetary obligation to Marquis is specific performance and which portion comprises the monetary award of mitigation damages, attorney's fees, interest, and arbitration expenses.

**6** According to the Court's calculations, the arbitration panel awarded Marquis a total of $2,988,127.70, including $2,731,174 in performance on the contract to purchase the yacht, $6,484.05 in mitigation damages, $91,301.75 in interest, $113,782.08 in attorney's fees and expenses, and $45,385.82 in arbitration expenses and arbitrator fees. Marquis, however, represented that the final award "requires Defendants to pay Marquis the aggregate sum of $2,987,170.53." (Application for Confirmation of Arbitration Award at 1, Docket No. 1.) Because neither party has questioned this minor discrepancy, and because the discrepancy operates in Allied's favor, the Court declines to order Allied to pay Marquis more than what Marquis requested in its application for confirmation of the arbitration award.

Generally, prejudgment interest is appropriate "when the amount of the underlying liability is reasonably capable of ascertainment and the relief granted would otherwise fall short of making the claimant whole because [he] has been denied the use of money which he was legally due." *Stroh Container Co. v. Delphi Indus., Inc.,* 783 F.2d 743, 752 (8th Cir.1986). Prejudgment interest serves several purposes: compensating prevailing parties for the true costs of damages, deterring attempts to benefit unfairly from the unavoidable delays of litigation, and promoting settlement in cases where liability and the amount of damages are fairly certain. *Id.* (citing *Gen. Facilities, Inc. v. Nat'l Marine Serv., Inc.,* 664 F.2d 672, 674 (8th Cir.1981)). Courts should award prejudgment interest so long as no exceptional or unusual circumstances exist that would make such an award inequitable. *Ohio River Co. v. Peavey Co.,* 731 F.2d 547, 549 (8th Cir.1984). Allied offers no specific objection to the Magistrate Judge's recommendation that the Court award prejudgment interest. (*See* Objections, Docket No. 31.)

Marquis has suffered avoidable delay waiting to receive the final award. The arbitration panel finalized the award in late June. After the panel issued the final award, Allied refused to pay, prompting Marquis to file the instant petition for confirmation. The Magistrate Judge issued the Report and Recommendation in mid-December, but Allied objected to it, compounding the avoidable delay. Allied has had unfair benefit of the money for several months. The Court finds no exceptional or unusual circumstances that might make an award of prejudgment interest inequitable.

### ORDER

**\*11** Based on the foregoing, and all the records, files and proceedings herein, the Court **OVERRULES** Defendants' objections [Docket No. 31] and **ADOPTS** the Magistrate Judge's Report and Recommendation [Docket No. 28] as modified. Accordingly, **IT IS HEREBY ORDERED** that:

1. The Final Arbitration Award is **CONFIRMED:**

   a. With respect to the award of specific performance:

      i. Allied is **ORDERED** to pay Marquis $2,731,174; and

      Marquis is **ORDERED** to deliver and Allied is **ORDERED** to accept delivery of the Marquis 720 Tri–Deck Yacht, hull No. A2004.

b. With respect to the remainder of the award, Allied is **ORDERED** to pay Marquis $255,996.53 in mitigation damages, interest, attorney's fees and costs, and arbitration fees and expenses.

2. Allied is **ORDERED** to pay Marquis post-award interest on the sum of $2,987,170.53, accrued from June 25, 2009 to the date judgment is entered at an annual prejudgment interest rate of four (4) percent.

3. Plaintiff's Motion for Summary Judgment [Docket No. 4] is **GRANTED in part and DENIED in part** as follows:

a. Plaintiff's request for post-award attorney's fees is **DENIED;** and

b. In all other respects, Plaintiff's motion for summary judgment is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1380137

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 7

2009 WL 210471
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

SOLE SURVIVOR CORP., Appellant(s),
v.
Paul BUXBAUM, et al., Appellee(s).

No. CV 07-3858-GW.
|
Jan. 22, 2009.

West KeySummary

1 **Bankruptcy**   Right of review and persons entitled; parties; waiver or estoppel

Company's only shareholder lacked standing to challenge the denial of company's ex parte motion in a bankruptcy case. The company was the only debtor in the underlying bankruptcy case and the shareholder was not a debtor or otherwise a party in that matter. The ex parte motion was brought only by the company, and the shareholder was not named as a moving party. Therefore, the order denying the ex parte motion referred only to the company as the moving party.

Decision re Appeal from the United States Bankruptcy Court for the Central District of California Bankruptcy Case No. 04-17544-MT.

**DECISION RE APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, BANKRUPTCY CASE No. 04-17544-MT**

GEORGE H. WU, District Judge.

**I. Introduction**

 **\*1** Appellants Sole Survivor Corp. ("Sole Survivor") and Donald N. Love ("Love") (together "Appellants") appeal a Bankruptcy Court Order entered on May 24, 2007,

denying Sole Survivor's Ex Parte Motion for an Order to Show Cause re: Contempt (the "Ex Parte Motion"). Appellants contend that Appellees-the Buxbaum Group, LLC ("Buxbaum"), Paul Buxbaum, and Sole Asset Holdings, Inc. ("SAH") (collectively "Appellees")-violated the automatic stay imposed by 11 U.S.C. § 362[1] by implementing a sham transfer of all of Sole Survivor's assets to a strawman corporation followed by a foreclosure sale.

[1] Unless otherwise indicated, all references to statutes herein are to Title 11 of the United States Code.

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure ("FRBP") and Local Rule 7, the Court finds the matter appropriate for disposition without oral argument.[2] The Court now DISMISSES the appeal for want of jurisdiction.

[2] This Court finds that the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. See Matter of Thirtyacre, 36 F.3d 697, 701 (7th Cir.1994).

**II. Factual and Procedural Background**

Sole Survivor's Ex Parte Motion was filed on March 14, 2007. See Docket Sheet for U.S. Bankruptcy Court, Central District of California Case Number 1:04-bk-16544-MT, Exhibit 1 in Appellants' Opening Appendix on Appeal ("Appellants' App.") at page 3. The factual background of this matter is fairly byzantine, and is repeated here only in enough detail to provide the necessary context, as this appeal can be resolved upon consideration of certain threshold matters.

Sole Survivor was a manufacturer of sportswear and related products under a number of different marks. See Declaration of Donald N. Love ("Love Decl.") ¶¶ 2-3, attached as Exhibit 3 to Appellants' App. at 39. At all relevant times, Love was Sole Survivor's only shareholder and, apparently, its only director and officer. Id. ¶ 1, Appellants' App. at 38.

In 2003 and 2004, Sole Survivor began to experience severe cash flow problems, and turned to Buxbaum with the intent of having Buxbaum provide both a secured credit facility as well as expertise in negotiating with creditors for the purpose of obtaining either discounts or workout arrangements with those creditors. Id. ¶ 7, Appellants' App. at 40. In 2004, Sole

Survivor and Buxbaum entered into a business relationship, in which Buxbaum extended Sole Survivor a significant amount of credit [3] in exchange for a security interest in "virtually all" of its assets. *See* Love Decl. ¶¶ 7-10, Appellants' App. at 40-42; Declaration of Paul Buxbaum ("Buxbaum Decl") ¶ 7, attached as part of Exhibit 20 to Appellees' Opening Appendix on Appeal ("Appellees' App.") at page 273. [4] By November 2004, Buxbaum had loaned $2,984,064 to Sole Survivor (Buxbaum Decl. ¶ 7, Appellees' App. at 273), and the latter was in default on its obligations to Buxbaum. *Id.* ¶ 9, Appellees' App. at 274. On November 13, 2004, Buxbaum sent Sole Survivor (and its creditors) a "Notice of Default and Exercise of Reservation of Rights," and initiated a foreclosure sale. *Id.* ¶ 10, Appellees' App. at 274; and Compendium, Exhibit 14, Appellants' App. at 186-88. Notices of Sale were published in the Los Angeles Times on November 21 and 28, 2004. Compendium, Exhibits 15 and 16, Appellants' App. at 191 and 194.

[3] Buxbaum made two loans to Sole Survivor in the aggregate principal amount of $870,000, and provided a secured revolving credit facility in the amount of $4 million (the "Buxbaum Loans"). Love Decl. ¶¶ 8-10, Appellants' App. at 40-42.

[4] Buxbaum's security interest in Sole Survivor's assets was perfected by the filing of UCC-1 financing statements with the California Secretary of State. *See* Buxbaum Decl. ¶ 7, Appellees' App. at 273; and Exhibits 6 and 13 attached to Evidentiary Compendium of Exhibits ("Compendium") which is part of Exhibit 7 to Appellants' App. at 127-29 and 181-84.

**\*2** On November 29, 2004, Camelot Enterprises, which had been Sole Survivor's landlord until June of 2004, and was afterward its judgment creditor, initiated Sole Survivor's bankruptcy case by filing an involuntary bankruptcy petition under Chapter 7 of the Bankruptcy Code (the "Involuntary Petition"). Compendium, Exhibit 17, Appellants' App. at 197-98. Buxbaum was served a copy of the summons and other notices by mail on December 2, 2004. *Id.,* Exhibit 20, Appellants' App. at 207-08.

In his declaration, Buxbaum stated that "because of" the Involuntary Petition, the foreclosure sale was continued to December 7, 2004. Buxbaum Decl. ¶ 11, Appellees' App. at 275. According to a Bill of Sale dated December 1, 2004, on that date all of Sole Survivor's assets were transferred

to an entity called Gramicci, Inc. ("Gramicci") for the sum of $5,000. [5] *See* Bill of Sale attached as Exhibit 8 to Appellants' App. at 246-50. Gramicci was apparently created on November 22, 2004. *See* Appellants' App. at 347. On December 6, 2004, SAH was created. *Id.,* at 211. The foreclosure sale of the assets of Sole Survivor (which were at that point owned by Gramicci) went forward on December 7, 2004. Buxbaum Decl. ¶ 14, Appellees' App. at 276. Following the foreclosure sale, at which the Buxbaum Group was the successful bidder (having proffered its credit bid of $3,025,000), the Sole Survivor assets were transferred to SAH. *Id.,* Appellants' App. at 215-16. Love subsequently entered into a consulting agreement with SAH. Appellees' App. at 332-37.

[5] Love contends that he could not have signed the documents related to the sale of Sole Survivor's assets to Gramicci-*i.e.,* the Bill of Sale and the "Joint Unanimous Written Consent of Board of Directors and Shareholders of Sole Survivor Corporation" (to which he is the sole signatory)- before December 6, 2004, and that they were not forwarded to him for his review until December 4, 2004.

Neither Love nor Sole Survivor contested the Involuntary Petition. On January 24, 2005, the Bankruptcy Court entered its Order of Relief and Order to File Schedules and Statement of Affairs (the "Order of Relief"). Six separate meetings of creditors were noticed under Bankruptcy Code § 341(a), but Sole Survivor and Love never appeared and no meeting of creditors was ever conducted. Buxbaum Decl. ¶ 15 & Ex. G, Appellees' App. at 276 and 306-27). Sole Survivor and Love never filed the Debtor's Schedules of Assets and Liabilities or Statement of Financial Affairs in compliance with the Order for Relief. *Id.* On August 12, 2005, the Bankruptcy Court entered an order dismissing the case "[f]or reasons orally stated on the record." [6] Appellants' App. at 242-43. On June 7, 2006, the Clerk of the Bankruptcy Court entered an order administratively closing the bankruptcy case because of the August 12, 2005 Order and "[s]ince it appears that no further matters are required[,] ... that this case remain open, or that the jurisdiction of this Court continue...." Appellants' App. at 245.

[6] The transcript of the August 12, 2005 hearing was not included in the parties' Appendices.

Sole Survivor's original contention in its Ex Parte Motion-which did not discuss the transfer to Gramicci-was that the foreclosure sale violated the automatic stay. [7] *See* Appellants' App. at 32. The Ex Parte Motion was not directly calendared. *See* Appellants' App. at 435. Instead, the Bankruptcy Court directed Sole Survivor to file a motion to reopen the bankruptcy case, which it did. *See* Exhibit 19 to Appellees' App. On May 16, 2007, the Bankruptcy Court issued a tentative ruling denying Sole Survivor's motion to reopen the bankruptcy case. Appellants' App. at 419. That ruling stated in part:

[7] Appellants now contend that, because soliciting a debtor's signature on documents that assign or sell the debtor's right, title, or interest in any type of property constitutes a violation of 🔖 § 362(a) (3), the transfer to Gramicci was void as a matter of law so that the foreclosure sale was still a violation of the automatic stay. Alternatively, they argue that the sale is subject to avoidance under § 549, because a debtor's freedom to make transfers during the "gap-period" under authority of § 303(f) is limited to the extent that it receives value for the transfer. Thus, the most that could have been removed from the bankruptcy estate as a result of the purported sale would be $5,000.

 **\*3** First, a motion to reopen is not applicable here. The bankruptcy case was dismissed because the debtor failed to appear at several 341(a) meetings and no schedules were ever filed. 9th Cir. law clearly states that a dismissed case cannot be reopened, *see* 🔖 *In re Pavelich,* 229 B.R. 777, 781 (9th Cir.1999);* 🔖 *In re Income Property Builders, Inc.,* 699 F.2d 963, 965 (9th Cir.1982).

 Second, even if the court were to deem the motion a motion to vacate dismissal, the one year time period to bring such a motion has passed. Under 🔖 F.R.C.P. Rule 60, made applicable by F.R.B.P. Rule 9024, a court may relieve a party from an order for fraud, but the motion shall be made not more than one year after the order was entered.

 *Id.* Thereafter, on that same day, a hearing was held as to the motions. After listening to arguments of attorneys for Sole Survivor and Buxbaum plus statements from the Chapter 7 Trustee (*i .e.* Diane C. Weil, Esq.) and considering the

moving and opposing papers and concomitant evidence, Bankruptcy Judge Maureen Tighe found and concluded that: 1) Love was the "main officer of the Debtor" during the relevant period; 2) Love was "participating" in the operations of Sole Survivor, including obtaining a consulting agreement with Gramicci following the sale of Sole Survivor's assets to Gramicci; 3) Sole Survivor/Love waited two and a half years after the foreclosure sale (of which Love was aware) before filing the Ex Parte Motion claiming that the foreclosure sale and transfer of assets violated the automatic stay; 4) Sole Survivor/Love had not appeared at any of the Section 341(a) meetings, filed any Schedule of Assets and Liabilities or Statement of Financial Affairs, or otherwise participated in the Chapter 7 proceedings; 5) both the Trustee and the Bankruptcy Court were aware of the transfer and foreclosure sale before deciding in August 2005 to dismiss the Chapter 7 bankruptcy; 6) the Trustee had reasonably concluded before the dismissal that there was no chance of some return to unsecured creditors and that, even if the transfer was voided, the only possible benefit would be to the remaining secured creditor CIT; 7) the "case was dismissed for good reason and not due to fraud on the Court;" and 8) the Ex Parte Motion would be denied because, in essence, "[i]t would be a waste of time." Appellants' App. at 451-54. On May 24, 2007, the Bankruptcy Court entered its Order Denying Motion to Reopen (Appellees' App. 349-51) and its Order Denying the Ex Parte Motion (Appellants' App. 457-63). Appellants have appealed the latter order, but not the former, as they contend that the Bankruptcy Court had jurisdiction to issue an order to show cause even without reopening the bankruptcy case. *See* Exhibit 15 to Appellants' App.

### III. Legal Standard

It is noted that Appellants' Brief does not contain a statement of the appropriate standard of review on appeal as required by 🔖 FRBP 8010(a)(1)(A). District courts have jurisdiction to hear appeals "from final judgments, orders, and decrees" of the bankruptcy court. 🔖 28 U.S.C. § 158(a). In considering a bankruptcy appeal, a district court must review findings of fact under a "clearly erroneous" standard and conclusions of law de novo. 🔖 *Lundell v. Anchor Const. Specialists, Inc.,* 223 F.3d 1035, 1039 (9th Cir.2000). Questions of statutory construction and interpretation are conclusions of law and are reviewed de novo. 🔖 *In re MacIntyre,* 74 F.3d 186, 187 (9th Cir.1996).

**\*4** A court's denial of a motion for contempt is generally reviewed for abuse of discretion. *See* [Irwin v. Mascott, 370 F.3d 924, 931 (9th Cir.2004)](). It has been suggested, however, that less deference should be applied in the context of an automatic stay violation. *See* [Jove Eng'g v. IRS, 92 F.3d 1539, 1546 (11th Cir.1996)](). Whether a bankruptcy court has jurisdiction to issue a contempt order after dismissal has been entered and after a case has been dismissed and/or closed is a question of law.

"[T]he federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines." [United States v. Hays, 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995)]() (citation, internal quotes, and brackets omitted). The party who invokes federal jurisdiction on appeal bears the burden of establishing standing. [United States v. San Francisco, 979 F.2d 169, 171 (9th Cir.1992)]().

## IV. Analysis

A. *Appellants Lack Standing to Bring this Appeal.*

1. *Love has no standing to bring this appeal.*
Sole Survivor was the only debtor in the underlying bankruptcy case. Love was not a debtor or otherwise a party in that matter.

The Ex Parte Motion was brought only by Sole Survivor, and Love is not named as a moving party. The Order denying the Ex Parte Motion refers only to Sole Survivor as the moving party.[8]

[8]    Love was named as a movant in the Motion to Reopen the Bankruptcy Case wherein he is characterized as an "unsecured creditor/equity interest holder." However, as noted above, the motion to reopen was not made a part of the present appeal.

Given the fact that Love was not a party or movant as to the Ex Parte Motion, he lacks standing to challenge its denial on appeal.

2. *As a general rule, the bankruptcy court has jurisdiction over contempt proceedings arising from violations of the automatic stay even after a case has been dismissed.*
The Bankruptcy Court's jurisdiction to consider the Ex Parte Motion did not depend on whether the bankruptcy case could be reopened. The Bankruptcy Code does not provide for reopening a case that has been dismissed. As the Bankruptcy Appellate Panel ("B.A.P.") stated in [Pavelich v. McCormick, Barstow, Sheppard, Wayte & Carruth LLP (In re Pavelich), 229 B.R. 777, 781 (B.A.P. 9th Cir.1999)]():

Reopening a dismissed case is an oxymoron-since the consolidated cases were dismissed rather than closed, there are no closed cases to reopen. *See Armel Laminates, Inc. v. Lomas & Nettleton Co.* ([In re Income Prop. Bldrs., Inc.), 699 F.2d 963 (9th Cir.1983)](). Moreover, the Bankruptcy Code differentiates closing a case from dismissing a case in a fashion that arguably treats closing and dismissal as mutually exclusive. *See, e.g.,* [11 U.S.C. §§ 349]()-[350(a)]().

The procedural alternative is merely to make a motion or file an adversary proceeding on a retained jurisdiction theory in a dismissed case. [Citations].

The parties disagree about whether a "retained jurisdiction theory" would permit the Bankruptcy Court to entertain contempt proceedings. [11 U.S.C. § 362(k)(1)]() provides that "individuals" injured by a willful violation of the automatic stay may recover damages.[9] "For other debtors [who are not 'individuals'], contempt proceedings are the proper means of compensation and punishment for willful violations of the automatic stay." *Johnston Envt'l Corp. v. Knight* ([In re Goodman), 991 F.2d 613, 620 (9th Cir.1983)]() (brackets in original). The B.A.P. has held that actions for damages based on violations of the automatic stay are not rendered moot by dismissal of the underlying bankruptcy. *See, e.g.,* [Davis v. Courington (In re Davis), 177 B.R. 907, 911 (B.A.P. 9th Cir.1995)](). Similarly, after a case has been dismissed, "... the bankruptcy court retains subject matter jurisdiction to interpret orders entered prior to dismissal of the underlying bankruptcy case ... and to dispose of ancillary matters." [Tsafaroff v. Taylor (In re Taylor), 884 F.2d 478, 481 (9th Cir.1989)]().

9

Sole Survivor, as a corporation, cannot utilize 11 U.S.C. § 362(k) as a vehicle for obtaining damages arising from a violation of the automatic stay. *See In re Colortron, Inc.,* 210 B.R. 823, 828 (B.A.P. 9th Cir.), *aff'd in part and rev'd in part on other grounds,* 165 F.3d 35 (9th Cir.1997); *In re Goodman,* 991 F.2d 613, 616 (9th Cir.1993).

**\*5** As noted in *In re Income Property Builders, Inc.,* 699 F.2d 963, 965 (9th Cir.1982): "[a]n order dismissing a bankruptcy case accomplishes a completely different result than an order closing it would and is not an order closing." In *Income Property,* the B.A.P. dismissed an appeal as moot where the debtor sought to reimpose the automatic stay after the dismissal of the underlying bankruptcy case. It held that the stay arises by operation of bankruptcy law and that after the dismissal of the underlying case it no longer had the power to restore the proceeding or to reimpose the stay. *Id.* at 964. Courts faced with requests to reopen a dismissed bankruptcy case under § 350(b) have relied upon *Income Property* in denying the requests. *See, e.g., In re Woodhaven, Ltd.,* 139 B.R. 745, 747-48 (Bankr.N.D.Ala.1992) ("[A] closed case and a dismissed case represent totally different results; closing a case contemplates a full estate administration and the completion of the bankruptcy process, whereas dismissing a case restores the assets and parties to their prepetition status, as if the case had never been filed.").

In *Aheong v. Mellon Mortg. Co. (in Re Aheong ),* 276 B.R. 233 (B.A.P. 9th Cir.2002), however, the B.A.P. held the bankruptcy court had jurisdiction to *annul* an automatic stay under either ancillary or "arising under" jurisdiction notwithstanding the dismissal of the case and regardless of whether the case was reopened. Appellees note that no court has held that "ancillary matters" include contempt of court. However, a party seeking an OSC re contempt is not seeking new relief, but is simply seeking enforcement of a prior order. *Id.* at 241. The relief sought here is more akin to that sought in *Aheong* than the relief sought in cases where courts have found a lack of jurisdiction. Thus, the fact that the bankruptcy case had been dismissed, did not, by itself, deprive the court of jurisdiction. Similarly, the Clerk's administrative act of ordering the bankruptcy case "closed" did not have any jurisdictional significance. *Cf. Menk v. Lapaglia (in Re Menk ),* 241 B.R. 896 (B.A.P. 9th Cir.1999) (no jurisdictional

requirement that a closed bankruptcy case be reopened before "arising under" jurisdiction can be exercised).

3. *Sole Survivor and Love lacked standing to initiate contempt proceedings and therefore lack standing to bring this appeal.*

Appellees also contend that Sole Survivor lacked standing to initiate contempt proceedings because it was hopelessly insolvent. This Court agrees. Only those persons who are directly and adversely affected pecuniarily by an order of the bankruptcy court have been held to have standing to appeal that order. *In re Fondiller,* 707 F.2d 441, 442 (9th Cir.1983). This standing limitation is more restrictive than the requirement for Article III standing. As the B.A.P. observed:

> Bankruptcy standing is narrower than Article III standing. *Spenlinhauer v. O'Donnell (In re Spenlinhauer ),* 261 F.3d 113, 117 (1st Cir.2001); *Cult Awareness Network v. Martino (In re Cult Awareness Network ),* 151 F.3d 605, 607 (7th Cir.1998). \* \* \* \* A "person aggrieved" is one whose property is diminished, burdens are increased, or rights are impaired by order on appeal. *In re El San Juan Hotel,* 809 F.2d 151, 154 (1st Cir.1987).

**\*6** *Great Rd. Serv. Ctr., Inc. v. Golden (In re Great Rd. Serv. Ctr., Inc.),* 304 B.R. 547, 550 (B.A.P. 1st Cir.2004); *see also Kane v. Johns-Manville Corp.,* 843 F.2d 636, 642 n. 2 (2d Cir.1988). As stated by the Ninth Circuit in *In re Fondiller,* 707 F.2d at 442-43:

> Only those persons who are directly and adversely affected pecuniarily by an order of the bankruptcy court have been held to have standing to appeal that order. *Hartman Corp. of America v. United States,* 304 F.2d 429, 431 (8th Cir.1962); *see Skelton v. Clements,* 408 F.2d 353 (9th Cir.),

*cert. denied,* [394 U.S. 933, 89 S.Ct. 1202, 22 L.Ed.2d 462 (1969)](). Thus, a hopelessly insolvent debtor does not have standing to appeal orders affecting the size of the estate. *E.g.,* [*Skelton v. Clements,* 408 F.2d at 354.]() Such an order would not diminish the debtor's property, increase his burdens, or detrimentally affect his rights. *[In re Capitano,* 315 F.Supp. 105, 107 (E.D.La.1970).]()*

At the hearing, the Bankruptcy Judge concluded that:

> I think [the order of dismissal] was a proper analysis of whether or not this was a bankruptcy case that should continue. It was clear that it was of no economic benefit to continue [the bankruptcy case] and that it was properly dismissed. So I see no reason to revisit that. And because of that, I'm not going to grant the ex-parte application because there would be no sense in doing that. It would incur a lot of legal fees and not bring any return at all to unsecured creditors. It would be a waste of time.

*See* Appellants' App. at 454. Additionally, the Bankruptcy Trustee stated at the hearing that both she and the Bankruptcy Court had been advised about both the transfer to Gramicci and the foreclosure. She further commented:

> And did I think that the transfer from Sole Survivor to Gramicci was avoidable? Probably. But as the Court aptly points out, to what benefit? There were two liens encumbering the vast majority of the assets. This was why the Buxbaum Group came in. And my ultimate conclusion was that yes, there probably was litigation that could be

brought, but the chances of success were very limited.

*Id.* at 448.

Obviously, Appellants are now asserting that they suffered pecuniary harm from Appellee's purported violation of the automatic stay (and, therefore, that they have a pecuniary interest that was affected by the Bankruptcy Court's denial of the *Ex Parte* Motion). It is clear from the Bankruptcy Judge's and the Trustee's comments, however, that the question whether Sole Survivor or Love could have had an interest that was "directly and adversely affected pecuniarily" by Buxbaum's supposed violation of the automatic stay was already considered and decided when the bankruptcy case was dismissed. Certainly, Appellants had the opportunity to demonstrate that they had such an interest while the bankruptcy case was pending, and failed to do so. To find that they now have standing to raise the violation of the automatic stay would conflict with the finding implicit in the Bankruptcy Court's Order of Dismissal that there was no economic benefit to continuing the bankruptcy case.

**\*7** Even assuming that the Bankruptcy Court's Order of Dismissal does not have any preclusive effect with respect to the issue of standing, the only indication that Love and/or Sole Survivor suffered pecuniary harm as a result of the foreclosure sale comes in the form of Love's own estimate of the "going concern/reorganization value" of the company of between $12 million and $15 million. However, the Debtor's total assets prior to the foreclosure sale were listed on Sole Survivor's 2004 tax return as $3,680,529. *See* Appellants' App. at 221. By Appellants' own admission, as of the Petition date, Sole Survivor had at least $5,684,676 in secured debt. (Motion to Reopen, Appellees' App. 14:4-6). Appellees' estimate the secured debt at approximately $7,221,016.13. There is little reason to question the Bankruptcy Judge's and the Trustee's conclusion that, even if the Gramicci transfer were avoidable and the foreclosure sale undone, it would have been fruitless to keep the Bankruptcy case open.

Thus, Sole Survivor and Love cannot assert that they suffered any pecuniary injury from any supposed violation of the automatic stay. As a consequence, they cannot assert that they have a pecuniary interest that was affected by the Bankruptcy Court's denial of the Ex Parte Motion. Because Appellants lack standing, the Appeal must be dismissed for want of jurisdiction.

B. *The Bankruptcy Court's Order Denying the Ex Parte Motion Was Not Reversible Error.*

Assuming *arguendo* that Sole Survivor had standing to bring the Ex Parte Motion seeking an order to show cause re contempt as to Appellees' purported violation of the automatic stay, it is readily apparent that the Bankruptcy Judge did not commit any error in dismissing the motion.

As noted above, Sole Survivor as a corporation could not bring the contempt motion pursuant to ⚑ 11 U.S.C. § 362(k).

*See* ⚑ *In re Goodman,* 991 F.2d at 616. As observed in 3 *Collier on Bankruptcy, 15th Edition Revised* § 362.11[3] at 362-126 (2008):

> Several courts have considered whether ⚑ section 362(k) provides all debtors with a remedy against stay violators or whether its scope is limited by the reference in ⚑ section 362(k) to an "individual" injured by a stay violation. The question is of some importance because, although a stay violation may be punished as contempt, the imposition of a remedy under a civil contempt procedure may be subject to a stricter standard than is imposed by ⚑ section 362(k).... Moreover, the power of a bankruptcy court to impose a civil contempt sanction is subject to more extensive procedural requirements than are present in affording a remedy under ⚑ section 362(k). [Footnote omitted.]

A motion for contempt for violation of the automatic stay may be made pursuant to 11 U.S.C. § 105(a) and Rule 9020 of the FRBP.

The Bankruptcy Judge correctly pointed to a number of factors which justify a denial of the contempt motion in the exercise of the judge's discretion. First, the motion was unconscionably late. Sole Survivor was aware of the transfer of its assets to Gramicci in December of 2004 (indeed it participated in the transfer) as well as the December 7th foreclosure sale. Sole Survivor waited more than two years and four months to bring its contempt motion even though the bankruptcy case was dismissed in August of 2005 and closed by the Bankruptcy Court Clerk in June of 2006. As observed in ⚑ *Matthews v. Rosene,* 739 F.2d 249, 251 (9th Cir.1984), in the context of orders issued in violation of the automatic stay, a bankruptcy court, as a court of equity, must be guided by equitable principles in exercising its jurisdiction. Hence, the Bankruptcy Court can consider whether a party has acted in a timely fashion in seeking discretionary relief.

**\*8** Second, Sole Survivor is guilty of unclean hands in the present situation. Not only did Sole Survivor fail to act in a timely manner, it itself was involved in the very conduct which it now says constituted a violation of the automatic stay. The transfer of its assets to Gramicci was pursuant to a "Bill of Sale" wherein it agreed to said transfer in exchange for $5,000. Furthermore, not only did Sole Survivor fail to inform the Bankruptcy Court and/or the Bankruptcy Trustee of the transfer/foreclosure sale but it violated the Bankruptcy Court's Order of Relief by failing to file its Schedule of Assets and Liabilities and Statement of Financial Affairs which would have provided the information to the Court and the Trustee. Additionally, Sole Survivor failed to appear or otherwise participate in six separate meetings of creditors wherein it could have sought to address the violation of the automatic stay issue which it now seeks to litigate.

Third, both the Bankruptcy Judge and the Trustee were informed by the Appellees prior to the dismissal of the bankruptcy case as to "the transfer and the foreclosure, and CIT which provided [the Trustee] with copies of their security documents." Appellants' App. at 445. The Trustee concluded and the Bankruptcy Court agreed that, while the transfer was "avoidable," at that time there were two secured liens encumbering the vast majority of Sole Survivor's assets such that any action on the violation of the automatic stay would not generate any financial benefit to either the debtor or unsecured creditors. For that reason, and others, the bankruptcy case was dismissed. Given the conclusion that Sole Survivor was not injured by either the transfer or the foreclosure sale, there would be no basis to hold the Appellees in contempt as to their purported violation of the automatic stay. As stated in *In re: A & J Auto Sales, Inc.,* 223 B.R. 839, 845 (D.N.H.1998):

Although ... the bankruptcy court's contempt power allows it to award damages for violations of the automatic stay, this power is discretionary. Thus, the bankruptcy court's decision not to award sanctions is only reviewed for an abuse of discretion. The bankruptcy judge determined that damages were inappropriate because the IRS had violated the stay in good faith and the debtor failed to present evidence of actual damages suffered as a result of the violation. The court sees nothing to suggest an abuse of discretion.

Judged by an abuse of discretion standard or even a less lenient standard, the Bankruptcy Court's decision to deny the Ex Parte Motion-assuming that the motion properly could have been reached-was not reversible error.[10] The Bankruptcy Court properly concluded that granting the Ex Parte Motion would be "a waste of time." Harsher conclusions could have been drawn.

[10]    Notwithstanding Love's contention that the dates on the documents are wrong, it is clear, as

evidenced by his signatures on the Bill of sale, Receipt of Payment, and Corporate Consent, that Love was aware of and facilitated and/or ratified the transfer of Sole Survivor's assets to Gramicci. *See* Appellees' App. 298-304. Love benefited from these transactions, because he subsequently entered into a consulting agreement with SAH under which he was paid $288,000 from January 2005 through March 2006, plus reimbursements for expenses and other costs. *See* Rubenstein Decl. ¶ 5-8 & Ex. J, Appellees' App. 278-79 and 332-37. Neither Sole Survivor nor Love contested the involuntary petition. Sole Survivor failed to meet any of its obligations under the Bankruptcy Court's orders, and, through its inaction, failed to avail itself of any of the benefits afforded by the Bankruptcy Code. It is difficult to imagine that any court would allow Appellants to invoke those protections more than two years later, and Appellants have not come close to making a creditable argument that it would be appropriate to allow them to do so here.

**V. Conclusion**

For the reasons stated above, the appeal is dismissed because of Appellants' lack of standing.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 210471

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 8

2018 WL 6443080
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Marc WILLICK, Plaintiff,

v.

NAPOLI BERN RIPKA &
ASSOCIATES, LLP, et al., Defendants.

Case No. 2:15-cv-00652-AB (Ex)

|

Signed 09/13/2018

### Attorneys and Law Firms

Colin Rolfs, James Lewis Goldman, Miller Barondess, LLP, Los Angeles, CA, Kelly Halford Clark, Pro Hac Vice, LA Waterkeeper, Santa Monica, CA, for Plaintiff.

Stephen J. Erigero, Tahereh Mahmoudian, Ropers Majeski Kohn and Bentley PC, Richard L. B Charnley, Annie Rian, Charnley Rian LLP, Los Angeles, CA, Kelly Drew Folger, Traci S. Lagasse, Andrews Lagasse Branch and Bell LLP, San Diego, CA, Todd E. Crouch, Daniel K. Dik, David M. Wright, Fraser Watson Crouch, Glendale, CA, for Defendants.

### ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD

ANDRÉ BIROTTE JR., UNITED STATES DISTRICT COURT JUDGE

**\*1** On August 17, 2018, Plaintiff Marc Willick ("Plaintiff") filed a motion to confirm an arbitration award. Dkt. No. 134. Defendant Napoli Bern Ripka & Associates, LLP ("NBRA") opposed the motion, and Plaintiff filed a reply. Dkt. Nos. 136, 137. The Court finds this matter appropriate for decision without oral argument and vacates the hearing scheduled for September 14, 2018. *See* Fed. R. Civ. P. 78; LR 7-15. For the following reasons, the Court **GRANTS** Plaintiff's motion.

### I. BACKGROUND

This case arises from a dispute between a lawyer and a law firm. According to Plaintiff, he and NBRA entered into two contracts. Complaint ¶¶ 7, 8 (Dkt. No. 1-1). Through the first contract ("First Contract"), entered into on March 7, 2011, Plaintiff agreed to serve as local counsel for NBRA

on asbestos-related cases. Compl. ¶ 7. Through the second contract ("Second Contract"), entered into on May 20, 2011, NBRA agreed to employ Plaintiff and pay him a portion of the fees NBRA earned from cases he brought in. Compl. ¶¶ 8, 14. Plaintiff claims NBRA has not paid him compensation it owes him. Compl. ¶ 14

Plaintiff sued NBRA; Napoli Bern Ripka Shkolnik & Associates, LLP; Napoli Bern Ripka Shkolnik, LLP; Napoli Bern Ripka, LLP; Napoli Kaiser Bern, LLP; Marc Bern; and Paul Napoli (collectively, "Defendants") in Los Angeles County Superior Court on December 12, 2014. *See* Compl. Defendants removed the case to this Court on January 28, 2015 and then moved to compel arbitration. Dkt. Nos. 1, 27. Defendants based their motion to compel arbitration on a paragraph in the Second Contract that provided for "arbitration in accordance with the rules of the American Arbitration Association [ ("AAA") ]." Decl. James Goldman ¶ 2, Ex. 1 at § 5.1 (Dkt. No. 134-1). The Court granted Defendants' motion to compel arbitration and stayed the case. Dkt. No. 39.

Following the Court's order, the parties agreed to appoint the Honorable Richard A. Stone (Ret.) (the "Arbitrator") as the arbitrator for the case. Goldman Decl. ¶ 6. At that time, the Arbitrator was affiliated with ADR Services, Inc. ("ADRS"). *Id.*

On December 21, 2015, the parties conducted an Arbitration Management Conference over which the Arbitrator presided. Goldman Decl. ¶ 7. The Arbitrator then issued an Arbitration Management Order, which stated that "[t]he arbitration shall be conducted according to ADR Services' Arbitration rules and the terms of the parties' arbitration agreement." Goldman Decl. ¶ 7, Ex. 3 at p. 2.

About two years later, the Arbitrator ordered the parties to conduct an accounting at NBRA's expense. Goldman Decl. ¶¶ 8c, 8d, 8e, Exs. 6, 7, 8, 9. The Arbitrator appointed Bjorn Malmlund of Ernst & Young LLP to conduct the accounting. Goldman Decl., Ex. 8 at p. 6. However, by late March 2018, NBRA had failed to pay Ernst & Young LLP's retainer for the accounting. Goldman Decl. ¶ 9e, Ex. 12 at p. 4.

Based on NBRA's failure to comply with the Arbitrator's accounting order, Plaintiff filed a motion for terminating sanctions. Goldman Decl. ¶ 9a. Although NBRA opposed the motion, the Arbitrator tentatively granted the motion on April 28, 2018. Goldman Decl. ¶ 9a, Ex. 10. He reasoned

that NBRA's failure to pay for the accounting amounted to a willful refusal to comply with his accounting order. *Id.* at p. 11. In addition to NBRA's failure to follow through with an accounting, the Arbitrator noted that NBRA had neglected its discovery obligations. *Id.* at pp. 3, 11. According to the Arbitrator, NBRA's conduct "demonstrate[d] a level of (continuing) obstruction so egregious as to warrant (if not *require*) the imposition of terminating sanctions." *Id.* at pp. 13–14. The Arbitrator therefore tentatively struck NBRA's answer and entered default. *Id.* at p. 14. He then scheduled a "prove-up hearing" during which Plaintiff would be required to "prove up all of his claims against [NBRA] ...." *Id.*

**\*2**  On June 30, 2018, the Arbitrator presided over a prove-up hearing. Goldman Decl. ¶ 9d. During that hearing, "Plaintiff presented his evidence and argument to prove up all of his claims against [NBRA]." Goldman Decl., Ex. 12 at p. 17. The Arbitrator confirmed his tentative decision to strike NBRA's answer and enter default on July 3, 2018. *Id.*

On August 3, 2018, the Arbitrator entered a "Final Award on Plaintiff's Claims Against Defendant [NBRA]" (the "Award"). Goldman Decl. ¶ 10a, Ex. 13. The Award granted Plaintiff a total of \$4,079,548.53 in damages on his claims against NBRA. *Id.* at p. 6. It also provided that the relief granted in the Award would be "the only relief granted to [Plaintiff] against [NBRA]." *Id.* However, the Award did not impair Plaintiff's right to seek relief from the other Defendants. *Id.* On August 10, 2018, Plaintiff filed a motion in the arbitration to amend the Award to add the other Defendants as alter egos of NBRA. Decl. Tahereh Mahmoudian, ¶ 12 (Dkt. No. 136).

Plaintiff now asks the Court to confirm the Award. NBRA opposes confirmation, primarily because it claims the Arbitrator lacked authority to enter default as a sanction.

## II. LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), a court must grant a request to affirm an arbitration award unless the award is vacated, modified, or corrected. 🚩 *9 U.S.C. § 9.* A court may vacate an arbitration award when (1) it was procured by corruption, fraud, or other undue means; (2) the arbitrator was evidently partial or corrupt; (3) the arbitrator was guilty of misconduct in refusing to postpone a hearing, excluding material evidence, or otherwise prejudicing a party; or (4) the arbitrator exceeded his or her power. 9 U.S.C. § 10(a). A court's review of an arbitration award is "highly deferential to

the arbitrator." 🚩 *Johnson v. Wells Fargo Home Mortg., Inc.,* 635 F.3d 401, 414 (9th Cir. 2011).

## III. DISCUSSION

NBRA raises essentially two arguments for denying Plaintiff's motion. First, it argues that the Arbitrator exceeded the scope of his authority in striking NBRA's answer and entering default as a sanction. Second, it argues that the Award Plaintiff seeks to confirm is not final, making Plaintiff's motion premature.

### A. Power to Enter Default as a Sanction

NBRA claims that the Court cannot confirm the Award because the Arbitrator lacked the power to issue it. It contends that the AAA rules, which it argues apply in this case, prohibit arbitrators from entering default as a sanction.

"The scope of the arbitrator's authority is determined by the contract requiring arbitration ...." 🚩 *Schoenduve Corp. v. Lucent Techs., Inc.,* 442 F.3d 727, 732 (9th Cir. 2006). Generally, an arbitrator's power to issue sanctions comes from the arbitration agreement or some separate statute. *See* 🚩 *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.,* 264 F. Supp. 2d 926, 943 (N.D. Cal. 2003) ("There are two possible sources for [sanction] power: authority that inheres in the FAA itself and the arbitration contract as construed in light of FAA policy."). "[T]he arbitrator's interpretation of the scope of his powers is entitled to the same level of deference as his determination on the merits." 🚩 *Schoenduve,* 442 F.3d at 733.

Because the power to issue sanctions must come from a statute or agreement, the Court looks to the arbitral rules that the parties agreed to follow. NBRA claims the AAA rules apply, as the Second Contract explicitly provides for arbitration under AAA rules. Plaintiff, on the other hand, asserts that the ADRS rules apply because the parties agreed to follow those rules during the Arbitration Management Conference. The Court need not decide which rules apply, however, because it concludes that the Arbitrator acted within the scope of his power under either set of rules.

### 1. AAA Rules

**\*3** The AAA Rules the parties agreed to follow in the Second Contract contemplate sanctions for failure to comply with an arbitrator's order. They provide as follows:

(a) The arbitrator may, upon a party's request, order appropriate sanctions where a party fails to comply with its obligations under these rules or with an order of the arbitrator. In the event that the arbitrator enters a sanction that limits any party's participation in the arbitration or results in an adverse determination of an issue or issues, the arbitrator shall explain that order in writing and shall require the submission of evidence and legal argument prior to making of an award. The arbitrator may not enter a default award as a sanction.

(b) The arbitrator must provide a party that is subject to a sanction request with the opportunity to respond prior to making any determination regarding the sanctions application.

AAA Rule 58.

NBRA focuses on the last sentence of AAA Rule 58(a), which states that "[t]he arbitrator may not enter a default award as a sanction." According to NBRA, that is exactly what the Arbitrator did here. By striking NBRA's answer and entering default, NBRA claims, the Arbitrator entered a default award as a sanction and therefore acted beyond the scope of his authority.

Plaintiff, on the other hand, focuses on the preceding sentence in AAA Rule 58(a), which contemplates an arbitrator entering "a sanction that limits any party's participation in the arbitration or results in an adverse determination of an issue or issues." According to Plaintiff, the arbitrator did just that. He made adverse determinations against NBRA on Plaintiff's two causes of action as a sanction for NBRA's failure to comply with his orders. He explained his reasoning in an order and then "require[d] the submission of evidence and legal argument," AAA Rule 58(a), before ultimately entering a $4,079,548.53 arbitration award in Plaintiff's favor. The rule's prohibition against entering a default award as a sanction, Plaintiff argues, means that an arbitrator cannot enter a default *award* without first requiring the prevailing party to submit evidence. The Arbitrator did not enter the Award as a sanction. Rather, he entered default as a sanction and only granted the

Award after hearing evidence and argument at the prove-up hearing.

Neither of the parties have identified case law interpreting AAA Rule 58, and the Court has not identified any through an independent search. Left with the plain text of the rule, the Court finds Plaintiff's interpretation more convincing.

AAA Rule 58 explicitly gives arbitrators the power to issue sanctions. The only limit the rule imposes is a prohibition on entering a "default award as a sanction." In this way, AAA Rule 58 reflects the process that applies for entering default judgment as a sanction in federal district court. A court may enter default judgment as a sanction, but it cannot impose a damages award as a sanction. *See* [⚑] *Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1414 (9th Cir. 1990)* (affirming the district court's damages award after it entered default as a sanction because "there was sufficient evidence to support the trial court's award of damages ...."). Rather, a plaintiff seeking default judgment carries the burden of proving damages. [⚑][⚠] *Philip Morris USA, Inc. v. Castworld Products, Inc., 219 F.R.D. 494, 498 (C.D. Cal. 2003)*. Similarly, by allowing an arbitrator to impose an "adverse determination of an issue or issues" as a sanction, AAA Rule 58(a) permits determinative sanctions. But in proscribing "a default award as a sanction," AAA Rule 58(a) prevents arbitrators from automatically, without proof, providing the non-defaulting party an award. Instead of immediately granting a default arbitration award, the arbitrator must consider "evidence and legal argument prior to making ... an award." AAA Rule 58(a).

**\*4** Here, the Arbitrator did not enter a default award as a sanction. Rather, he struck NBRA's pleadings and entered default as a sanction. He then conducted a prove-up hearing, during which Plaintiff presented evidence and legal argument to support an ultimate arbitration award. Only after that prove-up hearing did the Arbitrator enter the Award. Thus, the Arbitrator made adverse determinations against NRBA as a sanction and then entered the Award based on evidence and argument. This conduct falls within the scope of the power granted to arbitrators under AAA Rule 58.

### 2. ADRS Rules

The Arbitrator also acted within the scope of his authority under the ADRS rules. The ADRS rules provide as follows:

The arbitrator may order appropriate sanctions for failure of a party to comply with his/her/its obligations under any of these rules. These sanctions may include, but are not limited to, assessment of costs, exclusion of certain evidence, or in extreme cases ruling adversely on an issue submitted to arbitration against the party who has failed to comply.

ADRS Rule 31 (Supplemental Declaration of James Goldman, ¶ 6b, Ex. 33 at p. 9 [Dkt. No. 137-1]). The ADRS rules therefore explicitly allow arbitrators to rule against a party as a sanction in "extreme cases." *Id.*

The Arbitrator conducted a detailed analysis about NBRA's conduct and determined that it was sufficiently extreme to justify entering default as a sanction. Indeed, the Arbitrator wrote that he was "loath to impose terminating sanctions." Goldman Decl., Ex. 10 at p. 13. But NBRA's willful violation of the Arbitrator's order to provide an accounting, as well as its continuing discovery violations, rendered default an appropriate sanction. *Id.* at pp. 13–14. Because the Arbitrator entered an adverse ruling after determining that NBRA's conduct was extreme, he acted within the scope of his authority under the ADRS rules.

Thus, the Arbitrator did not exceed the scope of his authority under either the AAA or ADRS rules.

### B. Finality of Award

NBRA briefly argues that the Court should not confirm the Award because it is not yet final. It claims the Award is not final for two reasons: (1) it only applies to one of the seven Defendants participating in the arbitration, and (2) Plaintiff has moved to amend the arbitration award. Neither argument persuades the Court.

As an initial matter, NBRA cites no law suggesting that the Court should decline to confirm the Award. The FAA allows a court to vacate an arbitration award if it is not sufficiently definite or final, 9 U.S.C. § 10(a)(4), but NBRA does not argue that the award is not final in the sense that it cannot be enforced. Instead, it appears to argue that it would be premature for the Court to confirm the Award. But the Arbitrator chose to title the Award "Final Award on Plaintiff's Claims Against Defendant [NBRA]." Goldman Decl., Ex. 13. Indeed, the Award states that "the relief granted [in the Award] is and will be the only relief granted to [Plaintiff] against [NBRA]." *Id.* at p. 6. An arbitrator's determination that an award is final tends to control. *See* Smart v. Int'l Bhd. of Elec. Workers, Local 702, 315 F.3d 721, 725–26 (7th Cir. 2002) ("[I]f the arbitrator himself thinks he's through with the case, then his award is final ...."). And while the Arbitrator did reserve jurisdiction to resolve Plaintiff's claims against the other Defendants, it is unclear why that decision matters to NBRA. The claims against NBRA have been completely resolved, and the Arbitrator will not grant Plaintiff any further relief against NBRA. Because the Arbitrator has concluded that he has completed his review of Plaintiff's claims against NBRA, the Court sees no reason to delay confirming the Award.

**\*5** Finally, the fact that Plaintiff would like to amend the Award does not mean that it is not final. Parties frequently seek to amend judgments or awards, but that does not render those awards interim or temporary. NBRA cites no law suggesting otherwise. Accordingly, the Court finds the Award sufficiently final to confirm.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's motion. The Court lifts the stay as to NBRA, but will continue to stay the case as to the other Defendants.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6443080

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.